

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

**CHRISTOPHER AMBROSE**, Plaintiff

v.

**FRANK PARLATO, JR.**, Defendant

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

### I. PARTIES AND JURISDICTION

1. The Plaintiff, **Christopher Ambrose** ("Plaintiff"), is an individual domiciled in Madison, Connecticut.

2. The Defendant, Frank Parlato, Jr. ("Defendant"), is an individual domiciled in Big Pine Key, Florida. Parlato is an admitted federal felon who was ordered to pay fines and forfeiture exceeding $1,000,000 and served a term of confinement for his criminal conduct.

3. The amount in controversy exceeds **$75,000**, exclusive of interest and costs.

4. This Court has jurisdiction under **28 U.S.C. § 1332(a)**, as the parties are citizens of different states and the amount in controversy requirement is satisfied.

5. Venue is proper in this District pursuant to **28 U.S.C. § 1391(b)(2)**, as Defendant deliberately and maliciously targeted Plaintiff in Connecticut, and the events giving rise to the claims and the injuries occurred in the state, just as Defendant anticipated.

### II. STATEMENT OF FACTS

1.  This action arises from a sustained campaign of defamation, false light invasion of privacy, harassment, and intentional infliction of emotional distress perpetrated by Defendant Frank Parlato, Jr. against Plaintiff Christopher Ambrose.

2.  Since October 2, 2021, Parlato has published hundreds of articles falsely accusing Ambrose of heinous acts, including child sexual abuse, theft, conspiracy, and bribery of public officials, including family court judges. *This complaint addresses only statements published on or after July 20, 2023, within the applicable statute of limitations.*

3.  On April 14, 2022, Ambrose sent Parlato a cease-and-desist letter warning of the defamatory and harmful nature of his publications. Parlato responded not by ceasing his misconduct, but by mocking Ambrose and escalating his attacks with hundreds of additional defamatory articles.

4.  Ambrose previously filed suit in Connecticut Superior Court on July 21, 2022. Parlato removed the case to the U.S. District Court for the District of Connecticut. Due to financial hardship resulting from a protracted divorce, Ambrose represented himself *pro se*. Overwhelming family obligations, including sole custody of three children and caring for a dying parent, compelled him to discontinue the action.

5.  Parlato's publications have subjected Ambrose to public ridicule, death threats, threats of mutilation, and severe reputational, emotional, and other harm.

6.  Parlato's articles consistently repeat the false narrative advanced by Ambrose's ex-wife, Karen Riordan ("Riordan"), with whom Parlato had and/or has a romantic relationship.

Riordan identified herself on video as Parlato's "intimate partner" during a police response to a domestic violence incident at their Florida residence on November 9, 2021.

7.  Prior to publication, Parlato knew that multiple Connecticut courts, hospitals, child protective services, and law enforcement agencies had found Riordan's allegations against Ambrose to be unsubstantiated or false. Nevertheless, Parlato published her narrative as fact.

8.  Connecticut courts awarded Ambrose sole legal and physical custody of his children in April 2020 due to Riordan's conduct, which the court found sufficiently concerning to deny her visitation absent a psychiatric evaluation and intensive therapy—conditions she refused. Parlato knowingly disregarded these findings.

9.  Courts subsequently found Riordan in contempt of the custody orders and issued restraining orders against her for the protection of the children. Parlato was also aware of these rulings but continued to publish her false accusations.

10. Parlato is an admitted federal felon. He was indicted on 19 counts, including fraud, money laundering, conspiracy, and tax crimes. In 2023, he pled guilty, resulting in home confinement, a $1 million forfeiture, and a $185,000 payment to the IRS.

11. Parlato previously served as the publicist for NXIVM sex cult leader Keith Raniere, now serving a 120-year federal prison sentence.

12. Parlato has attempted to rebrand himself as an "investigative journalist." However, the U.S. Attorney's Office for the Eastern District of New York described him as a "gun for

hire," paid to conduct smear campaigns against targeted individuals and entities through tabloid-style websites, particularly FrankReport.com.

13. In dozens of articles, Parlato promotes baseless conspiracy theories about Connecticut family courts, falsely alleging systemic bribery and cover-ups of child sexual abuse in custody cases, citing Ambrose as his primary example. For instance, on August 30, 2023, he wrote on frankreport.com: "Ambrose can outspend his wife. This is all that is needed in CT Family Court's cash for kids enterprise."

14. Parlato has published the names and photographs of Ambrose's minor children, falsely branding them as victims of sexual abuse. This has caused irreparable psychological and reputational harm to the children.

15. Parlato's defamatory articles remain publicly accessible online, perpetuating ongoing harm to Ambrose and his family.

16. Defendant's publications, rooted in Riordan's falsehoods and amplified through his tabloid platforms, constitute an obsessive and malicious defamation campaign that harasses Ambrose, invades his privacy by false light, and inflicts severe emotional distress. Parlato has caused Ambrose devastating harm; his conduct warrants the Court's intervention and the award of substantial damages.

### III. ESSENTIAL CONTEXT

17. Ambrose and Riordan were married in June 2004. They initially resided in New York City but soon relocated to Los Angeles, where Ambrose secured employment as a television writer and producer. Riordan, a teacher, left her job after the wedding.

18.  While in Los Angeles, Riordan worked part-time as a tutor in a position arranged by one of Ambrose's colleagues. Otherwise, she remained unemployed throughout the marriage, including the three years before the couple had children.

19.  Both parties had professional experience working with at-risk youth and chose to build their family through adoption. In 2007, they adopted two infants—a daughter and a son from Guatemala—and later adopted a newborn boy from Utah. These three children are collectively referred to herein as "the children."

20.  The couple agreed that Riordan would remain the stay-at-home parent while Ambrose continued as the family's sole financial provider.

21.  Although the majority of professional opportunities for Ambrose were in Los Angeles, Riordan insisted on relocating to the East Coast. Ambrose obtained employment in New York City, and the family moved to Westport, Connecticut.

22.  In the television industry, employment is typically project-based and often lasts one or two years. When his position in New York ended, the only available jobs for Ambrose were in Los Angeles. Nevertheless, Riordan refused to move, even though the children were still in preschool. Needing to support the family, Ambrose accepted the Los Angeles position and commuted cross-country weekly at significant personal and financial cost to remain present in the children's and Riordan's lives.

23.  This Los Angeles employment lasted approximately 16 months, from mid-2010 through 2011. During this time, Riordan and the children joined him in California for extended stays. In addition, during a three-month hiatus, Ambrose was home full-time in

Connecticut. Contrary to Riordan's later representations, the family's "separation" was temporary and due only to geography and her unilateral refusal to relocate.

24. After returning from Los Angeles, Ambrose resolved to accept only East Coast jobs to reduce strain on the family. He declined numerous lucrative offers in Los Angeles to remain with Riordan and the children. He never lived away from the family, contrary to Riordan's later claims, all proved false during the divorce trial.

25. Ambrose was a consistently involved and devoted father, rarely missing the children's events or medical appointments. By contrast, Riordan often missed such activities and developed a pattern of conflict with medical and educational professionals.

26. The April 26, 2022 decision in the parties' divorce explicitly found that Riordan "had a need to challenge and create conflicts" with pediatricians, teachers, school administrators, and even the Westport School Board. **(Docket No. NNH-FA-19-6150042-S, Entry #520.10, Memorandum of Decision (Adelman, J.), "The Decision,"** p. 11.)

27. Ambrose frequently attended parent-teacher conferences alone and accompanied the children to medical appointments, including his daughter's quarterly full-day audiological assessments in New York, which Riordan attended only twice in three years.

28. During this period, Riordan began maligning Ambrose to the children, both subtly and overtly. This behavior escalated to excluding him from family outings and holiday gatherings, creating a deeply disturbing pattern. (See The Decision, pp. 6–25.)

29. Therapists working with the children—selected by Riordan—expressed concern over her efforts to turn the children against their father, since Ambrose had demonstrated no neglect or abuse and was an attentive and loving parent.

30. After multiple unsuccessful attempts at couple's counseling, they agreed the marriage was irretrievably broken. In July 2019, Ambrose filed for divorce, seeking shared custody and an equitable financial division.

31. Riordan did not respond to the filing. Instead, without notice, she took the children out of state and replaced their phones to prevent Ambrose from locating or communicating with them. Ambrose was forced to obtain a court order compelling her return so the children could begin the school year.

32. Riordan requested and was granted exclusive use of the Westport residence. Shortly thereafter, without informing Ambrose or the Court, she moved the children 50 miles away to New Haven County and signed an 18-month lease on a costly waterfront property, a significant and unexpected drain on the family's finances.

33. Almost immediately after Ambrose filed for divorce, Riordan began making false allegations that he had mistreated the children. When those claims failed to gain traction with authorities, she escalated to even more incendiary accusations, alleging he sexually abused the children—allegations never made prior to the divorce filing and unsupported by any evidence.

34. Given Riordan's erratic and pernicious conduct, and the severity of her allegations, the Court *sua sponte* ordered a comprehensive custody evaluation and appointed a Guardian ad Litem ("GAL"), with costs to be paid from marital assets.

35. Around this time, Riordan secretly entered the Westport residence and removed two laptop computers. Initially, she claimed the devices were used exclusively by Ambrose. When her counsel advised that using stolen evidence could backfire legally, she altered her story, claiming the laptops were used by the entire family.

36. Riordan retained a forensic expert and paid five figures for a report alleging the devices contained evidence that Ambrose had viewed and even created pornography, including child pornography. In other words, she claimed he viewed, produced and stored "kiddie porn" on laptops his children regularly accessed.

37. A forensic analysis conducted by the former head of the Connecticut State Police Computer Crimes Unit definitively refuted Riordan's expert's claims. Further, had child pornography been discovered, Ambrose would have been arrested. The Court barred Riordan from duplicating the hard drives and ordered their return to Ambrose.

38. In April 2020, before the divorce trial commenced, the custody evaluator issued a comprehensive report exceeding 100 pages. The Guardian ad Litem ("GAL") found the information about Riordan so alarming that she requested an emergency hearing.

39. At the hearing, the GAL and evaluator testified that Riordan was engaging in a deliberate pattern of behavior designed to destroy Ambrose's relationship with the children.

40. As a result, the Court (Grossman, J.) imposed a 90-day no-contact order on Riordan and granted Ambrose temporary sole legal and physical custody to allow time to repair the father-child relationship she had sought to undermine.

41. Within two weeks, Ambrose discovered that Riordan was secretly sending the children dozens of text messages instructing them to falsely claim mistreatment and abuse by their father. She also directed the children to delete her messages to avoid detection. (The Decision at p. 12.)

42. Upon this discovery, the GAL requested another emergency conference. After reviewing the messages, the Court sanctioned Riordan for her ongoing efforts to alienate the children from Ambrose. The Court ordered that following the 90-day no-contact period, Riordan's visitation would be supervised until she demonstrated an ability to refrain from maligning Ambrose and coaching the children.

43. While Ambrose was grateful for the opportunity to repair his relationship with the children, he was concerned about the psychological effects of their mother's absence. He immediately completed the required paperwork for court-appointed supervision and paid a $7,000 retainer from marital funds to enable Riordan's visitation as soon as possible.

44. Riordan, however, rejected supervised visitation and never completed the application. As a result, she voluntarily ceased lawful contact with the children after April 24, 2020.

45. The children, confused and distressed by their mother's absence, displayed symptoms of trauma, including anxiety, self-injury, and compulsive eating. Ambrose reassured them of

Riordan's love and reminded them she would see them again once she complied with the Court's requirements.

46. Each child worked with a therapist, paid from marital assets. None of the children reported any mistreatment by Ambrose. Therapists concluded that their emotional distress was directly caused by Riordan's abandonment, not by any conduct of their father.

47. During this period, Riordan maintained secret contact with the children. She falsely told them that Ambrose was responsible for her absence and accused him of stealing her inheritance, bribing DCF workers, therapists, and judges. She further instructed the older children not to leave their younger brother alone with Ambrose because he was allegedly "a gay child molester like Michael Jackson."

48. In December 2020, Riordan filed for an *ex parte* emergency restraining order (TRO), falsely alleging sexual abuse against the children by Ambrose. She filed in a different jurisdiction under her maiden name to conceal her history of false allegations.

49. The Court (Price-Borland, J.) initially granted the TROs, and Riordan removed the children from school mid-day. At an emergency hearing the following morning, Riordan failed to appear. Upon learning of her deception and history, the Court vacated the TROs.

50. Riordan failed to appear at another emergency hearing later that day before the family court (Grossman, J.). When police were dispatched to her residence, they found it vacant.

51. Riordan had taken the children to a hotel 25 miles from her home to meet her "private investigator," Manuel Gomez, a former NYPD officer with a history of domestic violence, witness tampering, strangulation, and other criminal accusations. Gomez,

terminated for cause by the NYPD, had also been publicly discredited by New York judicial authorities.

52.  Riordan left the children alone with Gomez, who filmed them giving rehearsed statements accusing Ambrose of sexual abuse. DCF later determined the circumstances under which these videos were produced, and every court barred their admission.

53.  After filming with Gomez, Riordan brought the children to Connecticut Children's Medical Center ("CCMC") in Hartford, where they repeated their coached accusations. She bypassed the significantly closer Yale New Haven Hospital because clinicians there had previously documented her attempts to manipulate the children's narratives. [1]

54.  After leaving CCMC, Riordan returned with the children to the hotel, remaining in hiding. Police used cell phone location data to find her. When they arrived, Riordan initiated a five-hour standoff involving two police departments and DCF, instructing her daughter to live-stream the ordeal—a severe invasion of the children's privacy.

55.  The following morning, the GAL scheduled another emergency hearing. Riordan again failed to appear and refused to speak with the Court by phone. Due to her escalating violations of court orders and misconduct, the Court (Grossman, J.) *sua sponte* transferred the case to the Regional Family Trial Docket ("RFTD"), a specialized division for high-conflict custody cases.

---

[1] The staff at CCMC reported that the children's allegations against their father "fell apart" under simple questioning and that staff overheard conversations among the children indicating they had been coached.

56.  Around this time, Riordan initiated an online smear campaign against Ambrose. She partnered with Paul Boyne, publisher of the notorious website familycourtcircus.com, known for anti-Semitic, racist, and homophobic attacks on Connecticut family courts, judges, attorneys, and litigants. [2]

57.  Under oath during the divorce trial, Riordan denied any connection to Boyne. However, subpoenaed phone records revealed hundreds of calls between them.

58.  Riordan also permanently deleted her email account and paid a technician to destroy her hard drive to avoid producing material evidence sought during discovery. The RFTD Court (Adelman, J.) sanctioned her for perjury and spoliation of evidence.

59.  The Court further found that Riordan provided Boyne with the sealed custody evaluation, which he published online, causing harm to the children and violating the family's privacy.

60.  Around this same time, a family services evaluation labeled Ambrose as a "high-risk" abuser. When the Court learned that this assessment relied entirely on Riordan's unsubstantiated allegations and that neither Ambrose nor the GAL had been interviewed, it dismissed the finding. These facts are reflected in the publicly available trial transcripts.

61.  The divorce trial commenced in March 2021 before Judge Gerard Adelman. It spanned 28 days over the course of a year, delayed partly by COVID-19 but, as the Court noted, "a more significant reason" was Riordan and her counsel's relentlessly obstructionist tactics. (The Decision at p. 1.)

---

[2] In July 2023, Boyne was indicted for cyberstalking and threatening three Connecticut Superior Court judges, all of whom had roles in the Ambrose–Riordan case.

62. During the trial, Riordan escalated her pattern of false accusations against Ambrose, re-alleging child abuse, theft, involvement in pornographic activity as both a viewer and producer, and other morally offensive conduct.

63. After extensive documentary evidence and testimony from numerous witnesses—including multiple DCF investigators, police detectives, the GAL, custody evaluator, and others—the Court found every one of Riordan's claims to be entirely unsubstantiated and without merit. *Every. Single. One.* (The Decision at pp. 16–24.)

64. One of Riordan's treating psychiatrists (she had several) testified that she appeared to be a competent mother. However, further testimony revealed that Riordan had withheld critical information from her mental health providers, including:

a. Her relentless denigration of Ambrose to the children;

b. Her coaching of the children to falsely accuse Ambrose of sexual and emotional abuse;

c. Her instructions to the children to delete incriminating text messages;

d. Her use of the children to spy on Ambrose, including searching his devices and legal materials and photographing purportedly "incriminating" items and notes to his attorney;

e. Her engagement of third parties to coach the children and disparage Ambrose and to intimidate witnesses; and

f. Her very public online smear campaign against Ambrose.

65. The Court also found that Riordan:

a. Filed false and incomplete affidavits, including financial disclosures;

b. Committed perjury and deliberately destroyed material evidence;

c. Employed third parties to intimidate witnesses; and

d. Persistently violated court orders throughout the litigation.

66. These findings, documented extensively in the The Decision (pp. 16–24), reflect a sustained pattern of deception, obstruction, and abuse of judicial process, driven by Riordan's determination to destroy Ambrose's relationship with the children, his reputation, and his quality of life.

### IV. PARLATO'S MALICIOUS CAMPAIGN OF ABUSE

69. While the divorce trial was ongoing remotely in Connecticut, Riordan secretly relocated in September 2021 to Big Pine Key, Florida, to live with Parlato, then under a 19-count federal indictment for conspiracy, fraud, money laundering, and tax evasion. Ambrose did not learn of Riordan's departure from Connecticut or her intimate relationship with Parlato until early 2023.

70. Riordan has repeatedly denied any relationship with Parlato, just as she had denied her extensive communications with Paul Boyne of familycourtcircus.com. However, on November 9, 2021, the Monroe County Sheriff's Office responded to a domestic violence incident at Parlato's residence. Body camera footage captured Riordan telling deputies that Parlato was her "intimate partner" and that she had lived with him since September 2021. She further reported that Parlato had been violent toward her. (The entire video is attached here. The relevant statements are made at timestamp ~14:00 in video: Dropbox link: **https://www.dropbox.com/scl/fo/q8gps010nfrvi09pxobi6/h?dl=0&e=1&preview=MCSO21OFF008178+S0249+BWC.mp4&rlkey=vosyrdoerygq**

5knrwm2alrn59). Please note the first 30 seconds of the video have no sound, but audio starts after that.

71. The Monroe County Sheriff's Office also released audio recordings of deputies' phone calls to Parlato, who had fled the scene, ordering him to return.

72. The incident report (Report #MCSO210FF008178(01)) charged Parlato with felony kidnapping–false imprisonment, obstruction of justice, and battery. However, the charges were dropped when Riordan later refused to testify against him. (She even denied the incident occurred despite her statements on camera to officers at the scene immediately after).

73. On October 2, 2021, shortly after Riordan moved to Florida with Parlato, he published the first of more than 300 defamatory articles targeting Ambrose on his sensationalist website, FrankReport.com. Parlato frequently reposted these articles, rooted in Riordan's falsehoods, on other platforms he controls, including artvoice.com, NiagaraFallsReporter.com, and outlets operated by his and/or Riordan's associates.

74. Although Parlato portrays himself as an "investigative journalist," he ignores fundamental journalistic ethics. While amplifying Riordan's debunked accusations against Ambrose, he never disclosed to readers that he was living with Riordan and that Ambrose was her ex-husband.

75. Due to his intimate relationship with Riordan, Parlato had access not only to public filings but also to confidential materials, some of which had been sealed by Connecticut courts. He then published these materials online.

76. In November 2021, during the ongoing divorce trial, Riordan's fifth attorney, Nickola
Cunha, accused the presiding judge (Adelman, J.) of bias. In response, Judge Thomas
Moukawsher held a hearing and issued a 19-page Memorandum of Decision on
December 10, 2021 (Entry #384.10, "The Moukawsher Decision"). Judge Moukawsher
found that Cunha had repeatedly lied to the court about both the presiding judge and
Ambrose.

77. Specifically, Cunha falsely asserted that a DCF report (Exhibit 71) documented findings
by a multi-disciplinary task force that Ambrose had sexually assaulted his children and
accused Judge Adelman of ignoring this due to bias. (Moukawsher Decision at pp. 13–
14.)

78. Judge Moukawsher wrote:

"The Court looked carefully at the document... It is certain that DCF did not conclude
that Christopher Ambrose abused his children in any way. It is certain that no multi-
disciplinary panel of experts concluded that Christopher Ambrose abused his children in
any way." (p. 14.)

79. He further stated:

"All three experts involved with the children said they had no concerns about the father's
behavior... DCF's conclusions were confirmed by its managers. The Madison Police
Department investigated and declined to bring charges, despite anonymous callers
accusing Ambrose of trafficking 'young Brown Latin American boys.'" (p. 15.)

80. On January 25, 2022, the Court (Moukawsher, J.) issued a second ruling (Entry #390.10),
permanently disbarring Cunha and affirming that Ambrose had been fully exonerated by
DCF, police, and clinical experts.

81. Despite being fully aware of these judicial findings, Parlato continued to publish articles
falsely portraying Ambrose as a sexual predator of children. His conduct demonstrates

actual malice and a reckless disregard for the truth, placing Ambrose in a false light and causing ongoing reputational, emotional, psychological, and other harm.

82. On April 14, 2022, Ambrose emailed Parlato, identifying hundreds of false and harmful statements in his publications and demanding retraction. Rather than comply, Parlato mocked and taunted Ambrose and published additional defamatory material, demonstrating his malice and intent to harm.

83. On April 26, 2022, the Court (Adelman, J.) issued The Decision, awarding Ambrose permanent sole legal and physical custody of the children. Riordan was granted only supervised visitation, contingent upon completing a psychiatric evaluation and engaging in court-supervised treatment designed to "eliminate the defendant's behaviors that have had a negative impact on the minor children and their relationship with the plaintiff." (The Decision at p. 37.)

84. Parlato had reported extensively on the trial, which included months of testimony from police detectives, DCF investigators, the custody evaluator, the GAL, Riordan's psychiatrist, Riordan, Ambrose, and others. He also reported on the Decision itself. Despite this, Parlato continued to publish misinformation about Ambrose, repeating allegations that had been thoroughly discredited by official investigations and in judicial findings.

85. That Parlato persisted in publishing defamatory material after the issuance of these findings demonstrates actual malice and an obsessive effort to destroy Ambrose's reputation, mental health, and quality of life.

86. The articles published by Parlato since July 20, 2023—the subject of this Complaint—show a deliberate disregard for judicial determinations and a calculated effort to perpetuate discredited allegations.

87. Parlato ignored the Court's findings that Riordan had told the children horrific lies about their father and had coached them to falsely accuse him of sexual abuse. (The Decision at pp. 11, 19.)

88. He also disregarded the Court's conclusion that Riordan used third parties—including Parlato himself—to destroy Ambrose's relationship with the children, damage his reputation, and intimidate witnesses. (Id. at p. 22.) Ambrose was never accused of witness intimidation or any misconduct whatsoever.

89. Parlato further published that Ambrose bribed or colluded with DCF, law enforcement, the GAL, the custody evaluator, the reunification specialist, Riordan's attorneys, and even Connecticut judges, in order to gain custody and favorable financial rulings—allegations that are entirely unsupported and defamatory.

90. Parlato also failed to report that the Court found Ambrose had submitted a full and transparent financial accounting, while Riordan had not. Riordan was compelled to admit she had secretly liquidated her 401(k), yielding hundreds of thousands of dollars. Parlato, however, repeatedly published unsubstantiated claims that Ambrose "stole" Riordan's modest inheritance, the value of which Riordan changed repeatedly.

91. Ambrose did not dispute that Riordan received a small inheritance; however, the parties commingled all assets during the marriage, making them marital property. Moreover, on

October 4, 2023, the Appellate Court dismissed Riordan's appeal of The Decision, including her claims of theft and financial impropriety. (Docket Entry #640.)

92.  Parlato knew that Riordan had repeatedly defied court orders, been found in contempt multiple times, and was severely sanctioned before and after the final decree. He ignored the Court's findings that Ambrose consistently attempted to co-parent collaboratively, while Riordan remained "uncooperative" and "hostile."

93.  He further knew of the Court's documented observations that Riordan exhibited traits consistent with Borderline Personality Disorder. Although the Court ordered a psychiatric evaluation, Riordan refused to comply, leaving the diagnosis incomplete. (The Decision at p. 11.)

94.  Parlato falsely claimed that Ambrose prevented Riordan from seeing the children. In reality, her inability to see the children resulted directly from her refusal to comply with court-ordered psychiatric evaluation and treatment.

95.  Parlato was aware that Ambrose testified he believed both parents should be present in their children's lives, and that after the custody orders, Ambrose repeatedly encouraged Riordan to undergo the required therapy so visitation could resume. She never responded to his written requests.

96.  On Mother's Day 2021, Ambrose facilitated a call between Riordan and the children, supervised by the court-appointed reunification specialist. Riordan never requested another call. (The Decision at p. 18.) Ambrose later discovered that Riordan had been secretly messaging the children through apps, in violation of court orders.

97. Although Riordan's covert contact with the children was unauthorized, Ambrose chose not to report it out of concern for their emotional well-being. Heartbroken over their mother's constructive abandonment, he did not want to deprive them of the contact they still had with her.

98. This compassionate decision, however, had severe negative consequences for Ambrose. During these communications, Riordan resumed her campaign of alienation, telling the children that Ambrose was to blame for her absence, that he did not love them, and that he sought custody only "to beat her"—the same falsehoods that had led to her loss of custody.

99. Parlato also published false claims that Ambrose refused to allow Riordan's family to see the children. In reality, Ambrose made every effort to preserve the children's relationships with their maternal relatives. He encouraged calls, texts, and online gaming with their cousins, and hosted Riordan's sister, niece, nephews, cousin, and aunt during the Christmas seasons of 2021, 2023, and 2024.

100. Despite these efforts, no member of Riordan's family invited the children to visit after Ambrose was awarded custody in April 2020. Her father even ceased acknowledging the children's birthdays and Christmas that same year.

101. Parlato further alleged that Ambrose isolated the children from Riordan's friends. In fact, only one such friend ever contacted Ambrose. He promptly arranged two FaceTime calls for her, leaving the children alone for privacy. The friend never reached out again.

102. Ambrose also organized in-person visits with the children's Westport friends. Eventually, the children declined further visits. Ambrose later learned from a Westport parent that the children's peers had seen Parlato's defamatory articles online.

103. Ambrose provided each of his three children with cell phones. T-Mobile records confirm he never disabled service for more than a few hours (as a typical parental consequence for misbehavior) and never blocked any numbers. The children were always able to contact anyone—including Riordan, her family, friends, and authorities—and they never reported any mistreatment by Ambrose.

104. The children's therapists consistently reported to authorities that the children never accused Ambrose of any mistreatment or abuse—physical, sexual, emotional, or psychological. Specifically, they never alleged yelling, threats, punishment, confinement, or harm to pets, as Parlato has published.

105. In contrast, these professionals attributed the children's distress and anxiety to Riordan's abandonment, her ongoing attacks on Ambrose, and the disinformation spread about him by Parlato, which lent false legitimacy to Riordan's narrative.

106. Parlato exacerbated this harm by publicly attacking anyone he perceived as adversarial to Riordan. His targets included the custody evaluator, GAL, therapists, DCF workers, police officers, Ambrose's family, and nearly every judge involved in the case—as well as the spouses and children of these individuals. He even mocked their physical appearances.

107. Parlato's baseless accusations that Ambrose "conspired" with these individuals undermined the children's trust in the very professionals assigned to protect them. Parlato also aggressively targeted several of Riordan's former attorneys, disparaging their professional competence and appearance.

108. Witnesses testified that numerous professionals declined to work with the children out of fear that Parlato would retaliate against them and their families online, as he had with others.

109. Ambrose never published any information about Riordan, Parlato, or anyone connected to the case.

110. In January 2023, Riordan returned to Connecticut without informing Ambrose and took up residence nearby his home. She soon began violating custody orders by secretly visiting the children and grooming them to turn against their father—the very behavior the custody orders were designed to prevent.

111. On April 22, 2023—almost one year to the day after the Decision—Riordan persuaded her daughter to run away. She immediately brought the girl to file a petition for emancipation and false sexual abuse allegations against Ambrose in New Haven Juvenile Court.

112. Using third parties, Riordan later took unlawful custody of the two sons and had additional abuse allegations filed before they were even brought to her residence.

113. Riordan replaced the children's phones, as she had done years earlier when she fled Connecticut. Ambrose had no way to locate or contact them.

114. Although Riordan orchestrated the filing of abuse claims, she obstructed subsequent DCF and police investigations, refusing access to her home, disallowing private interviews, and recording all interactions. After comprehensive investigations, child protective and law enforcement authorities determined the allegations against Ambrose were baseless. [3]

115. Because custody disputes are civil matters, police policy prevented them from removing the children from Riordan's home without a specific court order.

116. Ambrose was desperate to have his children returned, but his finances had been depleted by the divorce, and he was forced to represent himself. He filed motions which were repeatedly found procedurally deficient.

117. He eventually retained counsel, but delays continued. Riordan secured a three-week continuance, and the Court (Rodriguez, J.) then *sua sponte* postponed the hearing for an additional six weeks before abruptly declaring a mistrial without explanation, causing a delay of more weeks. Months passed with the Court taking no action.

118. Contrary to Parlato's published assertions, Ambrose did not "forum shop" and never "chose" to change judges—an unrealistic possibility under Connecticut law.

119. At enormous expense, Ambrose replaced his counsel, hiring a new attorney who filed for restraining orders against Riordan on behalf of the children, citing her contempt of court, obstruction, and coercive control over them.

---

[3] It is important to note that all three children, represented by independent counsel secured for them by Riordan, voluntarily withdrew the abuse petitions she had them file in Juvenile Court.

120. At the multi—day hearing, both Riordan and Ambrose testified, as did DCF. The lead investigator for DCF reported that Riordan was extremely uncooperative and engaged in coercive control over the children, which the law recognizes as a form of domestic violence. DCF endorsed continued sole custody for Ambrose.

121. The Court (O'Neill, J.) granted the restraining orders, prohibiting Riordan from having any contact with the children. However, Riordan failed to appear for the decision and refused to speak to the Court by phone, as she had done previously. When police attempted service, they again found her residence empty.

122. Police later discovered that Riordan had used third parties to secretly relocate the children out of state, evading court orders and interfering with lawful custody.

123. Over the next three months, each time Ambrose and authorities located the children, Riordan's associates prevented reunification by covertly moving them to new locations— first Rhode Island, then various counties in New York. Each relocation triggered new police and child welfare investigations. In every instance, Ambrose was fully exonerated of all allegations.

124. For the three months Riordan had the children in hiding, Ambrose repeatedly tried to negotiate a resolution, but she ignored all communications and remained in hiding herself.

125. Subpoenaed phone records confirm that Parlato was in regular contact with Riordan during this period. He repeated her false narrative in his articles, despite having access to

public records—including police reports and court findings—that directly contradicted her claims.

126. The preceding account of the children's three-month ordeal, along with the involvement of Riordan's associates—including Parlato—is corroborated by a 16-page ruling issued on October 25, 2024, by the Connecticut Superior Court in Bridgeport (O'Neill, J.) after an eight-day contempt hearing against Riordan (Docket No. FBT-FA-23-5052301-S).

127. Parlato's statements about Ambrose throughout this period were defamatory and misleading, casting Ambrose in a false light and violating his privacy.

128. For example, Parlato falsely claimed that Ambrose directed law enforcement, including the FBI and a SWAT team, to raid a residence where Riordan was staying. In reality, police located Riordan through traffic camera footage, as confirmed by contemporaneous police reports and Riordan's own testimony. Testimony also established that Ambrose was unaware of the incident until after it occurred.

129. To exacerbate the harm, Parlato published, promoted, and endorsed defamatory articles about Ambrose authored by discredited individuals, including psychiatrist Bandy Lee—retained by Riordan and later terminated by Yale University over concerns regarding her medical judgment and ethics—and Richard Luthmann, a convicted extortionist recently released from federal prison, who maintains close ties to both Parlato and Riordan.

130. Parlato's publications incited his audience to harass Ambrose, resulting in a flood of threatening and abusive communications—including death threats.

131. Despite having access to the truth, Parlato deliberately perpetuated falsehoods online, leading the public—and Ambrose's children, who had no access to court or police records—to believe his defamatory statements. Thousands of reader comments reinforced these lies, including allegations that Ambrose was preventing Riordan from seeing the children through political, financial, or legal manipulation and that he was a "dangerous psychopath," a baseless diagnosis made by Dr. Lee, who had never met Ambrose.

132. Parlato knowingly identified Ambrose's minor children by name and photograph as alleged victims of sexual abuse—a violation of privacy that legitimate media outlets universally avoid, even when reporting on adult victims.

133. Parlato gratuitously described the daughter as a "three-time rape victim" by unnamed men. This sensational claim is an unconscionable violation of her dignity and privacy. Worse still, police had determined the claims to be false.

134. Parlato was aware that multiple courts had found Riordan manipulated and coached the children into making false accusations. Nevertheless, he published these coerced statements, using them to cast Ambrose in a false light and further his defamatory campaign.

135. Parlato also knew the children were too young to consent to being exploited in this way and that Riordan, having lost legal custody, had no authority to consent on their behalf.

136. Parlato's use of salacious and graphic language to falsely portray Ambrose as a child sexual abuser was not only false and malicious but also transparently designed to shock, titillate, and drive traffic to his websites.

137. Articles concerning Ambrose and his children generated substantially more traffic and engagement than any others published by Parlato, as evidenced by the number of reader comments. Obsessed with publicity and attention, he kept this false narrative alive for economic gain and social media clout.

138. The children never met Parlato, who was in federal home confinement during this time. They were unaware their mother had, years before, relocated to Florida to live with him, leaving them behind in Connecticut, or that she was in an intimate relationship with him.

139. In a disturbing display of manipulation, Parlato persuaded Riordan to submit letters to his sentencing judge, purportedly from the children, seeking leniency for him while also gratuitously maligning Ambrose. Parlato later published these letters online, demonstrating his disregard for truth, ethics, and the children's well-being, as well as his malice toward Ambrose.

140. In his articles, Parlato falsely portrays himself as a "white knight" protecting the children from abuse. In doing so, he knowingly disregards the consistent findings of the children's therapists, GAL, reunification specialist, and DCF professionals—all of whom concluded that Ambrose caused no harm and attributed the children's emotional distress to Riordan's abandonment and relentless denigration of their father, assisted by Parlato's disinformation campaign.

141. These professionals further noted that the children's three-month ordeal—being repeatedly moved across state lines to evade court orders—was enabled by Riordan's associates, including Parlato and his defamatory publications. This odyssey caused the

children to miss school, lose contact with friends, therapy, and even access to necessary medication, resulting in significant psychological trauma.

142. Parlato publicly advocated for the children to be forced to testify in court, a position unanimously rejected by every mental health professional involved with them.

143. By contrast, Ambrose refused to file civil claims on behalf of the children against Riordan and Parlato, solely to spare them the additional trauma of being forced to testify against their mother.

144. Therapists consistently reported that Parlato's articles reinforced Riordan's false narrative, leaving the children confused about the truth and deepening their emotional harm.

145. Parlato's sustained campaign of malicious defamation has deeply complicated Ambrose's relationship with his children—an injury Ambrose considers the most grievous and irreparable harm caused by Parlato's cruelty.

146. Parlato's false narrative about Ambrose also served to promote his fringe conspiracy theory: that "wealthy" abusive fathers bribe Connecticut family courts to unlawfully seize custody from "protective" mothers like Riordan, his romantic partner.

147. When Riordan unlawfully took physical custody of the children in spring/summer 2023, Parlato escalated his defamatory campaign. Between July 20 and October 23, 2023, he published nearly 50 articles—sometimes as many as three per day—casting Ambrose in the most damning false light despite knowing that every court, law enforcement and child

protective services agency investigation in three states had cleared Ambrose of any wrongdoing.

148. Parlato's motivations were manifold and malicious: irrational animus toward Ambrose, servile loyalty to Riordan's vendetta, a compulsive need to be seen as a savior, an insatiable hunger for publicity, and greed for the financial rewards generated by sensationalized content.

149. Parlato's malice is further evidenced by his juvenile and grotesque personal attacks. He repeatedly published manipulated images of Ambrose, including one in which Ambrose's nose was replaced with a penis—an act intended solely to humiliate and dehumanize him.

150. Parlato's so-called "faction" (fact + fiction) articles, published on August 13, September 5, and September 10, 2023, are especially egregious in their accusations of fraud, child abuse, and judicial corruption. Though labeled satire, these articles mislead, insinuating that Ambrose committed heinous crimes. They are written in a crude, transparently malicious tone. In short, they are intended to violate Ambrose's privacy by putting him in a false light.

151. Though Parlato credits others with authorship of these "faction" pieces, on information and belief, they are written under pseudonyms he uses. Regardless of authorship, Parlato published, promoted, and endorsed each article and is therefore fully accountable for their content.

152. Perhaps most unconscionably, Parlato published statements obtained from the children by Riordan after she took them in violation of court orders. As detailed previously, every

professional involved—custody evaluator, GAL, therapists, physicians, DCF, law enforcement, and multiple judges—concluded that Riordan exerted coercive control and coached the children to make false accusations against their father.

153. Parlato exploited this tragic dynamic by publishing these statements in numerous articles with inflammatory headlines designed to inflict severe emotional distress on Ambrose. In doing so, he willfully ignored the harm such exploitation caused the children themselves.

154. The plaintiff brings this action not to silence free speech, but to vindicate core First Amendment values: truth, accountability, and informed public discourse.

155. The First Amendment does not protect knowingly false statements that damage another's reputation. Defamation—especially when made with actual malice—is a well-recognized exception. As the Supreme Court held: "There is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

156. While the Court has extended "a measure of strategic protection" to falsehoods to ensure protected speech survives, it has consistently held that intentional falsehoods lack First Amendment value. *Gertz*, 418 U.S. at 342.

157. Parlato may argue that Connecticut's anti-SLAPP statute, Conn. Gen. Stat. §52-196a, requires dismissal of this action because it targets protected speech. This is a misrepresentation. The statute does not shield demonstrably false and malicious

statements from liability. It expressly provides that a motion to dismiss must be denied where a plaintiff establishes a *prima facie* case for defamation—i.e., a false statement of fact, published to a third party, causing reputational harm.

158. Here, Ambrose can establish dozens of malicious, defamatory statements made by Parlato, including (to cite only one especially egregious example):

"[The daughter], 16, was sexually abused and assaulted by her father for three years when she was isolated from her mother."

This statement was published online *after* public court decisions confirmed that DCF and police thoroughly investigated such allegations and found them to be false and the product of Riordan's coaching. So, Parlato knowingly placed Ambrose in a viciously misleading false light despite every court exonerating him.

159. Connecticut law recognizes a cause of action for false light invasion of privacy. Publicity that unreasonably places another in a false light is not a constitutionally protected interest. See Prosser, *Privacy*, 48 Calif. L. Rev. 383, 398–401; *Restatement (Second) of Torts* §652E.

160. In Connecticut, false light invasion of privacy occurs when someone knowingly or recklessly portrays another person in a misleading way highly offensive to a reasonable person. See *Pace v. Bristol Hosp.*, 964 F. Supp. 628 (D. Conn. 1997); P*arnoff v. Aquarion Water Co. of Conn.*, 188 Conn. App. 153 (2019). This tort focuses on emotional harm from being portrayed inaccurately, rather than reputational injury alone.

161. Connecticut also prohibits harassment, which includes communications made with the intent to harass, annoy, or alarm that are likely to cause such effects.

162. This action seeks to hold Frank Parlato, Jr. accountable for the intentional harm he inflicted through demonstrably false and malicious statements. It also seeks to prevent Parlato from similarly harming and harassing others by trafficking in falsehoods, distortions, and defamatory narratives.

**V. PARLATO'S ASPIRATIONS AND INFLUENCE**

163. Defendant Frank Parlato operates multiple websites—including **frankreport.com**, **artvoice.com**, and **niagarafallsreporter.com**—which he has weaponized to conduct a relentless and malicious smear campaign against the plaintiff. On these platforms, Parlato has published more than 300 articles filled with false, salacious, and defamatory accusations. His sites reach a global audience, ensuring the plaintiff's reputational harm is both widespread and enduring.

164. Parlato's efforts are not confined to his own websites. He aggressively amplifies his defamatory content across social media platforms, including Instagram, Facebook, YouTube, and X (formerly Twitter), extending his reach to millions more. He deliberately seeks attention in mainstream publications, podcasts, and interviews, using every opportunity to advance his profile and his baseless Connecticut family court conspiracy theories and vilify the plaintiff.

165. To maximize exposure, Parlato republishes his content on collaborators' platforms, such as the Substack page of convicted extortionist and fraudster Richard Luthmann. He

routinely publishes defamatory articles written by others—including Luthmann and Dr. Bandy Lee, a discredited psychiatrist terminated by Yale—while presenting them as credible. These pieces are not casual or unsolicited third-party submissions. Rather, they are carefully curated, solicited, and endorsed by Parlato as part of his coordinated effort to destroy the plaintiff's reputation.

166. Within his sites, Parlato hyperlinks extensively to additional defamatory material, creating an echo chamber of falsehoods designed to reinforce and perpetuate his attacks against the plaintiff. These publications advance grotesque lies, including accusations that the plaintiff sexually abuses his children, denies their mother access, stole marital assets, harbors deviant sexual fetishes, bribes public officials, and is a violent psychopath and pedophile.

167. Parlato publishes these statements with actual malice—knowingly disregarding the truth and intent on inflicting maximum reputational, emotional, and other harm. He preys upon an audience receptive to conspiracy theories and extra-judicial "justice," encouraging his followers to disregard the findings of police, DCF, and multiple courts that have exonerated the plaintiff.

168. Parlato's publications falsely portray the plaintiff as:

- sexually abusing, isolating, and mistreating the children;

- denying Riordan and her family access to the children;

- stealing or concealing marital assets;

- harboring fetishes, including for child pornography;

- bribing and controlling law enforcement officers, DCF professionals, even family court judges; and

- being a dangerous, violent diagnosed psychopath.

169. These allegations are not only entirely false but also deeply malicious. Parlato also knowingly publishes them on platforms, like Luthmann's, that regularly feature conspiracy theories and calls for extra-judicial "justice," deliberately targeting an audience predisposed to accept and amplify these falsehoods.

170. The defendant's motives are clear: to gain social media clout, monetize his content, and promote himself at the expense of the plaintiff's reputation, safety, and emotional well-being. Parlato encourages his readers to disregard the findings of law enforcement, DCF, and multiple courts that exonerate the plaintiff, inciting them to harass, vilify, and threaten him.

171. Parlato maliciously encourages his readers to dismiss the determinations of public authorities, including the police, DCF, and even the courts, that exonerate Ambrose; he deliberately incites his readers to harass, excoriate, and threaten the plaintiff.

172. Below is a small sampling of the thousands of "reader comments" Parlato has published, nearly all anonymous: "CHRIS, YOU BETTER SLEEP WITH ONE EYE OPEN" "Why don't you… die." "Chris, you are going to get your punishment.""One day you'll get what's coming to you Chris and it can't be soon enough!!" "As a mother I only wish I could take you to the woods. Only one of us would come out and it sure as fuck wouldn't be you. I'm watching you always.""It's about to blow up in that psychopaths face." "You will answer to someone in the end." "Ambrose must be stopped." "Time for some pigs to get roasted." "Game over. Ambrose is a twisted fuck." "I wish Chris would just…end it. If he repents, maybe he can go to Purgatory with Father Harry (another family kiddy-diddler) and seek eternal salvation." "Ambrose should be in jail.""He needs to be incarcerated immediately." "Ambrose needs to be arrested." You're a goddamn pedo. Sick fuck!!!""All your actions support Dr. Lee's diagnosis" "You are shit. You are nothing." "Until this creep is in jail, he is a threat." "[Ambrose] has the personality profile of a

serial killer." "CALL the Attorney Generals office to report child molester Christopher Ambrose. 1-860-808-5420." "Demand an investigation of Ambrose and his cronies he has paid off to get these children." "Chris Ambrose is sociopath." "You have molested your own children." "You are a coward. You are scared of Manuel Gomez. He has the evidence form [sic] your computer showing more than 750 pictures of young boys being rectally penetrated on gay porn sights. He has the video of YOU molesting [the younger son], and video doesn't lie…." "You are a child molesting coward. You enjoy gay porn that involves young boys. Old men rectally penetrating young boys, it's all over your computer . As a matter of fact over 750 boys and gay porn sights." "You are a sick homosexual who loves touching boys." "It's sexual assault and it's been proven." "They bury evidence and protect pedos in CT." *The following are comments attributed to Parlato's frequent collaborator, felon/extortionist Richard Luthmann:* "Hugs and kisses, Christopher…I do enjoy a good kiss of death." "Eat a dick, Chris." "Chris, I'll see what I can do about getting you a job at a dildo factory. You can play with the little brown ones all day and be in your glory. Fucking CHOMO." [CHOMO is prison slang for "child molester." Luthmann was incarcerated in federal prison for 4 years for extortion and fraud.] "[Ambrose is] a sticker of his erect penis into the tiny orifices of children. He injects his throbbing penis into a child's anus and/or mouth to achieve personal sexual gratification. It is sickness. ..The only image I have of you is right after I shit down your neck, Chris. No Yarl [sic] would back a kiddie diddling CHOMO child rapist like you. Before I would let you die, I would feed you your member." "I have plenty of evidence that Christopher Ambrose is a sexual abuser of children. I've published some of it…I'm going to crucify him… Chris Ambrose is a psychopath.."

173. On September 27, 2023, Parlato publicly admitted on **frankreport.com** that he had received additional hate-filled and threatening comments directed at the plaintiff— apparently even more aggressive than those he had already published—but stated he chose not to make them public. In response to "Peaches," a reader, Parlato wrote:

"[Ambrose] has been getting hate comments and other threats which I am not publishing. We do not wish or condone him coming to harm… we must remain within the law… I mean for him to lose his psychopathic behavior and become a man who cares for his children… This must be done in lawful ways and not vigilante justice." (See https://frankreport.com/2023/09/27/he-told-us-to-kill-ourselves-ct-family-court-victim-matthew-ambroses-brilliant-smackdown-of-his-father/)

174. This admission underscores that Parlato was fully aware his publications were provoking threats and hostility toward the plaintiff. Nevertheless, with reckless disregard for the

plaintiff's safety and reputation, he maliciously continued to amplify these false and inflammatory narratives.

175. This statement is also nothing more than a performative gesture—an insincere and self-serving attempt to shield Parlato from liability while he continued, through his content, insinuations, and tone, to fuel reputational harm and even greater damage. As detailed herein, Parlato deliberately incited and published numerous reader comments reflecting alarming levels of hostility, contempt, and threats toward the plaintiff.

176. Parlato's actions were not accidental or careless; they were deliberate, calculated, and malicious. He either authored or knowingly amplified the false and defamatory statements at issue with the specific intent to harass, defame, and cast the plaintiff in a false and damaging light. As a direct consequence of this sustained campaign, the plaintiff has suffered profound emotional distress, irreparable reputational injury, and has been placed in ongoing fear for his personal safety as a foreseeable result of Parlato's reckless disregard for the consequences of his conduct.

## VI. PARLATO'S DEFAMATORY STATEMENTS

### July 20, 2023 Publication

177. On July 20, 2023, defendant Frank Parlato published an article on *Frank Report* titled:

**"The Great Escape: Ambrose's Kids Leave His Home, Cite Abuse; Ambrose Seeks Mother's Arrest"** Available at: https://frankreport.com/2023/07/20/part-1-the-great-escape-ambroses-kids-leave-his-home-cite-abuse-ambrose-seeks-mothers-arrest/ In this article,

Parlato made numerous false and/or misleading statements concerning the plaintiff

Christopher Ambrose that are defamatory or put him in a false light, including:

178. "*Christopher Ambrose wants his three teenagers arrested… [Ambrose] was away most of the time… Ambrose reentered the children's lives, transferred the joint marital money into his name, and then filed for divorce… But it is common in Family Courts…to take mothers out of children's lives – often based on a single report of a custody evaluator – frequently paid by the father – as was the case in the Ambrose matter.*"

179. "*Dr. Bandy Lee, a psychiatrist, who studied the Ambrose case, said, 'Separating growing children from their mother and primary caregiver is one of the worst forms of abuse, which can have lifelong ramifications, as well as decades of loss of life for each child.'*"

180. "*In this case, even after three years, the father was unsuccessful in alienating the children from their mother… Ambrose's attorneys will argue the judge should…order the Madison Police to go to the mother's house, break down the door if necessary, and take the kids – handcuff and shackle them if necessary – and force their return to the father… As police take three teenage children by force in handcuffs, drag them out to police cars as if they were criminals, and force them to return to their father.*"

181. These statements are demonstrably false, defamatory, and place the plaintiff in a false light

before the public. The article incited public hostility toward Ambrose, as evidenced by the

119 user comments that followed, nearly all of which attacked or denigrated him.

### July 20, 2023 Publication (Part 2)

182. On July 20, 2023, Parlato published a follow-up article on *Frank Report* titled:

**"Part 2: Innocence Lost in Father's House of Fear: The Daughter Speaks Out Against**

**Chris Ambrose!"** Available at: https://frankreport.com/2023/07/20/innocence-lost-in-

fathers-house-of-fear-the-daughter-speaks-out-against-chris-ambrose

183. In this publication, Parlato made the following false and defamatory statements about

Ambrose: "*For three years, the children lived in isolation with their father… separated from their extended family and all the friends they grew up with under their mother's care…*

*Ambrose came home to CT, changed the passwords to his and his wife's joint money market accounts, and then filed for divorce against her…"*

184. *"The daughter and her brothers lost their mother based on the opinion of a single custody evaluator – who was paid for by the father… The daughter began cutting after Family Court removed her from her happy home with her mother… [W]hile Riordan is in jail, Ambrose further seeks Madison police to break down the doors of the mother's home, capture and handcuff the three teenagers, and bring them forcibly back to him…"*

185. Despite knowing that Connecticut DCF and law enforcement determined that Riordan and others had coached the children to make abuse claims, Parlato published the dialogue attributed to one of the children during an exchange with Manuel Gomez, a disgraced ex-cop fired for cause who Riordan hired:

186. *"Three years ago, Yale Hospital took [the younger son] in following allegations of Ambrose's sexual abuse…. Here is an excerpt of an interview that New York City private investigator Manuel Gomez sent to US Attorney Ross, where [the younger son], then only ten, said about his father. [This has yet to be viewed by CT courts]: '[the younger son] Ambrose: He was touching me in my private parts. Manuel Gomez: Can you demonstrate to me what he was doing to you? [the younger son] Ambrose: He was like touching me right here. Manuel Gomez: All right, and how often was he doing that? Did you tell him to stop? And what did he say when you told him to stop? [the younger son] Ambrose: He didn't say anything. He just kept on doing it. Manuel Gomez: Did he ever show himself naked to you? [the younger son] Ambrose: Sometimes when he was in the shower, sometimes, well, like not on purpose, but sometimes there weren't any towels, and then he had to go get his clothes naked. Manuel Gomez: But did he let – in front of you, he did that? [the younger son] Ambrose: Um, sometimes.'"*

187. Parlato further inflamed the situation by claiming:

188. *"Photos, videos, and audios back [the younger son]'s claims and are in FR's possession. Some of them are obscene and cannot be published."*

189. These fabrications were designed to damage Ambrose's reputation and generate outrage. The article drew 119 reader comments, the vast majority of which publicly vilified Ambrose.

**July 21, 2023 Publication**

190. On July 21, 2023, Parlato published an article on *Frank Report* titled:

**"The Kids Are Alright: Judge Refuses to Arrest Teens or Mom; Ambrose Denied in**

**Family Court"** Available at: https://frankreport.com/2023/07/21/the-kids-are-alright-judge-refuses-to-arrest-teens-or-mom-ambrose-fumes-in-court-arrest-her-and-im-not-a-pedophile

191. In the article, Parlato falsely reported that: *"Ambrose also sought the arrest of his teenage children, seeking the court to order Madison police to break down the doors of Riordan's house, enter the house, armed and prepared to subdue the teens, handcuff and shackle them, and force them to return to his home… [T]hanks to Ambrose, they had not seen their mother for three years."*

192. This characterization is false and misleading. It fabricates court conduct, misrepresents Ambrose's legal positions, and falsely suggests that Ambrose orchestrated the children's separation from their mother out of malice or abuse.

193. This publication incited widespread public hostility toward Ambrose. The article generated 117 reader comments, nearly all of which contained personal attacks, ridicule, and threats directed at him.

## August 3, 2023 Publication

194. On August 3, 2023, Parlato published an article on *Frank Report* titled: **"Ambrose Continues to Terrorize His Teenage Children — His Crimes and Lies Exposed Part #1** Available at: https://frankreport.com/2023/08/03/ambrose-continues-to-terrorize-his-teenage-children-his-crimes-and-lies-exposed-part-1/

195. Parlato made the following defamatory and/or misleading statements putting Ambrose in a false light:

196. *"Ambrose tells everyone that the his teenage children should not have a voice in where they wish to live because he has legal custody. He wants the CT courts to…arrest [the children] – taking them in handcuffs and forcing them back to his house…Chris Ambrose has fought in*

*court for the arrest of … his children…Ambrose has stepped up his efforts to imprison his children back at his isolated rural house."*

197. Under a photo of the daughter, Parlato wrote the caption, *"[Daughter], 16 was sexually abused and assaulted by her father for three years when she was isolated from her mother… Ambrose is trying to arrest her and force her back to his home."*

198. Parlato identified Bandy Lee as *"one of the premier psychiatrists in custody and divorce cases,"* clearly promoting and endorsing her statements,*"Lee had a view of Ambrose that warrants our fullest attention if we value the safety of the three teenage children who are the targets of Ambrose."*

199. Parlato published and promoted pages of Lee's statements against Ambrose and even included a **hyperlink** to "confidential" psychiatric notes and reports Lee wrote about him. When he published, Parlato knew Lee never met, let alone examined, Ambrose: *"I have enough information to make a preliminary assessment of [Ambrose's] personality configuration—with an emphasis on the extent to which he may manifest characteristics of psychopathic personality," assigning him a diagnostic score of 32, which "is strongly suggestive that a diagnosis of psychopathy is present and justified - or, at the very least, the disturbing levels of psychopathic features are present."*

200. Continuing to shine this damning false light on the plaintiff, clearly intending to portray him as a "dangerous character." Parlato quoted Lee, *"[T]here should be an attempt to interview Mr. Ambrose, as well as additional collateral interviews. An arrangement through criminal, domestic violence, or juvenile court to this end would best help protect you as well as the evaluator… this potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked."*

201. In addition, Parlato quotes Lee blaming Ambrose as the reason Riordan hadn't seen the children for years, claiming it is further evidence of his psychosis, *"Separating growing children from their mother and primary caregiver is one of the worst forms of abuse, which can have lifelong ramifications as well as decades of loss of life for each child—and can be a sign of this dangerous personality disorder."* Parlato continues, *"Dr. Lee wrote in a letter addressed to Karen Riordan and submitted to law enforcement that the mentally ill person is not Riordan, but very likely Ambrose."*

202. Parlato also published and hyperlinks to a letter, dated May 3, 2023, Lee wrote on her stationery to Riordan (the "Riordan Letter").  He quotes the Riordan Letter extensively, saying it is *"highly likely"* that Ambrose *"suffers from psychopathy"* and *"the potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked."*

203. Parlato also quoted Lee saying that she diagnosed Ambrose to fit the profile of a
*"psychopath, [who] has taken advantage of or 'conned' [relatives, friends, neighbors, co-
workers, business associates, or other people] — since it is a common characteristic of
psychopathic individuals to mislead, cheat, or otherwise violate the rights of other people.
They, through a superficially-charming presentation, are often capable of eliciting
exceptional levels of sympathy from others as an effective means of escaping accountability
for their violence—for example, they may recruit others as 'patrons' or 'pawns' to help them
turn the narrative around to incriminating their victims instead)."*

204. Parlato's publication endorsed Lee's claims that persons, like Ambrose, *"afflicted with
Psychopathy [as she identified Ambrose] are prone to lying, deceiving, and beguiling
whoever is in their presence… [psychopaths like Ambrose] can be very destructive to society
and to human beings they come in close contact with, such as family members."*

205. Parlato also promoted Lee's psychiatric evaluation of Ambrose, which *"as expected, yielded
results that make it highly likely and reasonably reliable that [Riordan's] ex-husband suffers
from psychopathy… A 'full' diagnosis of psychopathy—a score above 30—raises many
alarms and could be a contraindication to parenting… Mr. Ambrose's score adds up to 32.
This is strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the
very least, that disturbing levels of psychopathic features are present."*

206. Parlato's hyperlink included a screenshot of the "Hare Psychopathy Psychopath Checklist"
that Lee says she completed to diagnose Ambrose as a psychopath, though she had never met
him (the "**Psychopath Psychopath Checklist**"). The hyperlink also has a Report of
Suspected Child Abuse or Neglect that Lee filed with DCF on May 24, 2023 ("Lee's DCF
Report"), accusing Ambrose of horrific mistreatment of his children and stating he also
abused Riordan. [4]

207. Lee notes in the Riordan Letter that reports of abuse to DCF are confidential because the
accused *"must be protect[ed] from an erroneous psychopathic diagnosis;"* yet, Parlato
published her report damning Ambrose as a psychopath, making it available to hundreds of
millions of readers on the Internet, brutally violating his privacy, putting him in a devastating
false light, subjecting him to scrutiny and ridicule, and causing extreme emotional distress.

208. Parlato prominently promotes, endorses and adopts everything Lee states by publishing her
DCF Report and her statements that Ambrose committed *"[s]exual, psychological,
emotional, verbal, and physical abuse, coercive control, and neglect worsened from multiple
years of impunity. Three years ago, he abducted and separated the children from their
mother through litigation abuse."* Parlato quotes Lee saying "interviews of victims, reliable

---

[4] Lee writes in the Riordan Letter that she became aware of this allegedly ongoing abuse on
April 23, 2023; yet, while she identifies herself as a mandated reporter, she waited until May 24,
2023 - more than a month - to alert authorities to this emergency.

*reports, voice recordings, video recordings, and perpetrator's prolific documentation of his threats, psychological manipulation, and coercive control indicate a DANGEROUS PERSONALITY DISORDER. [Emphasis in the original] The remaining two sons, however, were experiencing an escalation of abuse and verbal threats from the father. Now, the 12-year-old son remains, afraid for his safety."* [5]

209. As scores of Parlato's articles make clear, he baselessly promotes that Ambrose is involved in a conspiracy with the Connecticut Family Courts; Parlato uses Lee's statements to support this meritless theory, *"[Ambrose] controlled the Courts – Family Court corruption is an international crisis – and threatened and penalized the children behind the scenes."*

210. Falsely insinuating the plaintiff prevented Riordan's access to the children, Parlato published, *"The mother was [sic] not been able to see her children for three years, despite having a clean background and having successfully raised the children before the father's intervention… All the children are adopted, and the two older children are Hispanic, subject to the father's racial slurs."*

211. Parlato also published and adopted Lee's salacious, graphic allegations of sexual and other abuse for which she claims to have evidence that she has never produced, *"I have reviewed copious video, audio, and photographic documentation of Mr. Ambrose's abuse: inappropriately touching all children in sexual ways, penetrating or threatening to penetrate them, bringing in adult men to sleep in their bedrooms without clothes, having adult men have intercourse with underage girls in their bedrooms, permitting drugs and alcohol in their rooms, yelling and screaming at them, threatening and demeaning them, stalking and terrorizing them, and forcing the 12-year-old to drive… It is remarkable how Mr. Ambrose managed to weaponize the Court system, which is why his very overt patterns of having a serious and dangerous personality disorder must be examined."*

212. Parlato, who published Lee's diagnostics, maintains she *"had enough information to perform the widely-used and highly-respected Hare Psychopathy Psychopath Checklist-Revised (PCL-R) on [Ambrose], based on collateral information and his own written communications, I found that he met criteria for psychopathy - which is a contraindication to parenting… Indeed, under [Ambrose's] 'care,' [the older son] is said to have missed numerous days of school, abused [sic] substances, and been suicidal and injuring himself. Mr. Ambrose has been preoccupied with accusing the mother of being mentally unwell (common with psychopathic individuals trying to deny their own illness), but the mother is healthy and psychologically well-developed."*

---

[5] The law encourages reports of suspected abuse; however, it requires such reports to be made in good faith, based on reasonable concerns. As explained, Parlato knew Lee based her report on the narrative of a scorned ex-spouse, who multiple courts determined was so unreliable and troubled she could not have supervised visitation until she had a complete psychiatric evaluation and court-monitored therapy. Moreover, even if Lee believed the allegations she reported to DCF, publicizing the allegations is not protected speech.

213. Again, Parlato used Lee to support his conspiracy theory that the Connecticut family courts are corrupt and that Ambrose conspires with them, *"There is an international crisis of the Family Courts, which are authorized and yet ill-equipped to deal with dangerous personality disorders as Mr. Ambrose exhibits. Individuals showing signs of these disorders disguise themselves and manipulate the legal system to further their abuse and to reverse victim and offender in a way that acutely endangers especially women and children... Consistent with this abuse, all three children have been depressed, engaging in self-injurious behavior, and [the older son] had been suicidal. This is why I performed the PCL-R, on which Mr. Ambrose scored 32/40 (30 is cutoff for psychopathy) – this is a score indicating EXTREME POTENTIAL DANGER [Emphasis in the original] for the children and the mother, and almost all decisions by the Family Court need to be reexamined, as well as his diagnosis confirmed by a forensic psychiatrist or forensic psychologist with requisite experience and training to perform the PCL-R – all others are too vulnerable to being manipulated into making opposite conclusions..."*

214. Parlato goes on to quote Lee's DCF Report, supporting her character assassination of Ambrose and her claims about his conduct, despite knowing that every public authority, including the courts, had disputed each of her allegations. Therefore, Parlato used Lee's words to put Ambrose in the most horrific false light, *"That Mr. Ambrose has had custody of these children for so long is alarming – and the extreme signs of abuse and deterioration under him MUST BE RESPONDED TO. [Emphasis in the original]. That the mother, who singlehandedly raised these children before their abduction, has been denied access to her children for three years. This level of separation of children from their primary caregiver – especially the 12-year-old – portends serious, lifelong psychological and physical problems, as well as loss of possibly decades of life, on the part of the children if not intervened with rapidly...All indications are that [the children] were happy and thriving under their mother but have sharply declined academically and medically under Mr. Ambrose's 'care'...Mr. Ambrose appears to have had a pattern of abuse, neglect, and coercive control of the children all their lives, which the mother failed to recognize earlier, as she is a victim of domestic violence and psychological abuse herself."*

215. Parlato's hyperlink also includes a full page of Lee's alleged "qualifications" (the "Qualifications"), which she also references in the DCF Report. Lee has a well-documented history of misrepresenting, even flat-out fabricating, her professional associations and accomplishments, including in the Qualifications. Yet she uses these exaggerated professional credentials to mislead reasonable people to give her life-destroying allegations against Ambrose greater authority. Parlato endorsed Lee's false credentials and comments, including the Riordan Letter, the DCF Report, the Psychopath Checklist by endorsing and in publishing them, he is responsible for their content.

216. Parlato's article also includes photos of Ambrose and the children and identifies them by name as victims of sexual assault, a violation of privacy that even adult alleged victims of

such a crime are spared. Ambrose was exonerated of all the abuse allegations. Parlato's publication is further evidence of his malice.

217. Without referencing Riordan's court-determined history of coaching the children to make false allegations against Ambrose, Parlato's published article continues to use their solicited statements to put Ambrose in a false light, *"[The children] recount tales of Ambrose's danger, his lies and his criminal conduct…There is so much evidence and it is almost certain that law enforcement will take an interest in Ambrose's arrest and conviction. As a small example, look at this short interview of [the younger son], now 13, when he was 10 explaining to famed private investigator Manual Gomez what his father was doing to him… Within hours Ambrose got the police to force his children then 13, 13 and 10 back to his home. How they suffered over the next three years they have told FR… Ambrose himself is pushing for his own arrest, forcing the children to tell all that he has done to them…"*

218. Under the heading "[the younger son]'s Own Words," Parlato writes, *"Listen to [the younger son] here and decide for yourself. This is the tip of the iceberg."* Parlato then republished the exact same transcript that he published in his July 20, 2023 Part 2 article, as quoted above. Parlato knew that DCF had determined the statements the children made in this "interview" were the result of Riordan's coaching. In the interest of space, the interview statements will not be repeated yet again, but are incorporated as if fully set forth herein.

219. Despite portraying frankreport.com as a "news" site, Parlato frequently regurgitates the same information in scores of articles. But the repetition serves a purpose: the more information is repeated, the more likely it is to be believed by his readers; therefore, the more damage is done to Ambrose. Moreover, Parlato isn't merely "reporting" Lee's statements, he is clearly promoting and endorsing them, using them to support his claims against Ambrose and the Connecticut courts.

220. This publication incited widespread public hostility toward Ambrose. The article generated 117 reader comments, nearly all of which contained personal attacks, ridicule, and threats directed at him.

**August 5, 2023 Publication**

221. On August 5, 2023, Parlato published an article entitled ***"Ambrose's Attorney Withdraws, as National Media Outlet Looks at Ambrose CT Custody Case"*** by Janine Morrison (on information and belief, this is one of a number of pseudonyms Parlato uses). https:// frankreport.com/2023/08/05/ambroses-attorney-withdraws-as-national-media-outlet-looks-at-ambrose-ct-custody-case/

222. Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

223. *"Parlato told me. 'The crimes against these three teenagers and their mother are nothing short of a federal racketeering conspiracy…. Dr. Bandy X. Lee has identified Ambrose as a psychopath who, she says, scores dangerously high at 32 on the Hare Psychopathy Checklist."*

224. Again, Parlato embeds a hyperlink to the damning allegations Bandy Lee makes against Ambrose, using her statements to support his attacks on Ambrose. Lee's statements, discussed in detail above (under "August 3, 2023"), should be incorporated here as if fully set forth herein.

225. Parlato continued his flat-out fabrications, damning Ambrose: *"In this way, Ambrose hopes to persuade Madison police to arrest his three teenage children… and have them forcibly taken to his home where they will be on home detention…. If he can get the newly appointed Judge O'Neill to force the mother away from the teenage children who are old enough to*

*know and tell about his abuse, Ambrose may prevent the children from telling authorities about his sexual abuse of two of them… But people with psychopathic conditions never stop until someone stops them and unhappily for others, they oftentimes take others with them."*

226. This article generated 96 comments, nearly all of which denigrate and attack Ambrose.

**August 8, 2023 Publication**

227. On August 8, 2023, Parlato published an article entitled *"Confidentiality Clash: CT Attorney Edward Nusbaum Suspected of Sharing Sensitive Info in Ambrose Custody Case"* written by Richard Luthmann, the violent felon convicted of extortion and fraud, who served years in federal prison and is close to Riordan, who cross-posts Parlato's articles attacking Ambrose. https://frankreport.com/2023/08/08/confidentiality-clash-ct-attorney-edward-nusbaum-suspected-of-sharing-sensitive-info-in-ambrose-custody-case/

228. In the article, Parlato publishes and endorses the false statements and insinuations of his collaborator, which support his own false narrative:

229. *"Ambrose successfully blocked the children from seeing their mother for three years… [Referring to Bandy Lee, the disgraced doctor fired for her lack of medical knowledge and ethics] A noted psychiatrist identified [Ambrose] as likely psychopathic,"*

230. Again, to support his claims against Ambrose, Parlato embeds a hyperlink to Lee's damning allegations, which are detailed above and should be incorporated here as if fully set forth herein. Parlato's article repeats: *"Ambrose successfully blocked the children from seeing their mother for three years."*

231. This article provoked 37 comments, nearly all of which denigrate and attack Ambrose.

**August 8, 2023 Publication (Part 2)**

232. On August 8, 2023, Parlato published an article entitled **"CT Judge Orders Teens Away From Mother; Ignores Claims of Father's 'Abuse'; Ambrose Teens Homeless"** by Frank Parlato https://frankreport.com/2023/08/08/ct-family-court-judge-thomas-oneill-orders-ambrose-teens-away-from-mother-bars-riordans-contact-with-the-daughter-matt-and-sawyer-for-one-year/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

233. *"Because Ambrose took all their marital funds and Riordan's inheritance…Judge Grossman based her decision on a custody evaluation report paid for by Ambrose."* Parlato **hyperlinks** to the entire custody evaluation, which the Court had ordered sealed because it contains confidential information about the children and the parties. As the matrimonial Court (Adelman, J.) stated, Riordan likely provided this confidential document for publication.

234. *"Riordan had raised [the children] since each was adopted at less than six months of age… Ambrose worked away from home – an absentee father… Soon afterward, he changed the passwords of the joint accounts, locked Riordan out of her own funds, including her inheritance, hired experts to support his preplanned parental alienation narrative, then filed for divorce… Away from their mother, the children rapidly declined and plunged into depression… "[A]fter three years isolated from their mother and the extended family they grew up with…"*

235. Parlato published the same **hyperlink** to The Riordan Letter, DCF Report, Psychopath Checklist, and Qualifications he published in his Aug 3, 5, and 8 (part 1) articles. The hyperlinked documents have been detailed above and should be incorporated here as if fully set forth. Parlato uses the linked material to amplify and "corroborate" his false narrative against Ambrose. It is clear that Parlato is not merely "reporting" what Lee said, he is promoting and endorsing her comments, deliberately casting Ambrose in a false light.

236.Parlato also published the full text of an August 8, 2023 *ex parte* letter Lee inappropriately

sent to Judge Thomas P. O'Neill of the Connecticut Superior Court at Bridgeport (the

"O'Neill Letter"), who issued restraining orders on behalf of the children against Riordan

(and subsequently found Riordan in contempt of those orders).[6]

*237.*Lee's statements in the O'Neill Letter are false or so twist the facts determined in court and police reports that they put Ambrose in a false light: *"I must warn against your sending Ms. Karen Riordan's children to Mr. Christopher Ambrose. He is no ordinary violent man…I have heard recordings of Mr. Ambrose's threatening the daughter with vaginal penetration as punishment for minor misbehavior…All three children have reliably reported sexual abuse, and no one has believed them, frankly, because the father is so threatening, he has intimidated all witnesses (he has already been threatening to me, which I had to report to local police)…The 12 (now 13)-year-old recently reported anal penetration… Even if none of this occurred, their lives seem to have been living 'hell' from his coercive control, verbal, emotional, and psychological abuse, and isolation from the mother who raised them (the father did not raise them) for over three years, which is abundantly and clearly recorded. [Ambrose's] aggression is such that, immediately after the first child ran away, he found out their address from the Connecticut Address Confidentiality Program, hunted her down, and stalked her everywhere in his car, almost causing her to have an accident."*

238.To support his own false narratives about Ambrose, the Connecticut courts and DCF, Parlato's published article uses Lee's misleading insinuations about Ambrose which had been investigated and determined false by therapists and public investigators, and her conspiracy theories about the courts, *"As expected from [Ambrose's] coercion, these children exhibit objective signs of severe trauma: resorting to substances, self-harm, and suicidal thoughts while living with him, as well as going from normal weight to morbid obesity, as you have heard… Child protective services investigations were noted, but as a violence expert of twenty-five years' experience, I can tell you that I have found them to be too frequently wrong to be solely relied upon. Individuals of the most dangerous personality disorders go undetected… I told this to one of the supervisors at the Department of Children and Families, as Mr. Ambrose is just such an individual, but they have not followed up, which shows that they are not only ineffective, they are also insincere: these are children who have reported being severely punished if they ever gave a true report of Mr. Ambrose's abuse*

---

[6] Lee was desperate to testify as an expert witness for Riordan and even appeared in the courtroom, interrupting the hearing. The Court declined to qualify her. Undeterred, she ensured the Court "heard" her by sending the O'Neill Letter.  Lee says she's been involved in dozens of family court cases; therefore, she knows that privately contacting a judge about a case over which he presides is unethical and has potentially severe consequences.

*against them, and DCF should know that this threatening behavior is common among the most dangerous individuals."* Parlato knew when he published these statements that DCF and the police had done thorough investigations, presented to and accepted by the courts.

239. Parlato's article refers to Ambrose as Riordan's *"violent abuser"* and makes other false claims about Ambrose, *"[Ambrose] was able to hire a ['high-powered attorney'] only because he embezzled [Riordan's] inheritance and stole everything she had… It came out during the proceeding that this violent man, who lost his law license and was fired multiple times apparently for plagiarism and fraud, did not stop even when he rendered his ex-wife homeless."*

240. Since Parlato identifies Lee as an "expert in child abuse and psychopathy," a reasonable person would understand that a psychiatrist specializing in domestic violence determined Ambrose to be a violent, dangerous psychopath who committed the most horrific sexual abuse against his children, abused and stole from his wife, leaving her homeless, that he lost his law license was lost and was fired multiple times for cause.

241. Moreover, at the time he published, Parlato was aware that all Lee's allegations - including her claims to have recordings evidencing Ambrose's abuse of the children - had been investigated by public authorities, including DCF and the police, and found baseless, which the Court affirmed after testimony. Nevertheless, Parlato uses Lee's statements to support his published false allegations against Ambrose.

242. This article provoked/elicited 83 comments, nearly all denigrating Ambrose.

### August 9, 2023 Publication

243. On August 9, 2023, Parlato published an article entitled ***"Ambrose did the right thing Ambrose Sparks Standoff With The daughter and Police – But Teen Escapes Forced Return to His Home". https://frankreport.com/2023/08/09/ambrose-sparks-standoff-with-***

*mia-and-police-but-teen-escapes-forced-return-to-his-home/.* In it, Parlato made the

following defamatory and/or misleading statements, misrepresenting facts and putting

Plaintiff Ambrose in a false light:

244. *"Three days ago, The daughter was hospitalized. Her stress level from her father's attempts to take her from her mother was so high that she spent two days in the hospital… The daughter left the hospital with Ambrose, who had Westport police on hand to intimidate her into thinking she had to go home with her abuser…[Ambrose] held the children in isolation from their family for three years."*

245. This article provoked 30 comments, nearly all of which denigrate and attack Ambrose.

## August 12, 2023 Publication

246. On August 12, 2023, Parlato published an article entitled **"Psychiatric Diagnosis and**

**Custody Battle: Judge Grossman Suspected of Mental Illness as Battle Looms Over**

**Forced Return of Teens to Ambrose"** https://frankreport.com/2023/08/12/psychiatric-

diagnosis-and-custody-battle-judge-grossman-suspected-of-mental-illness-as-battle-looms-

over-forced-return-of-teens-to-ambrose/Parlato made the following defamatory and/or

misleading statements, placing Ambrose in a false light:

247. *"Ambrose paid [the custody evaluator] more than $12,000 to do a neutral custody evaluation report in 2020…Imagine you are the children of… absentee father Chris Ambrose [and a judge orders you to live with] with a mean and callous stranger named Ambrose… A CT Family Court Family Relations Counselor, Allison Kaas Esq. determined that Ambrose was a high-risk abuser… It took significant legal work from Ambrose's attorney to get the dissocial Judge Grossman to ignore this dangerous finding…The kids lost contact with their mother for three years, as Ambrose moved them to his rural house and kept them free of her and all her family and friends with whom the kids grew up – grandparents, aunts, uncles, cousins, and lifelong friends…"*

248. As explained in this Complaint, Parlato was aware that hospital personnel had determined the children were coached by Riordan to make false accusations. Nevertheless, Parlato

published:*"Hospital documents support that the children told the ER doctors and hospital psychiatrists of the sexual abuse they suffered at the hands of their adoptive father…The hospital determined that Mr. Ambrose was a threat to the children and recommended that the children go home with the mother…Throughout my investigation, Mr. Ambrose has made numerous false statements to the court. Each time, he or his lawyers present his allegations without evidence to support the narrative he invents…You must understand that Mr. Ambrose is a habitual liar. He continues to spin stories to paint an untrue narrative…"*

249. Parlato further published claims he knew were provably false: *"Another investigator conducted a forensic analysis on Mr. Ambrose's computer. The investigator found hundreds of photos of young boys and men having sex…In fairness to [the custody evaluator], she did not get a chance to determine if Ambrose visited child porn websites. It took work by his attorneys, but Ambrose obtained a court order that barred [the evaluator] from reviewing evidence of child porn on his computers."*

250. This article provoked 58 comments, nearly all of which denigrate and attack Ambrose.

**August 16, 2023 Publication**

251. On August 16, 2023, Parlato published an article entitled **"Ambrose's Misuse of Jennifers' Law Sparks Activist's Outcry: Judge O'Neill's Flawed Legal Decision Exposed"** https://frankreport.com/2023/08/16/ambroses-misuse-of-jennifers-law-sparks-activists-outcry-judge-oneills-flawed-legal-decision-exposed/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

252. *"To obtain the TRO, [Ambrose's attorney] shopped judges until he found Judge O'Neill… [The judge's] fact-finding was based on Ambrose's word alone. His fact-finding was based on Ambrose's word alone. Judge O'Neill refused to listen to the teenagers.…Father has the local police constantly (follow!) [sic] and harasses the kids."*

253. In the middle of his article, Parlato includes the comments of a third party, which he clearly endorses and uses to promote his narrative. Among these comments that put Ambrose in a false light and further Parlato's false claims that Ambrose conspires with the courts and DCF, *"the mother is endlessly harassed at all hours of the day and night and silenced…DCF ignores everything, but also harasses mom…Judge O'Neill refused to allow the children to be heard, even though they were represented by counsel."*

254. This article provoked 96 comments, nearly all of which denigrate and attack Ambrose.

**August 17, 2023 Publication**

255. On August 17, 2023, Parlato published an article entitled **"Is Chris Ambrose a Lying, Thieving, Selfish Narcissist?"** https://frankreport.com/2023/08/17/guest-view-is-chris-ambrose-a-lying-thieving-selfish-narcissist/

256. The article is attributed to Jessica Clark; again, on information and belief, this is another pseudonym Parlato uses. In any event, Parlato promotes and endorses the statements, which defame and/or are misleading and put Ambrose in a false light: *"Chris Ambrose is nothing but a lying, thieving, selfish narcissist through and through. It's plain for everyone to see. He has a bizarre predilection for near child porn and doesn't care about using and exploiting youth for pleasure."*

257. This article provoked 25 comments, nearly all of which denigrate and attack Ambrose.

**August 17, 2023 Publication (Part 2)**

258. On August 17, 2023, Parlato published a second article entitled **"Ashley Deckert Director of Rhode Island Department of Children, Youth & Families Responds to Concerns About Ambrose Children"** https://frankreport.com/2023/08/17/ashley-deckert-director-of-rhode-island-department-of-children-youth-families-responds-to-concerns-about-ambrose-children/ This article was written by federal felon, fraud/extortionist Richard Luthmann, Parlato's frequent collaborator. To support his attacks against Ambrose, Parlato promotes, endorses, and adopts Luthmann's content, which includes material published under the

subheading "Danger to Children in RI from Psychopath, Pedophile CT Father." Parlato

published:

259. "[T]he Ambrose children are at risk from their psychopath predator father…Ambrose may bring the children back to his den of iniquity in Madison, Connecticut, where underage drinking, drugs use, and sex (statutory rape) regularly occurs…"

260. Parlato provides a list in the article, which purports to be accurate. However, as Parlato is aware, his claims are false: *"[Materials showing] Christopher Ambrose's dangerousness: December 15, 2020 – CT Court Report showing Ambrose as "HIGH RISK" for dangerousness. Email dated June 6, 2023 between Attorney Michael G. Curley of Murtha Cullina, LLP, and Nancy Stewart, Kelly Burke, and Michelle Peterson of the Connecticut Department of Children and Families (DCF). In this email, there is a reference to 'a new allegation of penetration.' Report dated May 29, 2023, from Private Investigator Manuel Gomez to WDNY US Attorney Trini Ross's Office and the FBI Office-Buffalo detailing molestation by Christopher Ambrose. PI Gomez describes the video evidence he transmitted to the authorities and has in his possession. Report dated May 3, 2023, from Bandy Lee, MD, MDiv, warning of Christopher Ambrose's dangerousness where his children are involved. Signed statement dated May 29, 2023, of The daughter Ambrose detailing Christopher Ambrose's physically and emotionally abusive activity and improper touching. The statement corroborates the presence of men over the age of 18 (some in their 20s) with children aged 14 and 15 for "overnight" stays where there is underage drug, alcohol use, and sex. Social Media pictures corroborating underage drinking, drug use, and sex, published in the July 20, 2023 article: "How is Wealthy Elite Christopher Ambrose of Madison, CT Involved in Underage Drinking, Drugs, and Sex?"*

261. Parlato includes **hyperlinks** to the documents referenced above, which have been described

herein above and should be incorporated here as if fully set forth. Parlato uses the linked

material to amplify and "corroborate" his false narrative against Ambrose. The referenced

documents are not public, suggesting that Riordan provided them to her associate Luthmann

and/or her boyfriend Parlato.

262. Parlato also **hyperlinks** to a July 20, 2023 article published on Luthmann's substack.com page, endorsing the content to further the misleading perception that Ambrose is a deviant abuser of children who conspires with the supposedly "corrupt" Connecticut Family Courts.

263. Parlato published the above statements knowing that DCF, the police and Yale had investigated the allegations and determined them to be false. Moreover, Parlato knew at least two Courts (Moukawsher, J. And O'Neill, J.) had published decisions exonerating Ambrose of each of these claims.

264. Parlato also strategically posts **hyperlinks** with prominent photos and headlines to five articles he previously wrote and published on frankreport.com. By promoting these articles, Parlato is endorsing their content to further spread his defamatory/false light messages against Ambrose. The two hyperlinked articles dated July 20, 2023 and August 8, 2023 are discussed above and should be incorporated here as if fully set forth. The other three hyperlinked articles, dated March 28, 2022, October 10 and 12, 2021.

265. The August 17, 2023 article generated 56 comments, virtually all attacking Ambrose.

**September 12, 2023 Publication**

266. On September 12, 2023, Parlato published an article entitled "Ambrose Teens Flee Once Again: The Relentless Pursuit of a Father" https://frankreport.com/2023/09/12/ambrose-teens-flee-once-again-the-relentless-pursuit-of-a-father/. Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

267. *"For three years, Ambrose held his kids in captivity, not letting them see their mother, her family, or family friends – the ones they grew up with and loved…Ambrose, with a little forum shopping to get the right judge, Judge Thomas J. O'Neill."*

268. The August 17, 2023 article generated 44 comments, virtually all attacking Ambrose.

**September 13, 2023 Publication**

269. On September 13, 2023, Parlato published an article entitled "Money Talks in Family Court: How Christopher Ambrose Bought His Kids and Their Futures – And Turned Maternal Love into a Liability" https://frankreport.com/2023/09/13/money-talks-in-family-court-how-christopher-ambrose-bought-his-kids-and-their-futures-and-turned-maternal-love-into-a-liability/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

270. *"[Riordan] was a stay-at-home mother, and Ambrose, when he started the divorce proceedings in 2019, snatched every dime out of their accounts. He even took her inheritance for good measure – leaving her penniless and unable to play the game in CT Family Court, which is justice is what justice can buy…Ambrose outspent the mother 10-1. In CT Family Court, money buys custody and bullshit talks."*

271. Parlato went on a baseless rant against Ambrose and the alleged conspiracy of the family courts for which he provides no evidence: *"Ask the wake of judges – Grossman, Adelman, Moukaswher, or newly-minted O'Neill, called up from hell to roll in the detritus caused by a selfish father's insane demand to force three teenagers to live with him… Judge O'Neill [yelled at] all who threaten the parental alienation racket by refusing to force teenagers to live with the man who purchased them. The racket O'Neill protects is called parental alienation – which is to conspire to hand kids to abusers, then watch how the motions add up, and hearings pile high, billable by the hour. Though profitable for the cast of family court professionals, it causes havoc in the lives of mothers and children, which drives up the cost to the father. Ambrose paid a fortune to buy his kids…[H]e retained the children-snatching family law attorney Alexander Cuda, the leader of the conspiracy of attorneys and judges in the family law section of CT…"*

272. Parlato goes on to praise Bandy Lee, fired by Yale for concerns about her lack of medical knowledge and ethics then hired by Riordan, whose attacks on Ambrose he frequently publishes and endorses, and Manuel Gomez, the violent, disgraced former cop fired for cause by the NYPD, also paid by Riordan: *"Nor would [Judge O'Neill] hear from the psychiatrist Dr. Bandy Lee, who believes Ambrose is a dangerous psychopath, or Private Investigator Manual Gomez, who has evidence he says of Ambrose's abuse."*

273. Parlato betrays his malice for Ambrose with relentless schoolyard *ad hominem* insults: *"It is hard to fathom why any man, other than a psychopath, would wish to force three teens,*

*young adults, to live in his house against their wishes….At the center of the case, with his hunched shoulders and ugly visage, Ambrose seems the incarnation of greed. His beady eyes scan the court, uncaring and unfeeling, interested only in destroying the mother of his children and running their lives. He has an air of cold calculation, his psychopathy so virulent he seems ready, if need be, to use the law of Family Court profit, like Scott Mangano and Fotis Dulos, to snatch life away."*

274. The article generated 91 comments, virtually all attacking Ambrose.

**September 25, 2023 Publication**

275. On September 25, 2023, Parlato published an article entitled "Family Court Gave the Kids to a Psychopath? Chris Ambrose Scores 32 on Psychopathy Checklist" https://frankreport.com/2023/09/25/family-court-gave-the-kids-to-a-psychopath-chris-ambrose-scores-32-on-psychopathy-checklist/

276. Parlato published this article, extensively quoting and endorsing statements from Bandy Lee that put Ambrose in a damning false light. Before publishing, Parlato knew that Lee had never met Ambrose, authorities had investigated and dismissed her allegations against him. Moreover, he knew or should have known that Yale University had fired Lee in a highly publicized case for (among other things) concerns about her lack of medical knowledge and ethics, including publicly diagnosing individuals she had never met, like Ambrose. Nevertheless, Parlato promoted Lee as a renowned expert, falsely claiming that she served as the Director of Research for Harvard's Center for the Study of Violence; Harvard reports they have no such Center. But Parlato knew such exalted credentials would lend enormous credibility to Lee's attacks against Ambrose, furthering Parlato's goal of destroying his reputation and quality of life. Among the defamatory and/or misleading statements that put Ambrose in a false light:

277. Parlato details each diagnostic score Lee assigned to Ambrose on a psychiatric test, even though she had never met him: *"According to Dr. Lee, Ambrose's score was 32, placing him firmly within the psychopathy range… Dr. Lee…highlighted that a PCL-R score of 30 or more is alarming and may even contraindicate parenting. Ambrose's score of 32 suggests a psychopathic diagnosis or, at the least, alarming psychopathic traits…Dr. Lee pointed out once [sic] of Ambrose's traits: 'Separating growing children from their mother and primary caregiver' [which Lee claimed Ambrose did] is one of the worst forms of abuse, which can have lifelong ramifications as well as decades of loss of life for each child—and can be a sign of this dangerous personality disorder…"*

278. Parlato went on to publish Lee's chart, further detailing Ambrose's alleged psychopathy: *"Dr. Lee warned, 'This potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked.'"*

|  |  | 0 (definitely not present) | 1 (somewhat present) | 2 (definitely present) |
|---|---|---|---|---|
| 1 | Glibness/superficial charm |  |  | X |
| 2 | Egocentricity/grandiose sense of self-worth |  |  | X |
| 3 | Proneness to boredom/low frustration tolerance |  |  | X |
| 4 | Pathological lying and deception |  |  | X |
| 5 | Conning/lack of sincerity |  |  | X |
| 6 | Lack of remorse or guilt |  |  | X |
| 7 | Lack of affect and emotional depth |  |  | X |
| 8 | Callous/lack of empathy |  |  | X |
| 9 | Parasitic lifestyle |  |  | X |
| 10 | Short-tempered/poor behavioral controls |  |  | X |
| 11 | History of promiscuous sexual relations |  | X |  |
| 12 | History of early behavior problems | X |  |  |
| 13 | Lack of realistic, long-term plans |  |  | X |
| 14 | Impulsivity |  |  | X |
| 15 | Irresponsible behavior |  |  | X |
| 16 | Frequent marital relationships | X |  |  |
| 17 | History of juvenile delinquency | X |  |  |
| 18 | Revocation of conditional release | X |  |  |
| 19 | Failure to accept responsibility for own actions |  |  | X |
| 20 | Many types of offense |  |  | X |
| Total number of points |  | 32 (prorated from 31) / 40 | | |

279. Parlato also states that Lee suggests that psychopathic individuals, supposedly like Ambrose, *"mislead, cheat, or otherwise violate the rights of other people… They, through a superficially charming presentation, are often capable of eliciting exceptional levels of*

*sympathy from others as an effective means of escaping accountability for their violence—for example, they may recruit others as 'patrons' or 'pawns' to help them turn the narrative around to incriminating their victims instead…"*

280. Parlato **hypelinks** to Lee's May 24, 2023 "confidential" Report of Abuse to DCF, her May 3, 2023 Letter to Riordan and her full explanation of the test psychiatric test she supposedly performed on Ambrose without even meeting him. Parlato had published all of Lee's statements before (see the August 3, 2023 discussion) emphasizing his endorsement of the content. Therefore, all Lee's statements in the hyperlinked documents must be incorporated here as if fully set forth herein.

281. The article generated 46 comments, virtually all attacking Ambrose.

**September 25, 2023 Publication (Part 2)**

282. On September 25, 2023, Parlato published a second article entitled "The Escape Continues: Teens Run, Seek 4th Sanctuary from Ambrose's Grip" https://frankreport.com/2023/09/25/the-escape-continues-teens-run-seek-4th-sanctuary-from-ambroses-grip/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

283. Parlato began with his baseless conspiracy theories: *"Over the course of a three-year divorce and custody dispute, Ambrose transferred his case between three different judges. This strategy, sometimes referred to as 'forum shopping,' ensured that Ambrose was never held accountable for or had to return funds he allegedly took from his wife…Ambrose, leveraging connections… secured a legal victory, as Judge Jane Grossman, then under consideration for reappointment, ruled Riordan was alienating the children from Ambrose… Grossman ordered the children removed from their home with their mother, with whom they lived for 13 years while Ambrose worked in Hollywood and NYC… The children were not permitted to testify and were represented in court by a guardian ad litem… an attorney, closely aligned with Ambrose's attorney Aldrich and whom Ambrose, because he had seized*

*the marital funds, paid for, at $400 per hour, and approved her scope of work…Ambrose involved the Madison police in intimidating tactics against the children…"*

284. Parlato then sought support for his destruction of Ambrose by returning to Lee's specious attacks, paid for by Riordan, *"In a detailed report intended for the court, Dr. Lee labeled Ambrose with 'characteristics of psychopathic personality,' emphasizing his predisposition to deceive and manipulate. Her analysis portrayed Ambrose as someone who could attract immense sympathy, leveraging it as a tool to evade responsibility for his wrongdoings…*

285. Parlato repeated his false claims about Ambrose's treatment of the children, which had been investigated and dismissed as meritless when Parlato published:  *"[Lee] said the separation of children from their primary caregiver, as Ambrose had achieved through family court, 'is one of the worst forms of abuse, which can have lifelong ramifications, as well as decades of loss of life for each child'…[Riordan's father] was more of a father during their upbringing than mostly-absent Ambrose… [A] stark contrast to the isolation imposed by Ambrose over the previous three years, barring any contact with their mother's side of the family…They sought refuge with a family friend who had known them their entire lives, but was estranged due to Ambrose's restrictive directives, which prohibited them from contacting her or any friends they knew before CT Family Court took them away from their mother, family, and friends to live with their father — to protect them from parental alienation…"*

286. Parlato then embraced another false narrative, asserting that Ambrose orchestrated a SWAT-stye raid against Riordan by manipulating law enforcement, including the FBI; *"[U]pon discovering the teens' absence in the morning, Ambrose reported a suspected abduction, painting Riordan as a potentially dangerous psychopath. In a dangerous game of high-stakes escalation, upon discovering the teens' absence in the morning, Ambrose reported a suspected abduction, painting Riordan as a potentially dangerous psychopath. This alarm led to the assembly of a 20-person inter-jurisdictional task force, encompassing local and New York state police, as well as FBI agents. Acting on Ambrose's tip, they converged upon a residence where Riordan visited a friend. The SWAT team stormed the house with guns drawn, anticipating a possible confrontation and expecting to find the teens with their mother. Their primary objective was the arrest of Riordan for alleged kidnapping, and the retrieval of the teens to reunite them with Ambrose."*

287. Parlato even misrepresented what happened in the courtroom, insinuating Ambrose had the judge in his pocket, *"In a startling move based solely on Ambrose's claims, Judge O'Neill declared Riordan had illicitly been in touch with her teens, an act deemed criminal in CT."* Parlato's narrative is easily disproved by court transcripts, to which he had access.

288. Parlato extensively quotes Bandy Lee, hired by Riordan, and repeats her most graphic, disturbing falsehoods to titillate his readers, *"I have heard recordings of Mr. Ambrose threatening the daughter with vaginal penetration as punishment for minor misbehavior. All three children have reliably reported sexual abuse, and no one has believed them. Frankly, because the father is so threatening, he has intimidated all witnesses (he has already been threatening to me, which I had to report to local police). The 12 (now 13)-year-old recently reported anal penetration."* It's difficult to conjure a more damning false statement against a father. At the time Parlato published, he knew that DCF and the police had investigated Lee's allegations and determined them to be utterly baseless.

289. Parlato again provided a hyperlinks to a "confidential" August 9, 2023 Report of Abuse to DCF Lee filed, containing the same allegations as her earlier DCF report (detailed above under August 3, 2023); the statements made in the report should be incorporated here as if fully set forth herein.

290. Parlato also includes, *"In a letter dated May 29, 2023, NYC Private Investigator Manuel Gomez made alarming accusations against Mr. Ambrose, stating to the FBI and US Attorney that Ambrose had molested his children."* At the time he published, Parlato knew that every allegation Gomez had made was investigated and determined by DCF, the police, and the courts to be false.

291. The article generated 43 comments, virtually all attacking Ambrose. 53 comments.

### October 3, 2023 Publication

292. On October 3, 2023, Parlato published an article entitled "The Power Play: How Chris 20

293. ose's Affluence Shields Him from Scrutiny in CT Family Court" https://frankreport.com/2023/10/03/the-power-play-how-chris-ambroses-affluence-shields-him-from-scrutiny-in-ct-family-court/ When he published this article, Parlato knew authorities, including law enforcement, DCF, and the courts, had determined the conduct alleged against Ambrose

was false. Yet, deliberately put Ambrose in a false light to brutally invade his privacy and

destroy his reputation:

294. Parlato asks, *"Is Christopher Ambrose a predator? Has he sexually abused his three adopted children and potentially others when he was the executive director and then abruptly left* The Door, *a New York City not-for-profit for at-risk Latino and other troubled youths? Does his admission in the custody evaluation report that he knew that the website Latino Boiz featured models that appeared to be underage boys but were models over 18 suggest a reason to investigate?"* Again, when he published and deliberately put Ambrose in a brutal false light, Parlato was aware that all allegations had been investigated and deemed baseless.

295. Parlato also knew that other"facts" he reported had been dismissed as false, *"Computer forensics expert, Donna Eno, found numerous images that reflected concern. The material included gay military, Latino, and websites featuring 'young, hot Latinos.' The adopted children are Latino, and two of the children allege Ambrose sexually abused them."*

296. Parlato continued to misrepresent the position of public authorities, including the courts, *"Family Court ignored their outcries though Yale Hospital and New Haven Children's Hospital deemed them credible. Judge Jane Grossman ordered that any DCF investigation into Ambroses' [sic] suspected pedophilia come to a halt and overturned a 96 hour hold on the children's return to Ambrose. Judge Grossman ordered the immediate return of the children to Ambrose within eight hours – even getting out of bed after midnight to ensure DCF did not investigate the children's allegations."*

297. Parlato published other flat-out fabrications to vilify Ambrose, *"Ambrose punished his kids for their disclosures by taking their cell phones and internet away for about a year while retaining psychiatrists to ply them with drugs and psychologists with therapy focused on negating their experiences."*

298. Parlato returned to his conspiracy theories about the Connecticut system, asking baseless questions to deliberately put Ambrose in a false light, *"Did DCF Commissioner Vannesa Dorantes get a similar order, passed on to her assistant Peterson, to ensure DCF found nothing to hurt the affluent power broker, Christopher Ambrose, and his retinue of high-powered connected attorneys who seem to have malignant influence on the judges on his case?"*

299. The article generated 133 comments, virtually all attacking Ambrose.

**October 6, 2023 Publication**

300. On October 6, 2023, Parlato published an article entitled "Update on Ambrose Teens –
Living with Mom's Cousin in NY as Ambrose Aims for Mother's Arrest in CT" https://
frankreport.com/2023/10/06/update-on-ambrose-teens-living-with-moms-cousin-in-ny-as-
ambrose-aims-for-mothers-arrest-in-ct/ In the article, Parlato made the following
defamatory and/or misleading statements, knowing them to be false, and put Ambrose in a
false light for the public:

301. Parlato twisted the truth in misleading statements:*"[Ambrose's] career had previously
taken him to California and New York City, leaving the mother, Karen Riordan, as their
children's primary caretaker for the first 13 years of their lives…Ambrose fought hard for
custody and had all the money…"*

302. Parlato falsely insisted that Ambrose had the money so he controlled the judicial process,
*"[The] GAL… earned almost $200,000, paid by Ambrose…However, court-appointed
Guardian Ad Litem (GAL), funded by Ambrose, called an emergency hearing…This claim
was supported by custody evaluator Jessica Biren-Caverly, also paid by Ambrose…
Depending on the testimony of the GAL, to whom the father reportedly paid almost
$200,000, [Judge] Adelman found the children's preference to be with their mother
'uninformed'…"*

303. Parlato spews other falsehoods and even claims to read Ambrose's mind, stating
*"Ambrose went to Rhode Island and threatened to get a court order for the arrest of his
children…Ambrose sought to have the kids go home with him or have the court place
them in the Pleasantville Cottage School – a juvenile home for troubled youth."*

304. Parlato repeated his lie that Ambrose had orchestrated a SWAT-style raid, *"The following
day, Ambrose escalated the situation further when the FBI and state police, acting on tips
from Ambrose, performed a SWAT raid on a home Riordan was visiting. The FBI
disappointed him when they informed him that the kids were not there, and the mother
was not arrested…"*

305. Parlato accompanied this passage with the photo below showing a squad of armored
officers advancing in a SWAT-style cluster toward a residence, their long neck rifles
trained on the occupants. Anyone seeing this picture would assume it was the house
Riordan was supposedly in. However, it is an uncredited "stock photo" Parlato took from

the Internet, deliberately deceiving his readers. Moreover, as Parlato knew when he published, the police had located Riordan using traffic cameras, not a tip from Ambrose, and Riordan stated in her testimony no weapons were drawn.



"Ambrose weaved a yarn of a dangerous mother worthy of one of his Law-and-Order scripts. The FBI disappointed him when they informed him that the kids were not there, and the mother was not arrested."

306. Parlato also repeated one of his most frequent falsehoods, *"Ambrose ... took all the marital money and more than $150,000 of her inheritance."*

307. The article generated 137 comments, virtually all attacking Ambrose.

**October 7, 2023 Publication**

308. On October 6, 2023, Parlato published an article entitled "Ambrose Seeks Drastic Measures in Custody Coercion Battle, His Son, Sawyer, 13, Fights Back" https://

frankreport.com/2023/10/07/ambrose-seeks-drastic-measures-in-custody-coercion-battle-his-son-sawyer-13-fights-back/ Parlato made the following defamatory and/or misleading statements, knowing them to be false, putting Ambrose in a false light before the public.

309. Parlato frequently repeats allegations without acknowledging that investigations and courts determined the allegations were false; in so doing, he deliberately puts Ambrose in a false light. For instance, Parlato published *"Ambrose has been accused of stalking his children physically and in court"* when he knew these accusations were proved false. Likewise, Parlato misleadingly states *"Ambrose had previously shut off the children's cell phones, leading family and friends to provide them with alternative devices…"* and another mislead, *"Ambrose chases [his daughter] in a car."*

310. Some of Parlato's statements are complete conjecture stated as fact, "*A note discovered on Ambrose's desk prior to his divorce filing revealed his concerns about a three-year extramarital affair he had with someone and its potential impact on custody and court-ordered payments…"*

311. Parlato repeatedly insists that Ambrose is "abusive" and "buys" custody, "*Critics say [Judge O'Neill's] first major decision was…to protect an abusive father, Ambrose…Using [the custody evaluation], which he paid for, Ambrose succeeded in persuading judges that Riordan, the mother, was guilty of parental alienation…It was Caverly's report, paid by the father, that Judge Jane Grossman [judge #2] used to flip custody to Ambrose."*

312. The article generated 72 comments, virtually all attacking Ambrose.

**October 8, 2023 Publication**

313. On October 8, 2023, Parlato published an article written by Bandy X. Lee entitled "Famed Psychiatrist Dr. Bandy X Lee: The Egregious Case of Christopher Ambrose: How CT Family Court Failed Karen Riordan and Her Children" https://frankreport.com/2023/10/08/famed-pyschiatrist-dr-bandy-x-lee-the-egregious-case-of-christopher-ambrose-how-ct-family-court-failed-karen-riordan-and-her-children/.

314. In his preamble, Parlato extols Lee and endorses her brutally negative characterizations of Ambrose, which align with Parlato's baseless statements in scores of articles, *"Dr.*

*Bandy X. Lee, a distinguished American psychiatrist renowned for her expertise in forensic psychiatry and violence studies, delves into the life of Christopher Ambrose, a man she suggests exhibits psychopathic tendencies. Her report aims to uncover how Ambrose allegedly manipulates the Connecticut Family Court system to devastate the lives of his teenage children and their mother. Dr. Lee's analysis also explores the unsettling enjoyment such individuals derive from these destructive actions."*

315. When Parlato published the above, *he knew or should have known* that Lee had been fired for her lack of medical knowledge and medical ethics, that she had never met Ambrose, let alone examined him, and that authorities had investigated and determined her claims about Ambrose were meritless. In short, Parlato knowingly used Lee's professional credentials and assertions to lend credibility to his assertions that put Ambrose in a false light, violating his privacy and causing significant harm. Parlato promoted and promoted Lee's claims, all of which he knew to have been proved false. He quotes Lee:

316. *"Never in my 25 years of practice did I imagine there would be an 'alternative court,' that deals in criminal child trafficking, where an alternative 'law' reigns, and not even the rules of human decency apply. Indeed, through family court, Christopher Ambrose, who would have been held accountable in any other setting, was able to devastate the life of a client I evaluated, Karen Riordan, and of her children and emerged as 'the innocent one.'…The absentee father [Ambrose] seized the opportunity to marry her [Riordan]…a predatory move to steal her inheritance and hide his homosexuality, among other things…Even though he abruptly stopped being intimate with her as soon as they married, Riordan tolerated his 'quirks' — even though he immediately decided to leave for work in Hollywood and was hardly ever around…In a twisted game of manipulation, Ambrose disrupts the tranquility and joy of his teenage children. Does he take perverse pleasure in the turmoil he instigates? His abusive and exploitative personality emerged, and the children began screaming for help. Riordan initially tried to reconcile everyone, but his actions were outside the bounds of anything she had previously known or even imagined…"*

317. Under the heading, "A Psychopathic 'Father,'" Parlato published Lee's comments as facts, *"Being so caught off guard as the afflicted person wreaks havoc in your life is a common experience of those unfortunate enough to deal with a psychopathic personality. Christopher Ambrose exhibited extremely characteristic patterns, and given that high levels of the disorder are strongly correlated with dangerousness, I interrupted my evaluation of Riordan to perform the Hare Psychopathy Psychopath Checklist (PCL-R) on him…The highly-regarded and widely-used PCL-R requires doctorate-level education*

*in psychology or psychiatry, forensic training and clinical experience with dangerous personalities, and additional instruction specific to administering the scale…[P]sychopathic individuals' pathological lying, conning, and superficial charm can 'beguile' even the most seasoned clinicians into losing the accuracy of diagnosis during a personal interview…Already, from what I had, [Ambrose] reached a full diagnosis of psychopathy — a score of 32/40 (at least 30/40 is required for 'caseness') — which should raise many alarms and possibly be a contraindication to parenting…"*

318. Parlato presented Lee's statements as fact, referencing incidents fabricated by Riordan, which had been debunked during the divorce trial: *"Psychopathy is a disorder of empathy and conscience, where an individual is incapable of loving emotions but is driven to harm living beings, including one's own children. [Ambrose] already showed himself to be racist, taunting these children, the older two who are Guatemalan and the youngest half-Mexican, for their heritage. He also showed himself as a sadist, deliberately causing the family dog's death and killing the children's pet crabs…In a chilling act, Ambrose orchestrated the demise of the children's beloved dog, Cody. This cruel strategy not only deepened the children's disdain for him, but also served his ulterior motive of demonstrating parental alienation."*

319. Parlato published more of Lee's outrageous narrative, which he knew from following the divorce was all false, *"Christopher Ambrose first attempted to cover up his emotional, psychological, physical, and sexual abuse of the children by counter-accusing the mother of abuse. But, when that did not work, he turned to the 'parental alienation" theory'…No doubt, as a former lawyer, he recognized that this was the key to his ability to continue his abuse with impunity and even to turn it into a money-making enterprise by holding the children hostage — the children Karen Riordan adopted without his help — and demanding child support…In 2020, Family Court transferred Riordan's three children, ages 9 to 13, to their father with a 'no contact' order against the mother, and what was supposed to be a week's separation until trial extended into a month, a year, and eventually three years — the typical abuse of process by which Family Courts engage in the predatory alienation of children."*As Parlato is aware, the delays in the divorce trial were partly due to Covid, but more significantly to Riordan, as The Decision states on p. 1.

320. Lee continues to blame Ambrose, citing incidents that never happened or are taken wildly out of context, rendering them false, *"The oldest and youngest immediately started cutting themselves, and the middle child became suicidal and missed almost half a year of school…The oldest went from being an international gymnast and athlete to becoming morbidly obese. They ceased all activities and were confined in their rooms, if not constantly harassed, without privacy, even in the bathroom…The father took the doorknobs off the doors to ensure the children could not bar him from their bedrooms…When the children tried to report their sexual abuse to medical providers, Ambrose took away their phones and Internet access and constantly threatened them…In my*

*investigation, I heard recordings of Ambrose threatening the daughter with vaginal penetration as punishment for minor misbehavior…The 12-year-old's sexual assault was documented in a recording of his screams."*

321. Parlato embeds a video in the article with a caption, *"Video Above: In this video captured by [the daughter], shows her reaction to the chilling screams of a child echoing in the background. [the daughter] identifies the voice as her younger brother, [the younger son], then merely 11 years old, reacting to an undisclosed situation involving their father inside his room…"*

322. Parlato also embedded audio, writing: *"Audio Below: Listen closely to the ominous undertones in this audio clip. Here, we hear Ambrose threatening [the daughter], suggesting a harsh punishment for an unacceptable action. His parenting style leans towards aggression, possibly even crossing legal boundaries. The phrase 'dig it in deep' leaves us questioning its underlying meaning."* As Parlato knew when he published these digitized recordings, DCF and the police determined both were not what Lee claimed.

323. Parlato published more falsehoods still; again, he knew DCF, the police *and* the court-appointed counsel Riordan had secured for the children found the following allegations baseless: *"Adult men were invited to sleep in the 16-year-old daughter's room, bringing drugs and engaging in intercourse with other underage girls…All three children articulately and reliably reported this abuse to multiple adults, consistently including hospital personnel, school officials, and the police, but all eventually deferred to Family Court…These children thus had to endure a 'living hell'… Still, Ambrose hunted [the daughter] down over the Connecticut confidential address program Riordan enrolled in and stalked her with a car, almost getting her into a serious accident."*

324. Parlato published photos of Ambrose, the children, and their dog, further violating the family's privacy and subjecting all - including the minor children - to scrutiny, ridicule, emotional distress.

325. So, Parlato published this devastating impression of Ambrose, based entirely on "facts" he knew to be false. He then amplified the damage by hyperlinking to Lee's various social media platforms, including bandylee.com, and medium.com, which contain additional articles brutalizing Ambrose. Parlato also provided links to her profiles in Wikipedia, LinkedIn, Amazon, and other sites that discuss her "qualifications" (as

explained, many are exaggerated or simply false) to use the authority such credentials

engenders, harming Ambrose further still.

326. A reasonable person would understand Parlato's published article to assert that an

allegedly exalted expert with impressive (albeit often counterfeit or exaggerated)

qualifications diagnosed Ambrose as a dangerous psychopath and insists that he engaged

in morally disturbing conduct, including repeatedly sexually abusing his children.

327. This article elicited 82 reader comments, most denigrating Ambrose.

### October 10, 2023 Publication (Part 1)

328. On October 10, 2023, Parlato published an article entitled "Ambrose Case Sparks Alarm

in Rockland County – Authorities Launch Investigation" https://frankreport.com/

2023/10/10/ambrose-case-sparks-alarm-in-rockland-county-authorities-launch-

investigation/ . In the article, Parlato supports statements his frequent collaborator,

convicted felon Richard Luthmann, made to authorities.

329. At the time he published, Parlato knew that authorities in CT, RI, and NY had

investigated Luthmann's allegations and found them baseless. Nevertheless, Parlato

promoted and endorsed Luthmann's statements, defaming and/or putting Ambrose in a

false light.

330. The article Parlato published and promoted refers to Ambrose as a *"psychopath predator
father"* and claims "THE SITUATION REQUIRES IMMEDIATE CPS
INVESTIGATION" [emphasis in the original]. Parlato used the sub-headline
"**CHRISTOPHER AMBROSE MOLESTS HIS CHILDREN.'** [Emphasis in the
original]. He published, *"In a recording by the teens, [the daughter] makes distressing
revelations of her father's alleged sexual abuse… reinforcing allegations of her father's
abuse. [The son], 13, reported to Mt. Pleasant Police that his father sexually molested
him."* When Parlato published, he knew that police and child protective services had

determined the referenced allegations to be false and that the daughter had a documents history of making such allegations with coaching from her mother, who is Parlato's lover.

331. Parlato also repeats his frequent false claims that *"a report from the Multi-Disciplinary Task Force at Yale New Haven Hospital containing details of potential sexual abuse…Dr. Bandy X. Lee, a reputed psychiatrist, revealed recordings she'd obtained that allegedly contained threats from Ambrose to [the daughter], using sexually explicit language to control and intimidate her for seeking help."* When he published, Parlato knew Ambrose was exonerated of these allegations, as The Moukawsher Decision established.

332. Parlato also published, *"Ambrose…suggest[ed] the siblings be placed in 'brutal juvenile detention centers' rather than the haven of their maternal relative… Judge O'Neill [granted protective orders] without hearing testimony from the teens or any other expert or fact witnesses concerning the alleged abuse…"* Parlato goes on to state that *"Ambrose in Connecticut, with his wealth and connections, has successfully silenced [his children]."*

333. This article elicited 88 reader comments, most denigrating Ambrose.

**October 10, 2023 Publication (Part 2)**

334. On October 10, 2023, Parlato published a second article entitled "Social Media Celebrity Robbie Harvey Demands Investigation into Ambrose's Alleged Abuse" https://frankreport.com/2023/10/10/social-media-celebrity-robbie-harvey-demands-investigation-into-ambroses-alleged-abuse/

335. Robbie Harvey is a TikTok influencer who posts videos "exposing" individuals he identifies as "dangerous," inciting his 3M followers to take action against the targets.

336. On information and belief, Parlato contacted Harvey and shared his false narrative about Ambrose. Harvey did exactly as Parlato hoped: Beginning on September 28, 2023, Harvey posted a half dozen videos repeating Parlato's false accusations, using the

"evidence" (on information and belief, provided by Parlato), and encouraged his

followers to "go after" Ambrose. [7]

337. In this article, Parlato hyperlinked to and quoted two of Harvey's TikToks and embedded a third that was 7 minutes 54 seconds long. Parlato was thrilled with Harvey's work, stating in his article, *"Harvey's latest video goes beyond revealing [Ambrose's] alleged misconduct. He uses his significant online influence – boasting over 3 million followers – to call for action, urging his followers to contact the Connecticut Attorney General, William Tong, and demand an investigation into the claims of sexual and psychological abuse made against Chris Ambrose by his children."* At the time, Parlato published, he was aware that these allegations had been investigated and found baseless. Parlato's efforts to get Ambrose arrested and prosecuted for conduct he knew never happened betrays his extreme malice and willingness to deceive.

338. Parlato also published the transcript and video footage of the children accusing their

father of abuse that Riordan paid disgraced investigator Manny Gomez to produce.

339. In addition, Parlato published quotes from disgraced Bandy Lee, also paid by Riordan,

denigrating the evaluator's report that recommended Ambrose get custody, further

insinuating that Ambrose was an unfit parent.

340. In his article, Parlato hyperlinked Harvey's video, which parroted much of this information; the result left readers with the impression that Parlato had nothing to do with Harvey's story, when, in fact, the story and the "evidence" were based on Parlato's articles. Among the quotes Parlato published; *"[The daughter stated], 'Yeah, touched me on my **** before and my ***** before…[The younger son] 'Like he was touching me on my…' [Gomez]: 'Can you demonstrate to me what he was doing to you?' [Son] 'He was like…'[Gomez] 'Alright, and how often was he doing it?'[Son] 'A lot.'"* When he published this these exchanges, which had been produced three years before, Parlato knew authorities, including the courts, had determined the statements had been coerced from the children*.*

341. Parlato also endorsed Gomez's statements assassinating Ambrose's character, *"In all these cases and thousands of people I have met and encountered, I never have met one as manipulating as Christopher Ambrose. He is truly a Leonardo da Vinci of liars. He*

---

[7] Harvey posted a half dozen videos, all parroting Parlato's narrative, along with audios/videos Parlato provided on information and belief.

*manipulates everything. I don't think there's anything that comes out of this man's mouth that's ever the truth. Other than the word 'hello'."*

342. Parlato also quotes Lee and Harvey insinuating that Ambrose had "bought off" the custody evaluator: *"Well, allegedly, [the custody evaluator] was paid over $10,000 by Chris Ambrose. And if you count her fees to testify and her prep time, the amount is much higher."* By having Harvey publish the same narrative that he had published, Parlato created credibility for the falsehoods.

343. In short, Parlato used Harvey to amplify and give authority to his defamatory narrative about Ambrose. He chose Harvey because he has a history of inciting his 3M followers to "destroy" his targets. Parlato's intentions could not be more apparent: He tried to use Harvey to ruin Ambrose.

344. Upon learning of Harvey's videos, Ambrose sent him a cease and desist letter virtually identical to the one he had sent to Parlato. He also provided Harvey with the court documents detailing all the allegations, which Parlato had reported on. Harvey immediately realized that the narrative and "evidence" Parlato had provided to him were inaccurate and defamatory. Harvey removed every video and reader comment about Ambrose from his platforms. He never published another word about Ambrose, nor has he worked with Parlato again.

345. This article elicited 88 reader comments, most denigrating Ambrose.

**October 21, 2023 Publication**

346. On October 21, 2023, Parlato published another article in frankreport.com written by Riordan's disgraced psychiatrist Lee under the headline "Forensic Psychiatrist Bandy Lee Faces, Threats, Slander for Advocating for Ambrose Teens." https://frankreport.com/ 2023/10/21/forensic-psychiatrist-bandy-lee-faces-threats-slander-for-advocating-for-

ambrose-teens/ Parlato promotes and endorses Lee's claims, even as he knew authorities

had investigated and debunked everything she alleged in the article.

347. In the article, Parlato quotes Lee, *"I have written about Karen Riordan, because I know the case in detail as an expert witness and yet have been prevented from testifying on it (my experience of Family Courts is that they keep tightly to their pool of poorly qualified 'experts' who have the potential to be bought)."*

348. Lee states as fact the three children *"suffer[ed] three years of unspeakable abuse…I interviewed the daughter within 24 hours of her running away from her violent abuser-father."*

349. Under the subheading "Abusers Turn Tables on Victims," Parlato quotes Lee, *"If not contained, abusers become more entitled and violent… The abuser, in this case, Christopher Ambrose, not only discovered the location of his daughter within an hour of the mother notifying the police, but also looked up my contacts to write a threatening letter to me that I should never interview his daughter without his consent. Fortunately, based on the teen's disclosures, I had become a mandated reporter by the time he wrote to me."*

350. Parlato quoted Lee calling Ambrose an "abuser," even as he knew that Ambrose was exonerated of every allegation of misconduct, *"I even followed up with the 16-year-old when she interviewed for my book and documented how dramatically she improved in the four months of leaving her abuser…"*

351. Parlato continued publishing and endorsing Lee's abject falsehoods to support for his own false light statements against Ambrose, *"Since I immediately reported Ambrose's threats to the police, he could not write to me again. Still, he has been slandering me, fabricating false stories…Significantly, I have studied how dangerous personalities operate, and his obsession with researching all the different states in which I held licenses, his veiled threats, and his aggressive weaponisation [sic] of courts to reverse the narrative are signs of psychopathy…All three children, who eventually fled from their violent abuser, Ambrose…Their mother…singlehandedly raised them all their lives… Ambrose hunted them down and either sent the police or tried to manipulate their guardian into releasing them…Ambrose visited [the children] with police and executed a four-hour standoff, threatening the children."*

352. Under a photo of the plaintiff, Parlato wrote, *"Chris Ambrose won't let his children live with their mother or allow them to be happy anywhere."*

353. Parlato also hyperlinked to an article, "An 'Alternative Court' of Unspeakable Criminality, Violence, and Abuse," posted on Lee's medium.com site on October 7, 2023.

354. A reasonable person would understand the information in the article was provided by an *"expert witness who knows the case in detail,"* and that Parlato endorsed the content.

355. This article elicited 23 reader comments, most attacking Ambrose in graphic, vile terms.

**October 23, 2023 Publication**

356. On October 23, 2023, Parlato published an article written by felon/extortionist/former convict Richard Luthmann entitled "Family Court Mastery Secures Ambrose's Return of His Teenagers Amidst Abuse Claims" https://frankreport.com/2023/10/23/ambroses-legal-mastery-secures-return-of-his-teenagers-amidst-abuse-claims/ Parlato promoted Luthmann, including him on the frankreport.com masthead and posting photos of him in the the article; he also endorsed Luthmann's falsehoods and insinuations that put Ambrose in a false light:

357. *"The [Ambrose children], who had previously been on the run from their adoptive father due to accusations of serious abuse, are reportedly back under his roof in Madison, Connecticut, in a home brimming with newly installed locks, cameras, and alarm systems…Ambrose laid in wait outside Laurenzi's home…Ambrose explicitly directed the Sheriff and local police department action…But this time, Ambrose was able to coax the children into his car…"*

358. Parlato's article continued to put Ambrose in a false light. The article states that the two older children, born in Guatemala, could avoid Ambrose because "*international compacts prohibit legally sanctioned sexual molestation and abuse…[the children] tried to flee their abusive father but after chasing them through three states, he captured them and coerced their return…Ambrose had [gone to] coerce and threaten the children into returning to his Madison, Connecticut home…"*

359. In addition to relying on Luthmann, who served years in prison for fraud, Parlato's article sites Bandy Lee, whose claims had been debunked by public authorities and the court. Though Parlato was aware that Ambrose had been exonerated of all abuse charges, he published that Lee reported Ambrose for sexual abuse to police, who *"took Dr. Lee's personal complaint against Ambrose based on a threatening letter he sent her earlier…*

*Because of Ambrose's <u>ex-parte</u> maneuverings, no judge will hear the other side of the story any time soon, including Ambrose's history of threats…Ambrose is a dangerous psychopath, according to Dr. Lee's clinical medical opinion. Using the Hare Psychopathy Checklist, Dr. Lee evaluated Ambrose. Her report was unequivocal, 'A 'full' diagnosis of psychopathy—a score above 30—raises many alarms and could be a contraindication to parenting. I have also affixed my score of the twenty items of the PCL-R, along with the final score (which can be prorated in the case of non-incarcerated persons). Mr. Ambrose's score adds up to 32. This is strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the very least, that disturbing levels of psychopathic features are present…'Dr. Lee fears what Ambrose is capable of and knows he is "extremely dangerous…I have met individuals more dangerous than Christopher Ambrose in my clinical work. Every single one of them is currently housed in a maximum-security institution."*

360. Under a photo of the Ambrose children, Parlato wrote, *"[They] tried to flee their abusive father but after chasing them through three states, he captured them and coerced their return."*

361. This article elicited 62 reader comments, most attacking Ambrose in graphic, vile terms.

### October 26, 2023 Publication

362. On October 26, 2023, Parlato published an article entitled "When a Custody Battle Turns Tragic; 'When is Enough Enough?'" https://frankreport.com/2023/10/26/when-a-custody-battle-turns-tragic-when-is-enough-enough/ The article is attributed to Jeanine Morrison; on information and belief, this is a pen name Parlato uses. The article refers to Ambrose as a "child abuser" even though Parlato was aware Ambrose has been exonerated of all such allegations:

363. Parlato published,*"[T]he authorities are forcing [the children] to live with their abusive father, Chris Ambrose."* Parlato goes on to reference *"Chris' abuse."*

364. In addition Parlato published misleading "facts," all casting Ambrose in a false light,*"As a former attorney and screenwriter, he knows how to work the system, manipulate the narrative in his favor, and maybe send veiled threats to those who might oppose him…. [The children] live in terror, isolated and alone with their abuser. An abuser they have shunned, humiliated, and revolted against publicly, undoubtedly angering Chris and his*

*fragile ego to no end — so much so that he resorts to defending himself anonymously on this website in the comment section…Chris has weaponized the legal system and local authorities to get his way."*

365. The article compares Ambrose to a father who murdered a judge, stating *"[Ambrose] would fluctuate between severe surveillance — with hidden recorders in their rooms and taking the door knobs off the doors so they couldn't lock — to extreme neglect — letting the kids miss school, drink and do drugs, invite people over at all hours, and drive his car without a license."*

366. Under photos of Ambrose, Parlato makes more statements he knew authorities and the courts had determined to be false, *"The father took the doorknobs off the doors to ensure the children could not keep him out of the bedroom"* and *"Chris Ambrose won't let his children live with their mother or allow them to be happy anywhere."*

367. This article elicited 63 reader comments, most attacking Ambrose.

**November 1, 2023 Publication**

368. On November 1, 2023, Parlato wrote an article entitled "Three Teens Make Desperate Plea for Protection from Ambrose: Now He Wants to Take Away Their Phones" https://frankreport.com/2023/11/01/three-teens-make-desperate-plea-for-protection-from-ambrose-now-he-wants-to-take-away-their-phones/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

369. Parlato continued repeating his falsehoods and baseless conspiracy theories and alleging "facts" putting Ambrose in a false light. At the time he published, Parlato knew these claims had been disproved, as stated in The Decision. *Parlato wrote, "On August 8, after Ambrose went to two judges…he found Judge Thomas J. O'Neill…Ambrose made a motion… seeking a pliable judge willing to order the teens' cell phone service be canceled within 24 hours. Now, [the children] are locked and locked [sic], with 24 hour surveillance, with no phone or internet… "*

370. *"After Ambrose converted the joint accounts into his control, Riordan, unable to compete with the spending frenzy of family court, was like a sheep to be sheared. So were the children….Ambrose, aided by court-appointed professionals he paid, and some judicious judge hopping, managed to flip custody…Along the way, he subsumed more than $1*

*million of the mother's assets, avoiding financial disclosures, alimony and child support…"*

371. *"After he got custody, he kept the children in virtual isolation for three years, often taking away their phones and internet, and denying them the right to see their mother, or any of the family and friends they grew up with."*

372. Parlato continued his misrepresentations; writing of Riordan, his girlfriend, he wrote, "*Ambrose had taken all her money."*

373. Parlato even misstated judicial decisions, easily disproved by court transcripts, *"Before issuing his disastrous-to-the-children-but-pleasing-to-their–father ruling Judge O'Neill was adamant: He would not listen to the teenagers. Their voices were irrelevant… [T]o say it succinctly in O'Neill's vernacular – money talks and children should be neither seen nor heard."*

374. This article elicited 155 reader comments, virtually all attacking Ambrose.

**November 13, 2023 Publication**

375. On November 13, 2023, Parlato wrote an article entitled "CT Family Court: Ambrose's Adoption Deception Unraveled" https://frankreport.com/2023/11/13/connecticut-custody-battle-suspended-lawyers-aggressive-tactics-against-mother-revealed/ Parlato continued his repetitive misrepresentation of facts, defaming and/or making misleading statements that put Ambrose in a false light. The more a lie is repeated, the more likely it is to be believed:

376. *"[Ambrose] took control of the marital assets and flipped custody in family court. This effectively barred Riordan from contacting her children. Ambrose cited parental alienation while trying to alienate the children from their mother… [Judge] Adleman… never required Ambrose to file financial affidavits to show what he did with the marital assets… making his decision based entirely on Ambrose's allegations…"*

377. Parlato went on with more falsehoods, all disproved as publicly available court records demonstrate, *"Ambrose… now seeks to have the judge force Riordan to seek the removal of information about the teenagers from the publication before locking her up…*

*Ambrose's house, now equipped with surveillance systems…The loving father will do anything to prevent the three teens from seeing their adoptive mother."*

378. This article elicited 126 reader comments, virtually all attacking Ambrose.

**November 14, 2023 Publication**

379. On November 14, 2023, Parlato wrote an article entitled  "A Fairy Tale Adoption Turns Sour as Ambrose Seeks to Isolate Kids" https://frankreport.com/2023/11/14/a-fairy-tale-adoption-turns-sour-as-ambrose-seeks-to-isolate-kids/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

380. *"[Ambrose] figures that the teenagers won't be able to see [Riordan] if she is behind bars…They are living captive at his house under surveillance. The loving father will do anything to prevent the three teens from seeing their adoptive mother…[Riordan] raised the kids from infancy — for the first thirteen years of the two eldest…and the first nine years of the [youngest's] life…Ambrose wants the children to have the courts, exclude the adoptive mother, her family and the biological mother. Perhaps other abusers can understand it. If the teens see others, they might disclose something that could adversely impact Ambrose. Better to keep the teens isolated…It is said 'money can't buy love,' which is true. His children do not love him. They are afraid of him. But in Connecticut Family Court, money can at least buy custody.Just ask Chris Ambrose."*

381. Under a photo of Ambrose, Parlato wrote, *"Chris Ambrose captured his children and he does not want them to make any outtcries [sic], based on his theory that children should not be seen or heard."* Parlato also published the photo below, replacing Ambrose's nose with a penis with the caption *"If every one of Chris Ambrose's little white ones were to increase the size of his nose, he would enjoy a ponderous, a truly prodigious nose."* As explained, Parlato's malice for Ambrose is transparent.



382. This article elicited 222 reader comments, virtually all attacking Ambrose.

**December 15, 2023 Publication**

383. On December 15, 2023, Parlato published an article entitled "Nusbaum's Actions Under Microscope in Ambrose-Riordan Case" https://frankreport.com/2023/12/15/nusbaums-actions-under-microscope-in-ambrose-riordan-case/ Parlato published this article attributed to Janine Morrison (as explained, this is believed to be one of Parlato's pen names) promoting and endorsing the following defamatory and/or misleading statements, putting Ambrose in a false light:

384. *"[Ambrose] wants [Riordan] in prison, because his teenage children prefer to live with her, not him. Ambrose… was labeled potentially psychopathic by noted psychiatrist Dr. Bandy Lee, has used Connecticut's legal system to attempt to destroy his ex-wife and punish his children ages 17, 17 and 13. Since 2020, Ambrose has consistently…accus[ed] Riordan of brainwashing the children and reducing them to zombies…Ambrose…has barred the children from seeing any family members or friends…requested [Riordan's] arrest without a trial for custodial interference, with the hope that if she is in prison for a lengthy term, the teenagers will realize they can't see their mother…"*

385. Parlato goes on to repeat other baseless allegations, which were determined baseless by publicly available court decisions, *"Judge O'Neill chose not to allow the children to testify, relying solely on their father's version…To get the children away from their mother, Ambrose apparently lied to federal agents, saying the mother kidnapped the children and was a dangerous threat. A 20 person SWAT team descended on Riordan… The SWAT team left without arresting Riordan, beating, shooting or killing her, or even ransacking the house, much to Ambrose's chagrin and disappointment…"*

386. Parlato also repeated more falsehoods, *"Now that the teens have returned to their father's home, Ambrose has taken extraordinary measures to keep the teenagers from leaving his loving care. He installed bars on windows, alarm systems, secret surveillance devices to record the teens' every move, and illegally locked the children inside the house without sufficient means of egress in violation of fire and safety codes."* When he published, Parlato knew these statements had been contradicted by police and fire department reports, all publicly available.

387. Under a photo of Ambrose, Parlato wrote, *"Litigious, disgraced Hollywood writer and suspended lawyer Christopher Ambrose wants the children isolated and their mother arrested."*

388. Parlato hyperlinked to an article written by Bandy Lee that he published on October 8, 2023. Lee's defamatory/misleading statements, discussed herein under the heading "October 8, 2023," should be incorporated here as if fully set forth herein.

389. The article elicited 185 reader comments, many attacking Ambrose.

**February 5, 2024 Publication**

390. On February 5, 2024, Parlato published an article written by his frequent collaborator, the felon/extortionist/fraud/former convict Richard Luthmann, entitled "BREAKING: Video Indicates Jennifer's Law is a CT Family Courts 'Cash For Kids' Coverup" https://frankreport.com/2024/02/05/breaking-video-indicates-jennifers-law-is-a-ct-family-courts-cash-for-kids-coverup/ The article defames and/or puts Ambrose in a viciously false light:

391. The article pulls quotes from an earlier article Parlato wrote and published, stating *"Parlato published the following about the Ambrose v. Riordan case almost a year and a half ago: This is CT, and this is a family court…[that]… invented a way for well-to-do abusers and pedophiles to prevail – 'parental alienation' – and it is used as a weapon to take money from the rich and give the children in return…[O]nce it is determined by any quack or con artist GAL or custody evaluator – is to take the children from the parent they love and order no contact with her – and hand them over to the abuser with money.'*

392. The article continued, quoting Parlato, *"For those who say some mothers alienate their children from the father, which is true, I say children can be alienated from a father because he is a cruel ass, a cunning man… It can be the abuser himself. But alienated [sic] the children… because the father had the money and because he had CT family court – he could buy the children like you might buy a dozen eggs at the market. That market is CT Family Court, and it is, arguably, as vicious and sinister a place as the world has known."*

393. Parlato even repeated his most outrageous, unconscionable lies about Ambrose, *"In the Ambrose v. Riordan case, damning evidence of abuse and sexual penetration was repeatedly presented to public officials, judges, attorneys, the police, and the Connecticut Department of Children and Families (DCF). It was all ignored."*

394. The article elicited 273 reader comments, many attacking Ambrose.

**March 30, 2024 Publication**

395. On March 30, 2024, Parlato published an article entitled "Family Law Fraud; Courtroom Collusion; Lawyer's Underhanded Tactics – A Sickening Stew" https://frankreport.com/2024/03/30/family-law-fraud-courtroom-collusion-lawyers-underhanded-tactics-a-sickening-stew/ In the article, Parlato defamed and/or put Ambrose in a false light, writing:

396. *"Chris Ambrose had stolen all the marital money. He froze his wife of 17 years out of everything – about $2 million…He had been an absent father, and at his insistence, the mother, Karen Riordan, had given up her job as a teacher and raised the three kids full-time… But [Ambrose] knew the family court game and was ready to buy custody…"*

397. Under a banner in bold stating, "Ambrose was a Textbook Case of Parental Alienation as a Revenue Generator," Parlato continued his misrepresentations about Ambrose's and Riordan's positions, both of which are public record, to cast Ambrose in a false light, *"Where this became a peach of a deal – what lawyers call 'high conflict' – is that while Ambrose had unlawfully taken the money this mother would fight for her children...That means if the lawyers set it up right, they could make Ambrose pay a lot to fight off his wife... But to be blunt, the mother would only fight if she did not have any custody; she was willing to split custody. She even encouraged the children to be with their dad regularly. So, the plan was to take all custody away from her. Her first attorney, Rich Callahan, arranged with Ambrose's attorney, Nancy Aldrich, on how they were going to set up Riordan, the mother, to lose custody. The father wanted this as well. This was the way he could keep all the assets and not pay alimony or child support..."*

398. Parlato continued to spin his damning albeit baseless conspiracy theory, *"The first thing to do was get a GAL... Now, the plan was laid out to [the GAL] with a simple one line in an email by the mother's attorney (in a conspiratorial act of betrayal): 'The father has control of the money and will be paying.' Once the GAL knew this, the playbook called not for the silver bullet but for parental alienation. The GAL's first job was to get a custody evaluator... the ruthless monster of CT Family Court [names the evaluator with puerile ad hominem]. She recommended taking the kids away from the mother and giving them solely to the abusive father, who in fact paid her some $17,000 for her services. Her custody report is a masterpiece of deceit and distortion, and will no doubt be studied one day for how these criminal writings once passed as the rule of law...The lawyers all knew that once then mother lost custody, there would be years of fighting (billings)... Ambrose had stolen all the money..."*

399. Under another sub-headline, "Collaborating Grifters," Parlato continued to make unsupported claims against Ambrose, intentionally creating a damning picture of him, *"[T]he attorneys conspired to move the case to a judge who played their game... Ambrose was willing to pay six or even seven figures to buy custody...So [Judge Grossman] destroyed three children's lives by removing them from the mother – using the lie of parental alienation. [Ambrose] was largely a stranger [to his children] and a scary and abusive one at that..... [I]t is done for money. Nothing more...Ambrose...spent his wife's share of the marital assets and kept his own...So the clever attorney/plagiarist bought custody of the kids for about a million dollars but by using his wife's million. [Riordan's attorney] ...did nothing but collaborate with Ambrose's attorney...In the Ambrose case, he did abuse his children, but the attorneys decided to use parental alienation (falsely) because it was more lucrative..."*

400. The article elicited 437 reader comments, many attacking Ambrose.

## COUNT I – INVASION OF PRIVACY BY FALSE LIGHT

401. Under Connecticut law, false light invasion of privacy requires the plaintiff to prove that:

- The defendant publicized information placing the plaintiff in a false light that would be highly offensive to a reasonable person; and

- The defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff was placed.

402. Defendant Frank Parlato published false and/or misleading statements about Plaintiff Christopher Ambrose in:

- Articles authored by Parlato; and

- Articles authored by third parties but published, endorsed, and/or hyperlinked on his websites.

403. Parlato also published interviews and documents, including confidential DCF reports, diagnostic notes, the O'Neill Letter, the Riordan Letter, and other private correspondence (collectively, the "Writings"), that defame Ambrose or portray him in a false and misleading light. These publications, documents, and Writings are collectively referred to as "The Statements."

404. Parlato knew, or acted with reckless disregard for the truth, that The Statements were false or misleading and placed Ambrose in a false light. Parlato's actions significantly misrepresented Ambrose's character, conduct, and beliefs in a manner that a reasonable person would find highly offensive.

405. As a result, Ambrose has been subjected to public hatred, contempt, ridicule, harassment, disgrace, and threats of violence, causing severe harm to his emotional well-being, reputation, and quality of life.

406. Parlato published The Statements online, where they were accessed by individuals in Connecticut, throughout the United States, and worldwide.

407. Ambrose is a private individual and is not a public official or public figure.

408. The Statements were part of a continuous campaign of harassment by Parlato beginning in or about October 2021 and continuing through July 2023 and beyond.

409. As a direct and proximate result of Parlato's conduct, Ambrose has suffered actual and substantial damages, including emotional distress, reputational injury, and other harm.

**COUNT II – PUBLIC DISCLOSURE OF PRIVATE FACTS**

410. Under Connecticut law, public disclosure of private facts—also known as "publicity given to private life"—requires the plaintiff to prove that:

- The defendant's disclosure involved information that would be highly offensive to a reasonable person, not merely annoying or embarrassing;

- The information disclosed was truly private, not already in the public domain or readily accessible through public records or observation;

- The information was not newsworthy or of legitimate public interest; and

- The defendant disclosed private facts to the public at large, making it substantially certain they would become public knowledge.

411. Defendant Frank Parlato disclosed private facts about Plaintiff Christopher Ambrose in: articles authored by Parlato; and articles authored by third parties but published, endorsed, and/or hyperlinked on his websites.

412. Parlato also published interviews and documents, including confidential DCF reports, diagnostic notes, the O'Neill Letter, the Riordan Letter, and other private correspondence (collectively, the "Writings"), that contained private information about Ambrose not in the public domain or readily accessible through public records or observation. These publications and Writings are collectively referred to as "The Statements."

413. Parlato knew, or acted with reckless disregard for the truth, that The Statements contained private information about Ambrose that was neither newsworthy nor of legitimate public interest. The disclosures involved highly offensive material and were published online in a manner substantially certain to make them public knowledge.

414. As a result, Ambrose has been subjected to public hatred, contempt, ridicule, harassment, disgrace, and threats of violence, causing severe harm to his emotional well-being, reputation, and quality of life.

415. Parlato published The Statements online, where they were accessed by individuals in Connecticut, throughout the United States, and worldwide.

416. Ambrose is a private individual and is not a public official or public figure.

417. The Statements were part of a continuous campaign of harassment by Parlato beginning in or about October 2021 and continuing through July 2023 and beyond.

418. As a direct and proximate result of Parlato's conduct, Ambrose has suffered actual and substantial damages, including emotional distress, reputational injury, and other harm.

## COUNT III – DEFAMATION *PER SE*

419. Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

420. Under Connecticut law, a statement is defamatory *per se* when it falsely imputes conduct so inherently harmful to reputation that damages are presumed and need not be specifically proven. Common law and CT Gen Stat § 52-237.

421. Categories of *per se* defamation under Connecticut law include statements:
    a. imputing a crime involving moral turpitude, such as child abuse;
    b. imputing a crime punishable by imprisonment, such as bribery or theft; or
    c. charging a person with misconduct, incompetence, or lack of integrity in their profession.

422. Defendant Frank Parlato published numerous statements that constitute defamation *per se*, including but not limited to the following false accusations that Plaintiff Christopher Ambrose:
    a. sexually abused his children, including committing "child rape";
    b. emotionally, psychologically, and verbally abused his children and ex-wife, Karen Riordan;
    c. "stalked" and "hunted down" Riordan and their children;
    d. permitted minors to use alcohol and drugs in his home and be "statutorily raped" by adults;
    e. Hid and stole marital assets, embezzled Riordan's inheritance and "stole everything she had";
    f. lost his law license and was repeatedly fired for plagiarism and fraud;
    g. colluded with law enforcement, child protective professionals, therapists, and family court judges to unlawfully obtain custody of the children;
    h. conspired with law enforcement, child protective services and the judiciary to "cover up" and continue the abuse;
    i. lied in court under oath and to law enforcement, DCF, and federal agents, including the FBI, and "directing" a SWAT-style raid against Riordan.

423. These statements are false, defamatory, and were published with actual malice—that is, with knowledge of their falsity or reckless disregard for the truth.

424. The statements seriously misrepresented Ambrose's character and conduct, and would be highly offensive to any reasonable person.

425. Parlato published these statements on the Internet, making them accessible to readers in Connecticut, the United States, and globally.

426. Ambrose is a private individual, not a public official or public figure.

427. The statements were not isolated but part of a continuous campaign of defamation and harassment by Parlato, beginning in or around October 2021, continuing through July 2023 to the present.

428. Parlato's publications have caused Ambrose to suffer presumed damages as well as actual reputational harm, emotional distress, and other damages.

## COUNT IV– DEFAMATION (General)

429. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

430. Under Connecticut law, defamation occurs when a defendant publishes a false statement to a third party that identifies the plaintiff and harms the plaintiff's reputation. The defendant may be liable if the statement was made willfully, recklessly, or negligently. Conn. Gen. Stat. § 52-237.

431. Defendant Frank Parlato published, endorsed and/or hyperlinked to the false and misleading Statements about Plaintiff Christopher Ambrose, with knowledge of their falsity, reckless disregard for the truth, or negligence.

432. The Statements identified Ambrose and subjected him to public hatred, ridicule, contempt, distrust, harassment, disgrace, and potential violence, seriously damaging his personal and professional reputation.

433. Parlato knew, or reasonably should have known, that the Statements were false or misleading and that their publication would likely cause significant harm to Ambrose.

434. Parlato published the Statements on widely accessible Internet platforms, where they reached audiences in Connecticut, the United States, and globally.

435. These publications were part of a continuous, coordinated campaign of defamation and harassment beginning in or around October 2021 and continuing through the present.

436. Ambrose is a private individual, not a public figure or public official.

437. As a direct and proximate result of these publications, Ambrose suffered actual and substantial damages.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

438. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

439. Under Connecticut law, a claim for intentional infliction of emotional distress requires proof that:

a. The defendant intended to cause emotional distress, or knew or should have known that emotional distress was the likely result of their conduct;

b. The conduct was extreme and outrageous;

c. The conduct caused the plaintiff emotional distress; and

d. The emotional distress was severe.

440. Parlato's conduct, including publishing and disseminating highly inflammatory and false statements about Ambrose to a global audience, was extreme and outrageous, exceeding all bounds tolerated in a civilized society.

441. Parlato's conduct was intentional, willful, malicious, and/or carried out with reckless disregard for the likelihood that it would cause severe emotional harm to Ambrose.

442. As a direct and proximate result of Parlato's actions, Ambrose has suffered and continues to suffer humiliation, mental anguish, shame, distress, and other serious emotional injuries.

443. Ambrose is entitled to compensatory, special, and punitive damages in amounts to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. **A preliminary and permanent injunction** restraining defendant Frank Parlato, Jr. from:

- Making or republishing any statements—either directly or indirectly, including through third parties—about the plaintiff on any website(s), platform(s), forum(s), or podcast(s) he owns, controls, or contributes to;

- And granting any other injunctive relief the Court deems necessary for the plaintiff's protection, including directives to law enforcement.

B. **An order requiring the immediate removal** of all statements, comments, writings, photographs, videos, and audio recordings referencing the plaintiff, whether made by Parlato or third parties, from any medium Parlato controls.

C. **An order requiring Parlato to publish a full and prominent retraction** of the defamatory and false light statements, including but not limited to the false accusations that Ambrose:

- Sexually molested his children (including accusations of "child rape"),

- Emotionally, psychologically, and verbally abused his children and ex-wife,

- Stalked and hunted his children and ex-wife,

- Permitted substance use by minors and statutory rape in his home,

- Embezzled his ex-wife's inheritance and stole marital assets,

- Conspired with judges and state agencies to unlawfully retain custody of his children,

- Lied under oath in court and to other public authorities, including federal agents.

D. **An order requiring Parlato to publish a full and unqualified retraction** of all defamatory statements, including all allegations of abuse, on the any platform(s) he controls where the statements appeared and with visibility and reach equivalent to the original publications. Simply stating that he is publishing the retraction to avoid litigation or that Ambrose denied the statements will not suffice. The retractions must be unequivocal acknowledgments of all defamatory and misleading statements.

E. **An order requiring Parlato to publish a full and public apology** on any platform under his control where such defamatory statements were published. This apology must match the prominence of the original statements and must be sincere, unequivocal, and without qualification or reservation. A weak, grudging, or half-hearted effort will not suffice; and again, stating that he is apologizing to avoid litigation or because Ambrose denied the statements will not suffice.

F. **An award of compensatory and punitive damages** in an amount not less than **$5,000,000**.

G. **An award of all litigation costs, including any filing fees and service of process costs.**

H. **An award of pre-judgment and post-judgment interest** as permitted by law.

I. **Such other and further relief as the Court deems just and equitable.**

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Christopher Ambrose respectfully requests trial by jury.

Dated: ___ July 2025

Respectfully submitted,

Christopher A. Ambrose, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com