# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

**CHRISTOPHER AMBROSE,**
Plaintiff

Case No. 3:25-cv-01151-SVN

v.

AUG 29 2025 PM2:09
FILED-USDC-CT-HARTFORD

**FRANK PARLATO, JR.,**
Defendant

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

### I. PARTIES AND JURISDICTION

1. Plaintiff files this First Amended Complaint as of right pursuant to Fed. R. Civ. P. 15(a)(1)(A), prior to service of the original complaint.

2. The Plaintiff, Christopher Ambrose ("Plaintiff" or "Ambrose"), is an individual domiciled in Madison, Connecticut.

3. The Defendant, Frank Parlato, Jr. ("Defendant" or "Parlato"), is an individual domiciled in Big Pine Key, Florida. Parlato is a federal felon who was confined for his admitted crimes.

4. The amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has jurisdiction under 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy requirement is satisfied.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as Defendant deliberately and maliciously targeted Plaintiff in Connecticut, and the events giving rise to the claims and the injuries occurred in the state, just as Defendant anticipated.

## II. INTRODUCTION

7. This is a civil action seeking damages for defamation, defamation *per se*, false light invasion of privacy, public disclosure of private facts, intentional infliction of emotional distress and harassment under Connecticut law, committed by Parlato through a sustained campaign of malicious, false, and defamatory publications about Ambrose.

8. Since October 2, 2021, Parlato has published hundreds of articles falsely accusing Ambrose of heinous acts, including child sexual abuse, theft, conspiracy, and bribery of public authorities, including family court judges. This action addresses only the statements published on or after July 20, 2023, which are within the applicable statute of limitations.

9. On April 14, 2022, Ambrose emailed Parlato a cease and desist letter warning him of the defamatory and harmful nature of his publications. Instead of ceasing, Parlato further betrayed his malice by gleefully mocking Ambrose and escalating the defamatory attacks in scores of new articles.

10. Ambrose previously brought suit in Connecticut Superior Court on July 21, 2022, which Parlato removed to the US District Court for the District of Connecticut. Due to financial hardship following a brutal divorce, Ambrose was representing himself. However,

overwhelming family obligations, including sole custody of his three children and caring for a dying parent, forced Ambrose to discontinue that action.

11. Parlato's false and malicious publications have subjected Ambrose to public ridicule, death threats, threats of mutilation, widespread reputational and other harm. Parlato's actions have utterly destroyed Ambrose's quality of life.

12. Parlato's articles parrot the false narrative advanced by Ambrose's ex-wife, Karen Riordan ("Riordan"), with whom Parlato had and/or has a live-in, "intimate" relationship. (While Riordan has denied this relationship, when police responded to a domestic violence incident at their Florida home on November 9, 2021, she identified herself on camera to deputies as Parlato's "intimate partner").

13. Parlato knew, *prior to publishing*, that multiple Connecticut courts, hospitals, child protective services, and law enforcement agencies had found Riordan's abuse and other claims against Ambrose to be unsubstantiated or false. Despite this, he published her narrative as fact.

14. Connecticut courts awarded Ambrose sole legal and physical custody of his children since April 2020 based on Riordan's erratic conduct, which was determined to be so concerning, she was denied visitation unless she submitted to a complete psychiatric evaluation and intensive therapy, which she refused. Parlato knowingly disregarded these judicial findings.

15. Parlato was also aware that the courts subsequently found her in contempt of the custody orders and issued restraining orders against her on behalf of the children in August 2023.

16. Parlato is a federal felon who was charged with a 19-count indictment including fraud, money laundering, conspiracy and tax crimes. He pled guilty in 2023, resulting in confinement, a $1 million forfeiture and $185,000 payment to the IRS.

17. Parlato was previously the publicist for the NXIVM sex cult leader, who is serving a 120 year prison sentence.

18. Parlato has tried to reinvent himself as an "investigative journalist," but according to the US Attorney's Office for the Eastern District of New York, he operates as a "gun for hire," and is paid to defame targeted individuals and entities in smear campaigns on his various tabloid-style sensationalist sites, particularly the *FrankReport.com*.

19. In dozens of articles, Parlato promotes baseless conspiracy theories about the Connecticut family courts and other Connecticut authorities, including law enforcement and child protective services. He falsely alleges systemic bribery and "cover-ups" of child sexual abuse in custody cases, citing Ambrose as the primary example. For instance, he wrote, "Ambrose can outspend his wife. This is all that is needed in CT Family Court's cash for kids enterprise." (Published August 30, 2023, *FrankReport.com*)

20. Parlato seeks internet notoriety and "clout" by publishing sensational, defamatory content about Ambrose, and articles by fringe figures and disgraced individuals, including other

convicted felons, who align with his false and misleading narratives about Ambrose and the Connecticut courts and authorities.

21. Parlato has published the names and photographs of Ambrose's minor children, falsely branding them as victims of sexual abuse, thereby causing them irreparable psychological and reputational harm.

22. These defamatory articles remain online and accessible to the world, inflicting perpetual harm on Ambrose and his children.

23. Parlato's published articles, enmeshed with with Riordan's falsehoods, form the foundation of his obsessive and malicious smear campaign intended to harass and defame Ambrose, invade his privacy by disclosing private facts and casting him in a false light, and cause severe emotional distress and other harms—warranting this Court's intervention and the award of substantial damages.

### III. ESSENTIAL CONTEXT

21. Ambrose and Riordan married in June 2004. They resided in New York City, soon relocating to Los Angeles where Ambrose, a television writer and producer, had secured a new position. Riordan, a teacher, left her job immediately after the wedding.

22. While in Los Angeles, Riordan worked part-time as a tutor in a position arranged by one of Ambrose's colleagues. Otherwise, she remained unemployed throughout the marriage, including the three years before the couple had children.

23. Both parties had professional experience working with at-risk youth and chose to build their family through adoption. In 2007, they adopted two infants, a daughter and son from Guatemala, and later a newborn boy from Utah. The three children are collectively referred to as "the children."

24. The couple agreed that Ambrose would continue to be the family's sole financial provider, Riordan would be a stay-at-home parent.

25. Although the vast majority of professional opportunities for Ambrose were in Los Angeles, Riordan insisted on relocating to the East Coast. Ambrose obtained employment in New York City, and the family moved to Westport, Connecticut.

26. After that position ended, the only jobs available to Ambrose were in Los Angeles. (In network television, writing "gigs" often last only a year or two). However, Riordan refused to move, even though the children were only in preschool. Needing to support the family, Ambrose had to take the position. He commuted cross-country weekly, at great expense and personal sacrifice, in order to remain present in their lives.

27. The Los Angeles job lasted approximately 16 months (mid-2010 through 2011). Riordan and the children joined him in California for extended stays, and during a three-month hiatus, Ambrose was home full-time in Connecticut. Contrary to Riordan's later representations, the family was only "separated" geographically; keeping the family apart was entirely her unilateral decision.

28. After the job ended, Ambrose—concerned about the stress the bi-coastal arrangement had placed on the family—committed to taking jobs that allowed him to remain on the East Coast. He declined numerous high-paying and prestigious opportunities in Los Angeles in order to remain with Riordan and the children. This decision severely curtailed future employment and income.

29. Ambrose was consistently an involved and devoted father, rarely missing the children's events. By contrast, Riordan, though a stay-at-home parent, often missed such activities.

30. Ambrose frequently attended parent-teacher conferences alone and accompanied the children to medical appointments, including his daughter's regular full-day audiological assessments in New York, which Riordan attended only twice in four years. By contrast, Riordan had a documented history of conflict with medical and educational professionals. The divorce Decision explicitly states that she "had a need to challenge and create conflicts" with pediatricians, teachers, school administrators, and even the entire Westport School Board ("The Decision" at p. 11).

31. At some point during these years, Riordan began maligning Ambrose to the children, subtly and overtly. This behavior quickly escalated, becoming a deeply disturbing pattern. Riordan even excluded him from family outings and holiday parties. (See The Decision pp. 6-25).

32. Therapists involved with the children, all selected by Riordan, were alarmed by her deliberate efforts to turn the children against their father since he had not neglected or abused them; in fact, the children reported he was attentive and loving.

33. After multiple unsuccessful attempts at counseling, the couple agreed the marriage was irretrievably broken. In July 2019, Ambrose filed for divorce, seeking shared custody and an equitable financial division.

34. Riordan did not respond to the filing. Instead, without notice, she took the children out of state, and replaced their phones to prevent Ambrose from locating or communicating with them. It took Ambrose days to locate Riordan , and he was forced to get a court order to compel her to return so the children could begin the school year.

35. Riordan demanded and was granted exclusive use of the Westport residence, but shortly thereafter - without warning - she moved the children 50 miles away to New Haven County. She signed an 18-month lease on a costly waterfront property without informing Ambrose or the Court.

36. More troubling still, almost immediately after Ambrose filed for divorce, Riordan began making false allegations that he had mistreated the children. When her claims did not gain traction with authorities, she made even more incendiary accusations - including that he sexually abused the children. No allegations of any kind had ever been made prior to Ambrose filing for divorce. Riordan made no claims of abuse against her.

37. Given her erratic, pernicious conduct and the severity of her allegations, the Court *sua sponte* ordered a comprehensive custody evaluation and appointed a *Guardian ad Litem* ("GAL"), with costs to be paid from *marital* assets, despite Riordan's later claims that Ambrose paid - and therefore controlled - this professional.

38. Around this time, Riordan secretly entered the Westport residence and removed two laptop computers. Initially, she claimed they were used exclusively by Ambrose, but when advised by counsel that stolen evidence could backfire legally, she altered her story and said they were used by the entire family.

39. She hired a purported forensic "expert" and paid five figures for a report alleging that the devices contained evidence that Ambrose had viewed and created pornography and visited fetish sites, including those involving children. In other words, she claimed that he stored "kiddie" porn on laptops his children supposedly accessed.

40. A subsequent forensic analysis conducted by the former head of the Connecticut State Police Computer Crimes Unit definitively refuted Riordan's expert's claims. Moreover, had child pornography been discovered, Ambrose would have been arrested. The Court sanctioned Riordan, barred her from duplicating the hard drives and ordered them returned to Ambrose.

41. In April 2020, before the divorce trial even started, the custody evaluator released a 100+ page report. The GAL found the information about Riordan so alarming that she requested an emergency hearing.

42. At the hearing, both the GAL and evaluator testified that Riordan was engaging in a deliberate pattern of behavior intended to destroy Ambrose's relationship with the children.

43. As a result, the Court (Grossman, J.) imposed a 90-day no-contact order on Riordan and granted Ambrose temporary sole legal and physical custody to allow him time to repair the father-child bonds Riordan had sought to destroy.

44. However, within two weeks, Ambrose discovered that Riordan was secretly sending the children dozens of texts, instructing them to falsely report that their father was mistreating and abusing them. She also directed the children to delete her messages to avoid detection (Decision at p. 12).

45. Following the discovery of Riordan's covert texts, the GAL requested another emergency conference. After reviewing the messages, the Court sanctioned Riordan for her persistent efforts to alienate the children from Ambrose, and ordered that following the initial 90-day no-contact period, her visitation would be supervised until she demonstrated an ability to refrain from maligning Ambrose and coaching the children to turn against him.

46. While grateful for the opportunity to repair his paternal relationship, Plaintiff was concerned about the psychological impact of the children's sudden loss of their mother. He wanted them to be able to see Riordan as soon as the 90-day no-contact period ended. "The plaintiff, the evidence shows, was a very willing participant in the court ordered process. A supervising agency was retained by him in accordance with the orders. He

completed all the forms and paid the retainer required." (The Decision p. 17). This is one of many incidents that contradict Parlato's false claims that Ambrose tried to keep Riordan from the children. (In fact, recognizing the importance of both parents, he has repeatedly encouraged Riordan to comply with the orders to see the children).

47. But Riordan rejected supervised visitation, "[M]ore difficult to understand, the defendant continuously failed to follow the court order that would allow her to see and be with the children." (The Decision p.17). "The defendant never even did the paperwork required [for supervision]." (The Decision p. 18). In effect, Riordan unilaterally and voluntarily cut off lawful contact with the children after April 24, 2020.

48. The children, confused and distressed by their mother's sudden absence, experienced symptoms of trauma, including anxiety, self-injury, and compulsive eating.

49. All three children told their therapists and the GAL that Plaintiff had never mistreated them or disparaged their mother; to the contrary, he consistently reassured them of her love and reminded them she would see them once she complied with court requirements.

50. The therapists uniformly concluded that the children's emotional struggles were caused by Riordan's abandonment, not by any conduct of their father.

51. As she had during the 90-day no contact period, Riordan maintained secret phone/text contact with the children, falsely telling them that Ambrose was to blame for her absence. She also alleged—without basis—that Ambrose had stolen her inheritance, bribed DCF professionals, therapists and judges, and accused him of sexual deviancy, instructing the

older children not to leave their younger brother alone with their father because he was a "gay child molester like Michael Jackson."

52. In December 2020, Riordan filed for an *ex parte* emergency restraining order (TRO), again falsely alleging sexual abuse by Ambrose. She applied in a different jurisdiction and used her maiden name to conceal her record of false allegations. The Court (Price-Borland, J.), unaware of Riordan's history, initially granted the TROs, and Riordan removed the children from their schools mid-day.

53. At an emergency hearing the following morning, Riordan failed to appear. The Court (Price-Borland) vacated the TROs upon learning of her deception and history. Riordan failed to appear at another emergency hearing that afternoon before the family court judge (Grossman, J.). When police officers were sent to her home, it was vacant.

54. Riordan had taken the children to a hotel 25 miles away to meet her "private investigator," Manuel Gomez, a former NYPD officer with a lengthy history of domestic violence, witness tampering, strangulation and other criminal accusations. Gomez had been terminated for cause by the NYPD and publicly discredited by NY judicial authorities.

55. Riordan left the children alone with Gomez, who filmed them giving rehearsed statements accusing Ambrose of sexual abuse. DCF later determined the circumstances under which these videos were produced, and every court has barred their admission.

56. After Gomez filmed them, Riordan brought the children to Connecticut Children's Medical Center ("CCMC") in Hartford and had them repeat their coached accusations. She bypassed the much closer Yale New Haven Hospital, where clinicians had already documented her attempts to script the children's accounts.

57. At CCMC, professionals overheard the children's conversations, which implicated Riordan. Ambrose ultimately chose not to pursue criminal charges against her, in order to spare the children the additional trauma of either testifying against their mother or feeling compelled to lie to protect her.

58. After leaving CCMC, Riordan returned with the children to the hotel, remaining in hiding. Police had to "ping" her phone to locate her. When they arrived, she initiated a five-hour standoff with two police departments and DCF, while instructing her daughter to live-stream the ordeal, a massive maternal violation of the children's privacy.

59. Ultimately, the police and DCF—who supported Ambrose's sole custody—returned the children to him.

60. The following morning, another emergency hearing had been scheduled by the GAL. Riordan again failed to appear and refused to speak with the Court by phone. Due to her continued violations of court orders and escalating misconduct, the Court (Grossman, J.) transferred the case *sua sponte* to the Regional Family Trial Docket (RFTD), a specialized division for high-conflict custody cases.

61.  Around this time, Riordan began an online smear campaign against Ambrose. She partnered with Paul Boyne, publisher of the notorious *familycourtcircus.com*, a website known for anti-Semitic, racist, and homophobic attacks on the Connecticut family courts, including judges, attorneys and litigants. In July 2023, Boyne was indicted for cyberstalking and threatening three Connecticut Superior Court judges, all of whom had roles in the Ambrose/Riordan case.

62.  During the divorce trial, Riordan denied under oath any connection to Boyne. However, her subpoenaed phone records revealed hundreds of calls between them.

63.  In addition, Riordan permanently deleted her email account and paid a technician to destroy her hard drive to avoid production of material evidence sought during discovery. The RFTD Court (Adelman, J.) sanctioned her for perjury and spoliation of evidence.

64.  The Court also found that Riordan provided Boyne with the sealed, highly confidential custody evaluation, which he published online, causing harm to the children and violating the family's privacy.

65.  At around this time, a family services evaluation labeled Ambrose "high risk" abuser. However, when the Court learned the assessment was based entirely on Riordan's unsubstantiated claims and that neither Ambrose nor the GAL were even interviewed, the Court dismissed the finding, as reported in the publicly available trial transcripts.

66.  The divorce trial commenced in March 2021 before Judge Gerard Adelman. It spanned 28 days over the course of a year, delayed in part by COVID-19, but "a more significant

reason" was the relentlessly obstructionist tactics of Riordan and her counsel (The Decision, p. 1).

67. The Court found Riordan's conduct vexatious and manipulative. "Unfortunately this case almost from its start has been one in which the defendant has refused to obey any and all orders from the court." (Decision, p. 16).

64. Throughout the trial, Riordan repeated and escalated her pattern of false allegations, accusing Ambrose of child sexual and emotional abuse, theft, and producing and watching child pornography.

65. After extensive documentary evidence and testimony from numerous DCF investigators, police detectives, the GAL, custody evaluator and others, the Court found every one of Riordan's claims to be entirely unsubstantiated and without merit. *Every. Single. One.*

66. One of Riordan's treating psychiatrists (she had several) testified that she appeared to be a competent mother. However, further testimony revealed that Riordan had withheld critical facts from her mental health providers, including:

- Her repeated denigration of Ambrose to the children;

- Her coaching of the children to falsely accuse him of sexual and emotional abuse;

- Her direction to the children to delete incriminating text messages she had sent;

- Her use of the children to "spy" on Ambrose, including instructing them to search his laptop, phone, and legal correspondence with his attorney and provide her with photos of "incriminating" things they found;

- Her use of hired third parties to coach the children and disparage Ambrose to them;

- Her very public online smear campaign against Ambrose.

67. The Court also found that Riordan:

- Filed false and incomplete affidavits, including financial disclosures;

- Committed perjury and deliberately destroyed material evidence;

- Employed third parties to intimidate witnesses;

- Persistently violated court orders throughout the litigation.

68. These findings are documented in The Decision (pages 16–24) and reflect a sustained pattern of deception, obstruction, and abuse of judicial process, and a determination to destroy Ambrose's relationship with the children, his reputation and quality of life. Yet Parlato published her accounts as fact.

69. On the other hand, the Court found that Ambrose had complied with all orders, including financial disclosures, and had never been reprimanded, let alone sanctioned.

## IV. PARLATO'S MALICIOUS CAMPAIGN OF ABUSE

70. While the divorce trial was going on *remotely* in Connecticut, Riordan secretly relocated to Big Pine Key, Florida, in September 2021, to live with **Frank Parlato**, **Jr.,** who was under a 19-count federal indictment for conspiracy, fraud, money laundering, and tax evasion. Ambrose did not learn of Riordan's departure from Connecticut or her intimate relationship with Parlato until 2023.

71. Riordan repeatedly denied any relationship with Parlato, just as she had denied her extensive communications with Paul Boyne of *familycourtcircus.com*. However, on November 9, 2021, the Monroe County Sheriff's Office responded to a neighbor's call

reporting a domestic violence incident at Parlato's residence. Body cam footage captured Riordan telling deputies that Parlato was her "intimate partner", who she had lived with since September 2021, and he had been violent toward her. (See timestamp ~14:00 in video: https://www.dropbox.com/scl/fo/q8gps010nfrvi09pxobi6/h?dl=0&e=1&preview=MCSO21OFF008178+S0249+BWC.mp4&rlkey=vosyrdoerygq5knrwm2alrn59. **Please note: the first 30 seconds of the video do not have sound; the audio begins at approximately 31 seconds and continues throughout the rest of the video.**

72. The Sheriff also provided the audio of the deputies' phone calls ordering a clearly panicked Parlato, who had fled before the police arrived, to return to the scene.

73. The Sheriff's Office incident report (Monroe County Sheriff's Dept. Report #MCSO210FF008178(01)) charged Parlato with felony kidnapping–false imprisonment, obstruction of justice, and battery. However, Riordan refused to testify against him—a common occurrence in domestic violence prosecutions—and the charges were dropped.

74. So, Riordan had moved to Florida with Parlato in September 2021. Mere weeks later, on October 2, 2021, Parlato published the first of more than 300 defamatory articles attacking Ambrose on his sensationalist "news" site, *FrankReport.com*. He often reposted these articles, all rooted in Riordan's narrative falsehoods, on other outlets he controls, including *artvoice.com*, *NiagaraFallsReporter.com*, and on platforms controlled by his and/or Riordan's associates.

75. Though Parlato claims to be an "investigative journalist," he ignores journalistic ethical practices; for instance, while he parroted and amplified Riordan's debunked accusations against Ambrose, he never disclosed to his readers that he was living with her.

76. Because of his intimate relationship with Riordan, Parlato obtained access not only to public filings but also to confidential materials, including the custody evaluation that had been sealed by the court. In a flagrant breach of confidentiality, Parlato published a hyperlink to the sealed evaluation, which disclosed the children's private medical and psychological information.

77. In November 2021, during the remote trial, Riordan's fifth attorney, Nickola Cunha, asserted that DCF had determined Ambrose abused the children and further accused the trial judge, the Hon. Gerard Adelman, of concealing this finding because of bias against Riordan. In response, Presiding Judge Thomas Moukawsher convened a hearing and, on December 10, 2021, issued a 19-page Memorandum of Decision (Entry #384.10, the "Moukawsher Decision"), finding that Cunha had repeatedly misrepresented facts to the court, both about Judge Adelman and about Ambrose.

78. Specifically, Cunha falsely asserted that "the DCF report (Exhibit 71) records that a multi-disciplinary task force found that Christopher Ambrose had sexually assaulted his children. She asserted that [Judge Adelman] was ignoring this because of his bias against women who report child abuse" and stated a multi-disciplinary task force had found Ambrose sexually assaulted his children (The Moukawsher Decision at pp. 13-14).

79. However, in his decision, Judge Moukawsher wrote:

"The Court looked carefully at the document... It is certain that DCF did not conclude that Christopher Ambrose abused his children in any way. It is certain that no multi-disciplinary panel of experts concluded that Christopher Ambrose abused his children in any way." (Moukawsher Decision, p. 14)

80. Moukawsher further wrote:

"All three experts involved with the children said they had no concerns about the father's behavior... DCF's conclusions were confirmed by its managers. The Madison Police Department investigated and declined to bring charges, despite anonymous callers accusing Ambrose of trafficking 'young Brown Latin American boys.'" (p. 15)

81. On January 25, 2022, the court issued a second ruling (Entry #390.10), permanently disbarring Cunha and affirming that Ambrose had been fully exonerated by DCF, police, and clinical experts.

82. Despite being fully aware of these findings, Parlato has persisted in falsely portraying Ambrose as a child sexual predator, knowingly placing him in a false light and publishing defamatory narratives with actual malice.

83. On April 14, 2022, Ambrose emailed Parlato, identifying hundreds of false and harmful false statements and demanding retraction. Rather than comply, Parlato mocked and taunted Ambrose and published scores of articles defaming Ambrose, demonstrating his malice and intention to harm.

84. On April 26, 2022, the Court (Adelman, J.) issued its decision and awarded Ambrose permanent sole legal and physical custody of the children. (The Decision, p. 37).

85. Riordan was granted only supervised visitation, contingent upon undergoing a complete psychiatric evaluation and engaging in court-supervised treatment aimed at "eliminating the defendant's behaviors that have had a negative impact on the minor children and their relationship with the plaintiff." (The Decision, p. 37).

86. *Parlato had reported extensively on the trial, including months of testimony from police detectives, DCF investigators, the custody evaluator, GAL, Riordan's psychiatrist, Riordan, Ambrose, and others. Parlato also reported on The Decision, yet he continued to publish misinformation about Ambrose, despite knowing that the Court had rejected the very allegations his articles repeated. That Parlato continued his defamatory publications, even after judicial findings and official investigations discredited them, shows his reckless disregard for the truth, actual malice and an obsessive effort to destroy Ambrose's reputation, mental health, and quality of life.*

87. The articles published by Defendant Frank Parlato since July 20, 2023, which are the subject of this Complaint, show deliberate disregard for judicial findings and a calculated effort to perpetuate discredited allegations.

88. Parlato ignored the Court's determination that Riordan told the children horrific lies about their father and coached them to falsely accuse him of sexual abuse (The Decision, pp. 11, 19).

89. He also ignored the Court's finding that Riordan used third parties—including Parlato himself—to destroy Ambrose's relationship with the children, damage his reputation, and intimidate witnesses (The Decision, p. 22).

90. Parlato continued to baselessly insinuate that Ambrose had bribed and/or colluded with DCF, law enforcement, the GAL, the custody evaluator, the reunification specialist, Riordan's own attorneys, and even Connecticut judges, in order to gain custody and favorable financial rulings—claims that are entirely unsupported, defamatory, and misleadingly place Ambrose in a false light.

91. Parlato fabricated a false narrative by claiming that Ambrose had never submitted a full and transparent financial accounting, while asserting that Riordan had. In reality, as the Court's Decision makes clear, Ambrose filed the required financial disclosure (Decision at p. 30) and "also updated his deferred income and retirement assets" (Decision at p. 32). By contrast, Riordan submitted only two financial disclosures—both incomplete and internally inconsistent (Decision at p. 32). She admitted under oath that she had secretly liquidated her 401(k), yielding hundreds of thousands of dollars never reported to the Court.

92. While Riordan portrayed herself as destitute, the Court emphasized that "the defendant had made no effort at all to find employment despite claiming to be homeless and destitute" (Decision at p. 31).

93.  Parlato further repeated, without proof, Riordan's allegation that Ambrose had "stolen" her inheritance—an accusation the Court expressly rejected, noting "this inheritance is completely absent from her first financial affidavit and there was no testimony about any such inheritance" (Decision at p. 32). This ruling was upheld on appeal.

94.  The Court further found that although Ambrose managed the family's finances, "there is absolutely no evidence that he did not do all he could to support the defendant with the assets they possessed. In fact, his undisputed testimony was that he spent his portion of the house proceeds paying the defendant's expenses in an effort to save the deferred income benefits and avoid the taxable penalties" (Decision at p. 29).

95.  Parlato baselessly asserts that a fabricated, albeit widely reported, plagiarism allegation caused Ambrose to be "dropped" by his agents and to have his career "destroyed." This narrative is false. Ambrose's inability to secure work stems directly from the coordinated online smear campaign orchestrated by Riordan with Parlato and their associates. As the Court expressly found:

"[Ambrose's] professional agents have been very upfront with potential employers regarding the negative material about the plaintiff online. Their response has been that while they appreciate that much of the material online is untrue, they are concerned by the past actions of the defendant attacking people associated with the plaintiff. They mention the attacks on the judges, lawyers and mental health providers and ask how they can protect their shows and stars from attacks of that manner. No work is offered." (The Decision at 31–32).

96.  By disregarding the Court's actual findings and instead repeating disproven accusations as established fact, Parlato acted with reckless disregard for the truth and calculated to

humiliate Ambrose. These distortions deliberately cast Ambrose in a false light and further establish Parlato's actual malice.

97. Parlato omitted from his coverage that Riordan had repeatedly defied court orders, was found in contempt multiple times, and was severely sanctioned before and after the final decree.

98. Parlato also ignored the Court's documented observations that Riordan exhibited a pattern of conflict with professionals and displayed many traits consistent with Borderline Personality Disorder (The Decision, p. 11). Though the Court ordered a psychiatric evaluation, Riordan refused to comply, leaving the diagnosis incomplete.

99. Parlato ignored the Court's recognition that Ambrose consistently attempted to collaboratively co-parent, as stated several times in The Decision. Parlato also falsely claimed that Ambrose prevented Riordan from seeing the children; as documentary evidence and testimony shows, the opposite was true. Riordan's didn't see the children because she chose not to comply with court-ordered psychiatric evaluation and treatment.

100. Ambrose had testified that he believed both parents should be present in their children's lives. After the custody orders, he repeatedly encouraged Riordan to undergo the required therapy so that visitation could resume. She never responded to his written requests.

101. On Mother's Day 2021, Ambrose facilitated a call between Riordan and the children, supervised by the court-appointed reunification specialist. She never requested another

call (The Decision, p. 18). Ambrose soon learned why: Riordan was secretly messaging the children through apps, in violation of court orders.

102. When Ambrose discovered this covert contact, he did not report it out of concern for the children's emotional well-being. He was broken-hearted on their behalf that their mother had chosen to constructively abandon them; he did not want deprive them of the limited contact they had.

103. However, this compassionate decision came with enormous negative consequences for him. He later learned that during these communications, Riordan resumed her campaign of alienation, telling the children Ambrose was to blame for her absence, claiming he didn't love them, insisting that he only wanted custody "to beat her," that he was dangerous and a deviant—the same lies that led to her loss of custody.

104. Parlato also reported that Ambrose refused to allow Riordan's family to see the children. In fact, Ambrose made efforts to maintain the children's ties with her extended family. He encouraged calls, texts, and online gaming with their cousins, and hosted Riordan's sister, niece, nephews, cousin, and aunt during the Christmas season in 2021, 2023, and 2024.

105. Despite his good will, none of Riordan's family members invited the children to visit after Ambrose was first granted custody in April 2020. Her father even ceased acknowledging the children on their birthdays and Christmas in 2020, and did not inquire about them since then.

106. Parlato also falsely claimed that Ambrose isolated the children from Riordan's friends. Only one friend of Riordan's ever contacted Ambrose, and he promptly arranged two FaceTime calls for her, and left the children alone, ensuring privacy. The friend never contacted him again.

107. Ambrose also organized in-person visits with the children's friends in Westport. Eventually, the children declined to continue these visits; Ambrose later learned from the parent of one child that the Westport peers had told the children they had seen Parlato's defamatory online articles, which is why the visits ended.

108. Ambrose provided each of his three children with cell phones, and T-Mobile records confirm he never disabled service for more than a few hours (as a typical parental consequence for misbehavior), and never blocked any numbers. So, the children were always able to contact anyone—including Riordan, her family, friends, and the authorities. They never reported mistreatment of any kind. *Not once.*

109. The children's therapists uniformly reported to authorities that the children never accused Ambrose of any form of mistreatment or abuse—not physical, sexual, or psychological. Specifically, they never reported yelling, threats, punishment, confinement, or harm to pets, as Parlato has published.

110. In contrast, these professionals attributed the children's distress and anxiety to Riordan's abandonment, her unrelenting secret attacks about Ambrose to the children, and the

disinformation published about him by Parlato, which lent false legitimacy to Riordan's narrative.

111. Parlato exacerbated this harm by publicly attacking anyone he perceived as adversarial to Riordan, including the custody evaluator, GAL, therapists, DCF workers, police officers, Ambrose's family, and nearly every judge involved in the matter - and the spouses and children of these individuals. He even attacked people's physical appearances. His baseless accusations that Ambrose "conspired" with all these individuals undermined the children's trust in the very people assigned to protect them. Parlato has also aggressively targeted several of Riordan's former attorneys, insulting their professional competence and appearance.

112. Witnesses testified that numerous professionals declined to work with the children, fearing that Parlato would retaliate against them and their families online, as he had with others.

113. Ambrose never published information about Riordan, Parlato, or anyone connected to the case.

114. In January 2023, Riordan returned to Connecticut without informing Ambrose and rented a residence near him. She soon began violating custody orders by secretly visiting the children, intensely grooming them to turn against their father—the exact behavior the custody orders were designed to prevent.

115. On April 22, 2023—one year almost to the day after The Decision—Riordan persuaded the daughter to run away to her. Riordan immediately took the girl to file a petition of emancipation and false sexual abuse allegations against Ambrose in New Haven Juvenile Court.

116. Using third parties, Riordan later took unlawful custody of the two sons, and had additional abuse allegations filed before they were even brought to her house.

117. Riordan immediately replaced the children's phones, as she had done years earlier when she had taken the children out of Connecticut after Ambrose filed for divorce. As then, he had no way to locate or contact them.

118. Though Riordan had orchestrated the filing of the children's abuse claims, she obstructed the subsequent DCF and police investigations. She refused authorities access to her home, disallowing private interviews, forcing investigators to talk to the children through windows while she obtrusively recorded all interactions. After comprehensive investigations, child protective and law enforcement authorities found the claims against Ambrose were baseless. It is essential to note that all three children, represented by independent counsel secured for them by Riordan, _voluntarily_ withdrew the petitions of abuse filed in Juvenile Court.

119. Nonetheless, because custody disputes are civil, the police would not remove the children from Riordan's home without a specific court order.

120. Ambrose was desperate to have his children returned home. However, his finances depleted by the divorce, he was forced to represent himself. He received conflicting advice from the State Attorney and legal aid society about how to proceed, and filed motions that were repeatedly determined procedurally deficient.

121. He ultimately retained counsel, but the deficiencies and delays continued: Riordan secured a three-week continuance, then the Court (Rodriguez, J.) *sua sponte* postponed the hearing for six more weeks, then abruptly declared a mistrial without explanation and sent the parties to another Court (Nieves, J.), who determined Ambrose's attorney's filing was insufficient for her to rule upon. In short, months had been squandered due to Riordan'a manipulations and the Court's (Rodriguez, J.) inaction.

122. Contrary to Parlato's published assertions, Ambrose did not "forum shop," and never "chose" to change judges, which is not a realistic possibility. Furthermore, neither Judge Rodriguez nor Judge Nieves ruled on any evidence regarding coercive control or other substantive matters; their only decisions concerned discrete procedural issues. Parlato's misleading statements deliberately create the impression that Ambrose unlawfully manipulated a corrupt system.

123. At enormous expense, Ambrose hired a new, replacement attorney, who filed for restraining orders against Riordan on behalf of the children, citing her blatant contempt for the custody orders, obstruction, and coercive control over the children.

124. At the hearing, Riordan and Ambrose testified, as did DCF who said that Riordan was extremely erratic and uncooperative after filing the abuse petitions. They determined she exerted coercive control over the children, recognized as a form of domestic violence. DCF also endorsed continued sole custody for Ambrose.

125. The Court (O'Neill, J.) granted the restraining orders, preventing Riordan from having any contact with the children. However, she failed to appear in court for the decision and refused to speak to the Court by phone, as she had previously. When police attempted to serve her, they found her home empty, just as they had when she fled with the children and Gomez to the hotel.

126. Police eventually learned Riordan had used third parties to secretly move the children out of state, evading court orders and interfering with lawful custody. She disappeared.

127. Over the next three months, every time Ambrose and authorities located the children, Riordan had her associates hastily move them to a new location - even late at night to evade detection. Each move triggered fresh police and child welfare investigations - first in Rhode Island, then different counties in New York. In every instance, Ambrose was exonerated of all allegations. [1]

128. Despite Ambrose's repeated efforts to negotiate a resolution with her, Riordan refused to respond to any communications and remained in hiding.

---

[1] These facts are documented in a 16-page ruling issued by the Court (O'Neill, J.) on October 25, 2024, following an eight-day contempt hearing against Riordan (Docket # FBT-FA-23-5052301-S).

129. Subpoenaed phone records confirm that Parlato was in regular communication with Riordan throughout this time. He repeated her false narrative in his articles, despite having read public records—such as police reports and court findings—directly contradicting her claims. His statements were knowingly defamatory and/or misleading and cast Ambrose in a false light, violating his privacy.

130. For example, Parlato published that Ambrose directed law enforcement, including the FBI and a SWAT team, to raid a residence where Riordan was staying. In reality, police located Riordan via traffic cameras, as contemporaneous police reports and Riordan's own testimony later confirmed. Testimony also showed that Ambrose learned of the incident only *after* it had occurred.

131. To amplify the harm his publications caused Ambrose, Parlato published, promoted, and endorsed defamatory articles about Ambrose written by disgraced third parties, like psychiatrist Bandy Lee, hired by Riordan, and Richard Luthmann a convicted extortionist recently released from years in federal prison, who is close to both Parlato and Riordan. Parlato did not neutrally reference outside content; he deliberately curated these articles article, placed them within his own defamatory pieces to reinforce his narrative, and presented it as corroboration of Riordan's false claims.

132. Parlato's publications incited his audience to harass Ambrose, resulting in a flood of abusive and threatening communications—including death threats.

133. Despite having access to the truth, Parlato deliberately perpetuated falsehoods online, leading the world - and the Ambrose children, too young to access to court or police documents - to believe his statements. Thousands of reader comments only reinforced Parlato's lies—including that Ambrose was keeping Riordan from the children through political, financial or legal manipulation, and that he was a "dangerous psychopath," as diagnosed by Riordan's paid disgraced psychiatrist Dr. Lee, terminated by her employer for her lack of medical knowledge and professional ethics, who had never met him.

134. Parlato knowingly identified the children by name and photograph as victims of sexual abuse—a violation of privacy that legitimate media outlets universally avoid, even when reporting on adult victims. He even described the daughter as a 3-time "rape victim" of unnamed men, a gratuitous and unconscionable violation of her dignity and privacy.

135. Parlato was aware that multiple courts found that Riordan manipulated and coached the children into making false accusations. Nevertheless, he used these coerced statements to cast Ambrose in a false light and further his defamatory campaign. He also knew the children were too young to consent to being exploited in this way and that Riordan had no legal authority to consent on their behalf.

136. Parlato's use of salacious, graphic language to portray Ambrose as a child sex abuser was not only false and malicious, but transparently designed to shock, titillate, and drive traffic to his websites.

137. Articles concerning Ambrose and the children generated far more traffic and reader engagement than any others published by Parlato. Obsessed with publicity and attention, he kept this false narrative about the Ambrose family alive purely for economic gain and social media "clout."

138. The children never met Parlato, who was on federal home confinement in Florida. And they were unaware their mother had moved there to be with him, living them behind in Connecticut, or that she had an intimate albeit violent relationship with him.

139. In a stunning display of manipulation, Parlato persuaded Riordan to submit letters to his sentencing judge, purportedly from the children, seeking leniency for him while also gratuitously maligning Ambrose. Parlato later published these letters online, further demonstrating his disregard for ethics and the children's well-being as well as his malice toward Ambrose.

140. In his articles, Parlato falsely casts himself as a "white knight" protecting the children from abuse. In doing so, he knowingly ignores the consistent findings of numerous courts, the children's therapists, GAL, reunification specialist, and DCF professionals— all of whom say Ambrose caused no harm and blame Riordan's abandonment and relentless denigration of their father, massively assisted by Parlato, for the children's emotional distress.

141. These professionals also noted that the children's three-month ordeal of being moved from place to place—an odyssey the Court (O'Neill, J.) determined after testimony and

subpoenaed phone records was initiated by Riordan and enabled by Parlato's online disinformation - not only caused them to miss, school, friends, therapy, even medication, and but also to endure significant psychological trauma.(Docket # FBT-FA-23-5052301-S, Ruling issued October 25, 2024).

142. Parlato publicly advocated that the children be forced to testify in court, a position rejected by every single mental health professional who has met the children.

143. In stark contrast, Ambrose refused to call the children as witnesses, solely to spare them the additional trauma of being forced to choose between testifying truthfully or supporting their mother's false narrative.

144. Therapists have consistently reported that Parlato's articles reinforce Riordan's false narrative, leaving the children confused about the truth. His sustained campaign of malicious defamation has had a devastating impact on Ambrose's relationship with his children—an injury that is, to him, the most grievous and damaging result of Parlato's cruelty.

145. Parlato's false narrative about Ambrose also functions as a vehicle to promote his fringe conspiracy theory: that "wealthy," abusive fathers, such as Ambrose is portrayed, bribe Connecticut family courts to unlawfully seize custody from "protective" mothers like Riordan, Parlato's romantic partner.

146. When Riordan unlawfully took physical custody of the three children in spring/summer 2023, Parlato escalated his defamatory campaign. Between July 20 and October 23, 2023,

he published nearly 50 articles—sometimes as many as three per day—casting Ambrose in the most damning false light, despite knowing that DCF, law enforcement agency and *every* court had cleared him of any wrongdoing.

147. Parlato's motivations are manifold and malicious: irrational animus toward Ambrose, a man he has never met; supplicant loyalty to Riordan's disturbed vendetta; a compulsive need to be seen as a savior; a desperate hunger for publicity and online attention; and greed for the financial prospects generated by sensational content.

148. Parlato's malice is further evident in his juvenile and grotesque personal attacks. He has repeatedly published manipulated images of Ambrose, including one where Ambrose's nose was replaced with a penis—a puerile act intended solely to humiliate and dehumanize him.

149. Parlato's so-called "faction" (fact + fiction) articles, published on August 13, September 5, and September 10, 2023, are especially aggressive with their pernicious accusations of fraud, child abuse, and Connecticut judicial corruption. Though hiding behind parody, Parlato uses these articles - written in a crude, transparently malicious tone - to amplify his false light narrative about Ambrose.

150. Though Parlato credits others with authorship of these pieces, on information and belief, these are merely pen names he uses. Regardless, Parlato carefully curated, published, promoted, and endorsed each article, using them as evidence supporting his narrative; he is therefore accountable for their content.

151. Perhaps most unconscionably, Parlato published statements coaxed from the children by the deeply troubled Riordan after she took them in violation of court orders. As previously detailed, every professional involved in the matter—custody evaluator, GAL, therapists, school counselors, physicians, DCF, law enforcement, and multiple judges—concluded that Riordan exercised coercive control and relentlessly coached the children to falsely accuse their father.

152. Parlato exploited this tragic dynamic by publishing the statements in dozens of articles with inflammatory headlines intended to inflict severe emotional distress on Ambrose. In doing so, he willfully ignored the harm such exploitation also caused the children themselves.

153. The plaintiff brings this action not to silence free speech, but to defend the core values the First Amendment protects—truth, accountability, and informed public discourse.

154. Based on Parlato's published statements, Ambrose anticipates that he will attempt to invoke the protections of the First Amendment. That defense fails.

155. The First Amendment does not shield knowingly false statements of fact that destroy reputations. It is well established that defamation—particularly when published with actual malice—falls outside constitutional protection. As the Supreme Court has held: "There is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-

open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

156. Parlato's publications were not only knowingly false, but calculated to inflict maximum harm on Ambrose's reputation, family relationships, and emotional well-being. They therefore constitute actionable defamation and are unprotected by the First Amendment. While the Court has extended "a measure of strategic protection" to falsehoods to safeguard legitimate speech, it has consistently held that intentional falsehoods lack First Amendment value. *Gertz*, 418 U.S. at 342.

157. Parlato may also argue, as he has before, that Connecticut's anti-SLAPP law requires dismissal of any lawsuit "targeting protected speech." That too is wrong. Conn. Gen. Stat. § 52-196a does not immunize demonstrably false and malicious statements from liability. To the contrary, it expressly provides that dismissal must be denied if the plaintiff establishes a prima facie case for defamation—namely, a false statement of fact, published to a third party, causing reputational harm. Ambrose can do so here.

158. Among numerous false and offensive statements, Parlato published online the following: *"[The daughter], 16, was sexually abused and assaulted by her father for three years when she was isolated from her mother."* Defendant published this statement despite having reviewed court decisions expressly finding that DCF and law enforcement thoroughly investigated all such allegations, concluded they were false, and determined that Riordan had coached the children to make them, with the daughter being most vulnerable to such influence (The Decision p.19). Defendant knew from these rulings that

Plaintiff had been exonerated by DCF, law enforcement, and the courts, yet deliberately advanced the opposite narrative. By doing so, Defendant knowingly cast Plaintiff in a viciously false and misleading light. In addition to defamation and defamation per se, Connecticut law provides multiple remedies for such misconduct:

- **False Light Invasion of Privacy.** Publicity that knowingly or recklessly places another in a false or misleading light, highly offensive to a reasonable person, is actionable. See *Restatement (Second) of Torts* § 652E; *Pace v. Bristol Hosp.*, 964 F. Supp. 628 (D. Conn. 1997); *Parnoff v. Aquarion Water Co.*, 188 Conn. App. 153 (2019). Unlike defamation, false light targets the emotional injury from being portrayed inaccurately.

- **Public Disclosure of Private Facts.** Connecticut recognizes liability for the publication of true but private information that is not of legitimate public concern. See Restatement (Second) of Torts § 652D, adopted in *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107 (1982). Truth is not a defense to this tort.

- **Intentional Infliction of Emotional Distress.** Liability attaches when conduct is extreme and outrageous, intentionally or recklessly causing severe emotional distress. *Petyan v. Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986).

- **Harassment.** Connecticut law also prohibits communications made with the intent to harass, annoy, or alarm, where such effects are reasonably likely. Conn. Gen. Stat. § 53a-183.

159. This action seeks to hold Parlato accountable for intentionally inflicting harm through demonstrably false, malicious statements, and for trafficking in distortions that endangered Ambrose's reputation and emotional health, and caused other harms. Parlato has no constitutional defense, and Connecticut law provides no safe harbor for such misconduct. The case is straightforward: the facts are undisputed, the law is settled, and each day this matter proceeds increases Parlato's liability. Ambrose respectfully asks this Court to provide relief commensurate with the harm caused.

## V. PARLATO'S ASPIRATIONS AND INFLUENCE

147. Defendant Frank Parlato operates multiple websites, including frankreport.com, artvoice.com, and niagarafallsreporter.com, through which he has published over 300 defamatory articles targeting the plaintiff. These sites reach a global internet audience, ensuring widespread and ongoing reputational harm.

148. In addition to his websites, Parlato disseminates and promotes his content via social media platforms including Instagram, X (formerly Twitter), Facebook, and YouTube, reaching potentially millions more.

149. Parlato aggressively seeks media exposure through mainstream publications, third-party podcasts, and appearances, promoting his Connecticut family court/child protective services/law enforcement conspiracy theories and smear campaigns against individuals like the plaintiff.

150. To further expand his reach, Parlato republishes his content on collaborators' platforms, particularly the Substack page of his employee, convicted extortionist/fraud Richard Luthmann, recently released from years in prison.

151. Parlato also regularly publishes defamatory articles about Ambrose written by others, such as Luthmann and Dr. Bandy Lee, the discredited psychiatrist and conspiracy theorist terminated by Yale over concerns about her lack of medical knowledge and ethics, who Riordan hired.

152. Within the articles published on his sites, Parlato hyperlinks to still more defamatory and misleading articles, intentionally reinforcing falsehoods about the plaintiff.

153. To be clear, these re-published articles are carefully curated - even solicited - and prominently endorsed by Parlato to support his false narrative, despite being factually debunked by police, DCF, and multiple courts; they are not merely comments made by random readers.

154. Parlato's publications falsely suggest that Ambrose:

- sexually abuses, isolates, and mistreats his children;

- denies Riordan and her family access to the children;

- stole or hid marital assets;

- harbors fetishes, including for child pornography;

- bribes, conspires with, and controls law enforcement officers, DCF investigators, family court judges, and other professionals to unlawfully gain favorable custodial and financial rulings; and

- is a "dangerous," "violent" "psychopath."

154. These claims are not only false but deeply malicious. Parlato knowingly publishes them on sites that frequently discuss conspiracy theories, including his own, and extra-judicial justice; so, he intentionally engages a sympathetic audience receptive to his falsehoods about Ambrose.

155. Parlato's motives are clear: demonstrate his loyalty to Riordan, obtain social media "clout," monetary gain, and self-promotion at the expense of the plaintiff's reputation, safety, and emotional well-being.

156. Parlato maliciously encourages his readers to dismiss the determinations of public authorities, including the police, DCF, and even the courts, that exonerate Ambrose, and deliberately incites his readers to harass, excoriate, and threaten the plaintiff.

157. Below is a small sampling of the thousands of "reader comments" Parlato has published, nearly all anonymous: "CHRIS, YOU BETTER SLEEP WITH ONE EYE OPEN" "Why don't you… die." "Chris, you are going to get your punishment.""One day you'll get what's coming to you Chris and it can't be soon enough!!" "As a mother I only wish I could take you to the woods. Only one of us would come out and it sure as fuck wouldn't be you. I'm watching you always.""It's about to blow up in that psychopaths face." "You will answer to someone in the end." "Ambrose must be stopped." "Time for some pigs to get roasted." "Game over. Ambrose is a twisted fuck." "I wish Chris would just…end it. If he repents, maybe he can go to Purgatory with Father Harry (another family kiddy-diddler) and seek eternal salvation." "Ambrose should be in jail.""He needs to be incarcerated immediately." "Ambrose needs to be arrested." You're a goddamn pedo. Sick fuck!!!""All your actions support Dr. Lee's diagnosis" "You are shit. You are nothing." "Until this creep is in jail, he is a threat." "[Ambrose] has the personality profile of a serial killer." "CALL the Attorney Generals office to report child molester Christopher Ambrose. 1-860-808-5420." "Demand an investigation of Ambrose and his cronies he has paid off to get these children." "Chris Ambrose is sociopath." "You have molested your own children." "You are a coward. You are scared of Manuel Gomez. He has the evidence form [sic] your computer showing more than 750 pictures of young boys being rectally penetrated on gay porn sights. He has the video of YOU molesting Sawyer, and video doesn't lie…." "You are a child molesting coward. You enjoy gay porn that involves young boys. Old men rectally penetrating young boys, it's all over your computer . As a matter of fact over 750 boys and gay porn sights." "You are a sick homosexual who loves touching boys." "It's sexual assault and it's been proven." "They bury evidence and protect pedos in CT." *The following are comments attributed to Parlato's frequent collaborator, felon/extortionist Richard Luthmann:* "Hugs and kisses, Christopher…I do enjoy a good kiss of death." "Eat a dick, Chris." "Chris, I'll see what I can do about getting you a job at a dildo factory. You can play with the little brown ones all day and be in your glory. Fucking CHOMO." [CHOMO is prison slang for "child molester." Luthmann was incarcerated in federal prison for 4 years for extortion and fraud.] "[Ambrose is] a sticker of his erect penis into the tiny orifices of children. He injects his throbbing penis into a child's anus and/or mouth to achieve personal sexual gratification. It is a sickness. ..The only image I have of you is right after I shit down your neck, Chris. No Yarl [sic] would back a kiddie diddling CHOMO child rapist like you. Before I would let you die, I would feed you your member." "I have plenty of evidence that Christopher Ambrose is a sexual abuser of children. I've published some of it…I'm going to crucify him… Chris Ambrose is a psychopath.."

158. On September 27, 2023, Parlato publicly acknowledged on *frankreport.com* that he had received other hate-filled, threatening comments directed at the plaintiff - apparently even more aggressive than those above - but chose not to publish them. In response to a reader identified as "Peaches," he wrote:

"[Ambrose] has been getting hate comments and other threats which I am not publishing. We do not wish or condone him coming to harm… we must remain within the law… I mean for him to lose his psychopathic behavior and become a man who cares for his children… This must be done in lawful ways and not vigilante Justice." (See https://frankreport.com/2023/09/27/he-told-us-to-kill-ourselves-ct-family-court-victim-matthew-ambroses-brilliant-smackdown-of-his-father/)

159. However, this statement is performative—an insincere attempt to shield himself from liability while continuing to encourage reputational harm and worse through content, implication and tone, for, as detailed, Parlato continued to incite and publish numerous reader comments expressing alarming hostility and contempt toward Ambrose.

160. Parlato is aware that Ambrose's children read his publications about them and their father.

161. Parlato's conduct was knowing, intentional, and malicious. He either authored or knowingly solicited and/or published the false and defamatory statements identified herein with the specific intent to harass, defame, and place the plaintiff in a false light and violate his privacy. As a direct result, Ambrose has suffered significant and ongoing emotional distress, reputational damage, and other personal harm.

## VI. PARLATO'S DEFAMATORY STATEMENTS

### July 20, 2023 Publication

162. On July 20, 2023, defendant Frank Parlato published an article on *Frank Report* titled:

"**The Great Escape: Ambrose's Kids Leave His Home, Cite Abuse; Ambrose Seeks Mother's Arrest**"

Available at: https://frankreport.com/2023/07/20/part-1-the-great-escape-ambroses-kids-leave-his-home-cite-abuse-ambrose-seeks-mothers-arrest/ In this article, Parlato made numerous false and defamatory statements concerning the plaintiff Christopher Ambrose, including:

163. *"Christopher Ambrose wants his three teenagers arrested… [Ambrose] was away most of the time… Ambrose reentered the children's lives, transferred the joint marital money into his name, and then filed for divorce… But it is common in Family Courts…to take mothers out of children's lives – often based on a single report of a custody evaluator – frequently paid by the father – as was the case in the Ambrose matter."*

164. *"Dr. Bandy Lee, a psychiatrist, who studied the Ambrose case, said, 'Separating growing children from their mother and primary caregiver is one of the worst forms of abuse, which can have lifelong ramifications, as well as decades of loss of life for each child.'"*

165. *"In this case, even after three years, the father was unsuccessful in alienating the children from their mother… Ambrose's attorneys will argue the judge should…order the Madison Police to go to the mother's house, break down the door if necessary, and take the kids – handcuff and shackle them if necessary – and force their return to the father… As police take three teenage children by force in handcuffs, drag them out to police cars as if they were criminals, and force them to return to their father."*

166. These statements are demonstrably false, defamatory, and place the plaintiff in a false light before the public. The article incited public hostility toward Ambrose, as evidenced by the 119 user comments that followed, nearly all of which attacked or denigrated him.

### July 20, 2023 Publication (Part 2)

167. On July 20, 2023, Parlato published a follow-up article on *Frank Report* titled:

"**Part 2: Innocence Lost in Father's House of Fear: The Daughter Speaks Out Against**

**Chris Ambrose!"**

Available at: https://frankreport.com/2023/07/20/innocence-lost-in-fathers-house-of-fear-the-daughter-speaks-out-against-chris-ambrose

168. In this publication, Parlato made the following false and defamatory statements about Ambrose:

169. *"For three years, the children lived in isolation with their father… separated from their extended family and all the friends they grew up with under their mother's care… Ambrose came home to CT, changed the passwords to his and his wife's joint money market accounts, and then filed for divorce against her…"*

170. *"The daughter and her brothers lost their mother based on the opinion of a single custody evaluator – who was paid for by the father… The daughter began cutting after Family Court removed her from her happy home with her mother… [W]hile Riordan is in jail, Ambrose further seeks Madison police to break down the doors of the mother's home, capture and handcuff the three teenagers, and bring them forcibly back to him…"*

171. Despite knowing that Connecticut DCF and law enforcement determined that Riordan and others had coached the children to make abuse claims, Parlato published a scripted dialogue attributed to one of the children:

172. *"Three years ago, Yale Hospital took Sawyer in following allegations of Ambrose's sexual abuse…. Here is an excerpt of an interview that New York City private investigator Manuel Gomez sent to US Attorney Ross, where Sawyer, then only ten, said about his father. [This has yet to be viewed by CT courts]: 'Sawyer Ambrose: He was touching me in my private parts. Manuel Gomez: Can you demonstrate to me what he was doing to you? Sawyer Ambrose: He was like touching me right here. Manuel Gomez: All right, and how often was he doing that? Did you tell him to stop? And what did he say when you told him to stop? Sawyer Ambrose: He didn't say anything. He just kept on doing it. Manuel Gomez: Did he ever show himself naked to you? Sawyer Ambrose: Sometimes when he was in the shower, sometimes, well, like not on purpose, but sometimes there weren't any towels, and then he had to go get his clothes naked. Manuel Gomez: But did he let – in front of you, he did that? Sawyer Ambrose: Um, sometimes.'"*

173. Parlato further inflamed the situation by claiming:

174. *"Photos, videos, and audios back Sawyer's claims and are in FR's possession. Some of them are obscene and cannot be published."*

175. These fabrications were designed to damage Ambrose's reputation and generate outrage. The article drew 119 reader comments, the vast majority of which publicly vilified Ambrose.

### July 21, 2023 Publication

176. On July 21, 2023, Parlato published an article on *Frank Report* titled:

**"The Kids Are Alright: Judge Refuses to Arrest Teens or Mom; Ambrose Denied in Family Court"**

Available at: https://frankreport.com/2023/07/21/the-kids-are-alright-judge-refuses-to-arrest-teens-or-mom-ambrose-fumes-in-court-arrest-her-and-im-not-a-pedophile

177. In the article, Parlato falsely reported that:

178. *"Ambrose also sought the arrest of his teenage children, seeking the court to order Madison police to break down the doors of Riordan's house, enter the house, armed and prepared to subdue the teens, handcuff and shackle them, and force them to return to his home… [T]hanks to Ambrose, they had not seen their mother for three years."*

179. This characterization is knowingly false and misleading. It fabricates court conduct, misrepresents Ambrose's legal positions, and falsely suggests that Ambrose orchestrated the children's separation from their mother out of malice or abuse.

180. This publication incited widespread public hostility toward Ambrose. The article generated 117 reader comments, nearly all of which contained personal attacks, ridicule, and threats directed at him.

### August 3, 2023 Publication

181. On August 3, 2023, Parlato published an article on *Frank Report* titled: **"Ambrose Continues to Terrorize His Teenage Children — His Crimes and Lies Exposed Part #1"** Available at: https://frankreport.com/2023/08/03/ambrose-continues-to-terrorize-his-teenage-children-his-crimes-and-lies-exposed-part-1/

182. Parlato made the following defamatory and/or misleading statements putting Ambrose in a false light:

183. *"Ambrose tells everyone that the his teenage children should not have a voice in where they wish to live because he has legal custody. He wants the CT courts to…arrest [the children] – taking them in handcuffs and forcing them back to his house…Chris Ambrose has fought in court for the arrest of … his children…Ambrose has stepped up his efforts to imprison his children back at his isolated rural house."*

184. Under a photo of the daughter, Parlato wrote the caption, *"[Daughter], 16 was sexually abused and assaulted by her father for three years when she was isolated from her mother… Ambrose is trying to arrest her and force her back to his home."*

185. Parlato identified Bandy Lee as *"one of the premier psychiatrists in custody and divorce cases,"* clearly promoting and endorsing her statements,*"Lee had a view of Ambrose that warrants our fullest attention if we value the safety of the three teenage children who are the targets of Ambrose."*

186. Parlato published and promoted pages of Lee's statements against Ambrose and even included a hyperlink to "confidential" psychiatric notes and reports Lee wrote about him. When he published, Parlato knew Lee never met, let alone examined, Ambrose: *"I have enough information to make a preliminary assessment of [Ambrose's] personality configuration—with an emphasis on the extent to which he may manifest characteristics of psychopathic personality,"* assigning him a diagnostic score of 32, which *"is strongly suggestive that a diagnosis of psychopathy is present and justified - or, at the very least, the disturbing levels of psychopathic features are present."*

187. Continuing to shine this damning false light on the plaintiff, clearly intending to portray him as a "dangerous character." Parlato quoted Lee, *"[T]here should be an attempt to interview Mr. Ambrose, as well as additional collateral interviews. An arrangement through criminal,*

*domestic violence, or juvenile court to this end would best help protect you as well as the evaluator… this potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked."*

188. In addition, Parlato quotes Lee blaming Ambrose as the reason Riordan hadn't seen the children for years, claiming it is further evidence of his psychosis, *"Separating growing children from their mother and primary caregiver is one of the worst forms of abuse, which can have lifelong ramifications as well as decades of loss of life for each child—and can be a sign of this dangerous personality disorder."* Parlato continues, *"Dr. Lee wrote in a letter addressed to Karen Riordan and submitted to law enforcement that the mentally ill person is not Riordan, but very likely Ambrose."*

189. Parlato also published and hyperlinks to a letter, dated May 3, 2023, Lee wrote on her stationery to Riordan (the "Riordan Letter"). He quotes the Riordan Letter extensively, saying it is *"highly likely"* that Ambrose *"suffers from psychopathy"* and *"the potential for Mr. Ambrose's dangerousness, especially where children are involved, should not be overlooked."*

190. Parlato also quoted Lee saying that she diagnosed Ambrose to fit the profile of a *"psychopath, [who] has taken advantage of or 'conned' [relatives, friends, neighbors, co-workers, business associates, or other people] — since it is a common characteristic of psychopathic individuals to mislead, cheat, or otherwise violate the rights of other people. They, through a superficially-charming presentation, are often capable of eliciting exceptional levels of sympathy from others as an effective means of escaping accountability for their violence—for example, they may recruit others as 'patrons' or 'pawns' to help them turn the narrative around to incriminating their victims instead)."*

191. Parlato's publication endorsed Lee's claims that persons, like Ambrose, *"afflicted with Psychopathy [as she identified Ambrose] are prone to lying, deceiving, and beguiling whoever is in their presence… [psychopaths like Ambrose] can be very destructive to society and to human beings they come in close contact with, such as family members."*

192. Parlato also promoted Lee's psychiatric evaluation of Ambrose, which *"as expected, yielded results that make it highly likely and reasonably reliable that [Riordan's] ex-husband suffers from psychopathy… A 'full' diagnosis of psychopathy—a score above 30—raises many alarms and could be a contraindication to parenting… Mr. Ambrose's score adds up to 32. This is strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the very least, that disturbing levels of psychopathic features are present."*

193. Parlato's hyperlink included a screenshot of the "Hare Psychopathy Psychopath Checklist" that Lee says she completed to diagnose Ambrose as a psychopath, though she had never met him (the "Psychopath Psychopath Checklist"). The hyperlink also has a Report of Suspected Child Abuse or Neglect that Lee filed with DCF on May 24, 2023 ("Lee's DCF Report"),

accusing Ambrose of horrific mistreatment of his children and stating he also abused Riordan. [2]

194. Lee notes in the Riordan Letter that reports of abuse to DCF are confidential because the accused *"must be protect[ed] from an erroneous psychopathic diagnosis;"* yet, Parlato published her report damning Ambrose as a psychopath, making it available to hundreds of millions of readers on the Internet, brutally violating his privacy, putting him in a devastating false light, subjecting him to scrutiny and ridicule, and causing extreme emotional distress.

195. Parlato prominently promotes, endorses and adopts everything Lee states by publishing her DCF Report and her statements that Ambrose committed *"[s]exual, psychological, emotional, verbal, and physical abuse, coercive control, and neglect worsened from multiple years of impunity. Three years ago, he abducted and separated the children from their mother through litigation abuse."* Parlato quotes Lee saying *"interviews of victims, reliable reports, voice recordings, video recordings, and perpetrator's prolific documentation of his threats, psychological manipulation, and coercive control indicate a DANGEROUS PERSONALITY DISORDER. [Emphasis in the original] The remaining two sons, however, were experiencing an escalation of abuse and verbal threats from the father. Now, the 12-year-old son remains, afraid for his safety."* [3]

196. As scores of Parlato's articles make clear, he believes that Ambrose is involved in a conspiracy with the Connecticut Family Courts; Parlato uses Lee's statements to support this baseless theory, *"[Ambrose] controlled the Courts – Family Court corruption is an international crisis – and threatened and penalized the children behind the scenes."*

197. Falsely insinuating the plaintiff prevented Riordan's access to the children, Parlato published, *"The mother was [sic] not been able to see her children for three years, despite having a clean background and having successfully raised the children before the father's intervention… All the children are adopted, and the two older children are Hispanic, subject to the father's racial slurs."*

198. Parlato also published and adopted Lee's salacious, graphic allegations of sexual and other abuse for which she claims to have evidence that she has never produced, *"I have reviewed copious video, audio, and photographic documentation of Mr. Ambrose's abuse: inappropriately touching all children in sexual ways, penetrating or threatening to penetrate*

---

[2] Lee writes in the Riordan Letter that she became aware of this allegedly ongoing abuse on April 23, 2023; yet, while she identifies herself as a mandated reporter, she waited until May 24, 2023 - more than a month - to alert authorities to this emergency.

[3] The law encourages reports of suspected abuse; however, it requires such reports to be made in good faith, based on reasonable concerns. As explained, Parlato knew Lee based her report on the narrative of a scorned ex-spouse, who multiple courts determined was so unreliable and troubled she could not have supervised visitation until she had a complete psychiatric evaluation and court-monitored therapy. Moreover, even if Lee believed the allegations she reported to DCF, publicizing the allegations is not protected speech.

*them, bringing in adult men to sleep in their bedrooms without clothes, having adult men have intercourse with underage girls in their bedrooms, permitting drugs and alcohol in their rooms, yelling and screaming at them, threatening and demeaning them, stalking and terrorizing them, and forcing the 12-year-old to drive… It is remarkable how Mr. Ambrose managed to weaponize the Court system, which is why his very overt patterns of having a serious and dangerous personality disorder must be examined."*

199. Parlato, who published Lee's diagnostics, maintains she *"had enough information to perform the widely-used and highly-respected Hare Psychopathy Psychopath Checklist-Revised (PCL-R) on [Ambrose], based on collateral information and his own written communications, I found that he met criteria for psychopathy - which is a contraindication to parenting… Indeed, under [Ambrose's] 'care,' [the older son] is said to have missed numerous days of school, abused [sic] substances, and been suicidal and injuring himself. Mr. Ambrose has been preoccupied with accusing the mother of being mentally unwell (common with psychopathic individuals trying to deny their own illness), but the mother is healthy and psychologically well-developed."*

200. Again, Parlato used Lee to support his conspiracy theory that the Connecticut family courts are corrupt and that Ambrose conspires with them, *"There is an international crisis of the Family Courts, which are authorized and yet ill-equipped to deal with dangerous personality disorders as Mr. Ambrose exhibits. Individuals showing signs of these disorders disguise themselves and manipulate the legal system to further their abuse and to reverse victim and offender in a way that acutely endangers especially women and children… Consistent with this abuse, all three children have been depressed, engaging in self-injurious behavior, and [the older son] had been suicidal. This is why I performed the PCL-R, on which Mr. Ambrose scored 32/40 (30 is cutoff for psychopathy) – this is a score indicating EXTREME POTENTIAL DANGER [Emphasis in the original] for the children and the mother, and almost all decisions by the Family Court need to be reexamined, as well as his diagnosis confirmed by a forensic psychiatrist or forensic psychologist with requisite experience and training to perform the PCL-R – all others are too vulnerable to being manipulated into making opposite conclusions…"*

201. Parlato goes on to quote Lee's DCF Report, supporting her character assassination of Ambrose and her claims about his conduct, despite knowing that every public authority, including the courts, had disputed each of her allegations. Therefore, Parlato used Lee's words to put Ambrose in the most horrific false light, *"That Mr. Ambrose has had custody of these children for so long is alarming – and the extreme signs of abuse and deterioration under him MUST BE RESPONDED TO. [Emphasis in the original]. That the mother, who singlehandedly raised these children before their abduction, has been denied access to her children for three years. This level of separation of children from their primary caregiver – especially the 12-year-old – portends serious, lifelong psychological and physical problems, as well as loss of possibly decades of life, on the part of the children if not intervened with rapidly…All indications are that [the children] were happy and thriving under their mother*

*but have sharply declined academically and medically under Mr. Ambrose's 'care'...Mr. Ambrose appears to have had a pattern of abuse, neglect, and coercive control of the children all their lives, which the mother failed to recognize earlier, as she is a victim of domestic violence and psychological abuse herself."*

202. Parlato's hyperlink also includes a full page of Lee's alleged "qualifications" (the "Qualifications"), which she also references in the DCF Report. Lee has a well-documented history of misrepresenting, even flat-out fabricating, her professional associations and accomplishments, including in the Qualifications. Yet she uses these exaggerated professional credentials to mislead reasonable people to give her life-destroying allegations against Ambrose greater authority. Parlato endorsed Lee's false credentials and comments, including the Riordan Letter, the DCF Report, the Psychopath Psychopath Checklist by endorsing and in publishing them, he is responsible for their content.

203. Parlato's article also includes photos of Ambrose and the children and identifies them by name as victims of sexual assault, a violation of privacy that even adult alleged victims of such a crime are spared. Ambrose was exonerated of all the abuse allegations. Parlato's publication is further evidence of his malice.

204. Without referencing Riordan's court-determined history of coaching the children to make false allegations against Ambrose, Parlato's published article continues to use their solicited statements to put Ambrose in a false light, *"[The children] recount tales of Ambrose's danger, his lies and his criminal conduct...There is so much evidence and it is almost certain that law enforcement will take an interest in Ambrose's arrest and conviction. As a small example, look at this short interview of Sawyer, now 13, when he was 10 explaining to famed private investigator Manual Gomez what his father was doing to him...Within hours Ambrose got the police to force his children then 13, 13 and 10 back to his home. How they suffered over the next three years they have told FR... Ambrose himself is pushing for his own arrest, forcing the children to tell all that he has done to them..."*

205. Under the heading "Sawyer's Own Words," Parlato writes, *"Listen to Sawyer here and decide for yourself. This is the tip of the iceberg."* Parlato then republished the exact same transcript that he published in his July 20, 2023 Part 2 article, as quoted above. Parlato knew that DCF had determined the statements the children made in this "interview" were the result of Riordan's coaching. In the interest of space, the interview statements will not be repeated yet again, but are incorporated as if fully set forth herein.

206. Despite portraying frankreport.com as a "news" site, Parlato frequently regurgitates the same information in scores of articles. But the repetition serves a purpose: the more information is repeated, the more likely it is to be believed by his readers; therefore, the more damage is done to Ambrose. Moreover, Parlato isn't merely "reporting" Lee's statements, he is clearly promoting and endorsing them, using them to support his claims against Ambrose and the Connecticut courts.

207. This publication incited widespread public hostility toward Ambrose. The article generated 117 reader comments, nearly all of which contained personal attacks, ridicule, and threats directed at him.

### August 5, 2023 Publication

208. On August 5, 2023, Parlato published an article entitled *"Ambrose's Attorney Withdraws, as National Media Outlet Looks at Ambrose CT Custody Case"* by Janine Morrison (on information and belief, this is one of a number of pseudonyms Parlato uses). https://frankreport.com/2023/08/05/ambroses-attorney-withdraws-as-national-media-outlet-looks-at-ambrose-ct-custody-case/

209. Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

210. *"Parlato told me. 'The crimes against these three teenagers and their mother are nothing short of a federal racketeering conspiracy…. Dr. Bandy X. Lee has identified Ambrose as a psychopath who, she says, scores dangerously high at 32 on the Hare Psychopathy Checklist."*

211. Again, Parlato embeds a hyperlink to the damning allegations Bandy Lee makes against Ambrose, using her statements to support his attacks on Ambrose. Lee's statements, discussed in detail above (under "August 3, 2023"), should be incorporated here as if fully set forth herein.

212. Parlato continued his flat-out fabrications, damning Ambrose:

213. *"In this way, Ambrose hopes to persuade Madison police to arrest his three teenage children… and have them forcibly taken to his home where they will be on home detention…. If he can get the newly appointed Judge O'Neill to force the mother away from the teenage children who are old enough to know and tell about his abuse, Ambrose may prevent the children from telling authorities about his sexual abuse of two of them… But people with psychopathic conditions never stop until someone stops them and unhappily for others, they oftentimes take others with them."*

214. This article generated 96 comments, nearly all of which denigrate and attack Ambrose.

**August 8, 2023 Publication**

215. On August 8, 2023, Parlato published an article entitled ***"Confidentiality Clash: CT Attorney Edward Nusbaum Suspected of Sharing Sensitive Info in Ambrose Custody Case"*** written by Richard Luthmann, the violent felon convicted of extortion and fraud, who served years in federal prison and is close to Riordan, who cross-posts Parlato's articles attacking Ambrose.

https://frankreport.com/2023/08/08/confidentiality-clash-ct-attorney-edward-nusbaum-

suspected-of-sharing-sensitive-info-in-ambrose-custody-case/

216. In the article, Parlato publishes and endorses the false statements and insinuations of his

collaborator, which support his own false narrative:

217. *"Ambrose successfully blocked the children from seeing their mother for three years…*
*[Referring to Bandy Lee, the disgraced doctor fired for her lack of medical knowledge and*
*ethics] A noted psychiatrist identified [Ambrose] as likely psychopathic,"*

218. Again, to support his claims against Ambrose, Parlato embeds a hyperlink to Lee's damning
allegations, which are detailed above and should be incorporated here as if fully set forth
herein. Parlato's article repeats:

219. *"Ambrose successfully blocked the children from seeing their mother for three years."*

220. This article provoked 37 comments, nearly all of which denigrate and attack Ambrose.

**August 8, 2023 Publication (Part 2)**

221. On August 8, 2023, Parlato published an article entitled **"CT Judge Orders Teens Away**

**From Mother; Ignores Claims of Father's 'Abuse'; Ambrose Teens Homeless"** by Frank

Parlato https://frankreport.com/2023/08/08/ct-family-court-judge-thomas-oneill-orders-

ambrose-teens-away-from-mother-bars-riordans-contact-with-the-daughter-matt-and-sawyer-

for-one-year/ Parlato made the following defamatory and/or misleading statements, putting

Ambrose in a false light:

222. *"Because Ambrose took all their marital funds and Riordan's inheritance…Judge Grossman*
*based her decision on a custody evaluation report paid for by Ambrose."* Parlato hyperlinks
to the entire custody evaluation, which the Court had ordered sealed because it contains
confidential information about the children and the parties. As the matrimonial Court
(Adelman, J.) stated, Riordan likely provided this confidential document for publication.

223.

224. *"Riordan had raised [the children] since each was adopted at less than six months of age… Ambrose worked away from home – an absentee father… Soon afterward, he changed the passwords of the joint accounts, locked Riordan out of her own funds, including her inheritance, hired experts to support his preplanned parental alienation narrative, then filed for divorce… Away from their mother, the children rapidly declined and plunged into depression…"[A]fter three years isolated from their mother and the extended family they grew up with…"*

225. Parlato published the same hyperlink to The Riordan Letter, DCF Report, Psychopath Checklist, and Qualifications he published in his Aug 3, 5, and 8 (part 1) articles. The hyperlinked documents have been detailed above and should be incorporated here as if fully set forth. Parlato uses the linked material to amplify and "corroborate" his false narrative against Ambrose. It is clear that Parlato is not merely "reporting" what Lee said, he is promoting and endorsing her comments, deliberately casting Ambrose in a false light.

226. Parlato also published the full text of an August 8, 2023 *ex parte* letter Lee inappropriately sent to Judge Thomas P. O'Neill of the Connecticut Superior Court at Bridgeport (the "O'Neill Letter"), who issued restraining orders on behalf of the children against Riordan (and subsequently found Riordan in contempt of those orders).[4]

227. Lee's statements in the O'Neill Letter are false or so twist the facts determined in court and police reports that they put Ambrose in a false light: *"I must warn against your sending Ms. Karen Riordan's children to Mr. Christopher Ambrose. He is no ordinary violent man…I have heard recordings of Mr. Ambrose's threatening the daughter with vaginal penetration as punishment for minor misbehavior…All three children have reliably reported sexual abuse,*

---

[4] Lee was desperate to testify as an expert witness for Riordan and even appeared in the courtroom, interrupting the hearing. The Court declined to qualify her. Undeterred, she ensured the Court "heard" her by sending the O'Neill Letter.  Lee says she's been involved in dozens of family court cases; therefore, she knows that privately contacting a judge about a case over which he presides is unethical and has potentially severe consequences.

*and no one has believed them, frankly, because the father is so threatening, he has intimidated all witnesses (he has already been threatening to me, which I had to report to local police)...The 12 (now 13)-year-old recently reported anal penetration... Even if none of this occurred, their lives seem to have been living 'hell' from his coercive control, verbal, emotional, and psychological abuse, and isolation from the mother who raised them (the father did not raise them) for over three years, which is abundantly and clearly recorded. [Ambrose's] aggression is such that, immediately after the first child ran away, he found out their address from the Connecticut Address Confidentiality Program, hunted her down, and stalked her everywhere in his car, almost causing her to have an accident."*

228. To support his own false narratives about Ambrose, the Connecticut courts and DCF, Parlato's published article uses Lee's misleading insinuations about Ambrose which had been investigated and determined false by therapists and public investigators, and her conspiracy theories about the courts, *"As expected from [Ambrose's] coercion, these children exhibit objective signs of severe trauma: resorting to substances, self-harm, and suicidal thoughts while living with him, as well as going from normal weight to morbid obesity, as you have heard... Child protective services investigations were noted, but as a violence expert of twenty-five years' experience, I can tell you that I have found them to be too frequently wrong to be solely relied upon. Individuals of the most dangerous personality disorders go undetected... I told this to one of the supervisors at the Department of Children and Families, as Mr. Ambrose is just such an individual, but they have not followed up, which shows that they are not only ineffective, they are also insincere: these are children who have reported being severely punished if they ever gave a true report of Mr. Ambrose's abuse against them, and DCF should know that this threatening behavior is common among the most dangerous individuals."* Parlato knew what he published these statements that DCF and the police had done thorough investigations, presented to and accepted by the courts.

229. Parlato's article refers to Ambrose as Riordan's *"violent abuser"* and makes other false claims about Ambrose, *"[Ambrose] was able to hire a ['high-powered attorney'] only because he embezzled [Riordan's] inheritance and stole everything she had... It came out during the proceeding that this violent man, who lost his law license and was fired multiple times apparently for plagiarism and fraud, did not stop even when he rendered his ex-wife homeless."*

230. Since Parlato identifies Lee as an "expert in child abuse and psychopathy," a reasonable person would understand that a psychiatrist specializing in domestic violence determined Ambrose to be a violent, dangerous psychopath who committed the most horrific sexual

abuse against his children, abused and stole from his wife, leaving her homeless, that he lost his law license was lost and was fired multiple times for cause.

231. Moreover, at the time he published, Parlato was aware that all Lee's allegations - including her claims to have recordings evidencing Ambrose's abuse of the children - had been investigated by public authorities, including DCF and the police, and found baseless, which the Court affirmed after testimony. Nevertheless, Parlato uses Lee's statements to support his published false allegations against Ambrose.

232. This article provoked/elicited 83 comments, nearly all denigrating Ambrose.

## August 9, 2023 Publication

233. On August 9, 2023, Parlato published an article entitled ***"Ambrose did the right thing Ambrose Sparks Standoff With The daughter and Police – But Teen Escapes Forced Return to His Home". https://frankreport.com/2023/08/09/ambrose-sparks-standoff-with-mia-and-police-but-teen-escapes-forced-return-to-his-home/***. In it, Parlato made the following defamatory and/or misleading statements, misrepresenting facts and putting Plaintiff Ambrose in a false light:

234. *"Three days ago, The daughter was hospitalized. Her stress level from her father's attempts to take her from her mother was so high that she spent two days in the hospital… The daughter left the hospital with Ambrose, who had Westport police on hand to intimidate her into thinking she had to go home with her abuser…[Ambrose] held the children in isolation from their family for three years."*

235. This article provoked 30 comments, nearly all of which denigrate and attack Ambrose.

## August 12, 2023 Publication

236. On August 12, 2023, Parlato published an article entitled **"Psychiatric Diagnosis and Custody Battle: Judge Grossman Suspected of Mental Illness as Battle Looms Over Forced Return of Teens to Ambrose"** https://frankreport.com/2023/08/12/psychiatric-diagnosis-and-custody-battle-judge-grossman-suspected-of-mental-illness-as-battle-looms-over-forced-return-of-teens-to-ambrose/Parlato made the following defamatory and/or misleading statements, placing Ambrose in a false light:

237. *"Ambrose paid [the custody evaluator] more than $12,000 to do a neutral custody evaluation report in 2020…Imagine you are the children of… absentee father Chris Ambrose [and a judge orders you to live with] with a mean and callous stranger named Ambrose… A CT Family Court Family Relations Counselor, Allison Kaas Esq. determined that Ambrose was a high-risk abuser… It took significant legal work from Ambrose's attorney to get the dissocial Judge Grossman to ignore this dangerous finding…The kids lost contact with their mother for three years, as Ambrose moved them to his rural house and kept them free of her and all her family and friends with whom the kids grew up – grandparents, aunts, uncles, cousins, and lifelong friends…"*

238. As explained in this Complaint, Parlato was aware that hospital personnel had determined the children were coached by Riordan to make false accusations. Nevertheless, Parlato published:

239. *"Hospital documents support that the children told the ER doctors and hospital psychiatrists of the sexual abuse they suffered at the hands of their adoptive father…The hospital determined that Mr. Ambrose was a threat to the children and recommended that the children go home with the mother…Throughout my investigation, Mr. Ambrose has made numerous false statements to the court. Each time, he or his lawyers present his allegations without evidence to support the narrative he invents…You must understand that Mr. Ambrose is a habitual liar. He continues to spin stories to paint an untrue narrative…"*

240. Parlato further published claims he knew were provably false:

241. *"Another investigator conducted a forensic analysis on Mr. Ambrose's computer. The investigator found hundreds of photos of young boys and men having sex…In fairness to [the custody evaluator], she did not get a chance to determine if Ambrose visited child porn websites. It took work by his attorneys, but Ambrose obtained a court order that barred [the evaluator] from reviewing evidence of child porn on his computers."*

242. This article provoked 58 comments, nearly all of which denigrate and attack Ambrose.

**August 16, 2023 Publication**

243. On August 16, 2023, Parlato published an article entitled **"Ambrose's Misuse of Jennifers' Law Sparks Activist's Outcry: Judge O'Neill's Flawed Legal Decision Exposed"** https://frankreport.com/2023/08/16/ambroses-misuse-of-jennifers-law-sparks-activists-outcry-judge-oneills-flawed-legal-decision-exposed/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

244. *"To obtain the TRO, [Ambrose's attorney] shopped judges until he found Judge O'Neill… [The judge's] fact-finding was based on Ambrose's word alone. His fact-finding was based on Ambrose's word alone. Judge O'Neill refused to listen to the teenagers.…Father has the local police constantly (follow!) [sic] and harasses the kids."*

245. In the middle of his article, Parlato includes the comments of a third party, which he clearly endorses and uses to promote his narrative. Among these comments that put Ambrose in a false light and further Parlato's false claims that Ambrose conspires with the courts and DCF, *"the mother is endlessly harassed at all hours of the day and night and silenced…DCF ignores everything, but also harasses mom….Judge O'Neill refused to allow the children to be heard, even though they were represented by counsel."*

246. This article provoked 96 comments, nearly all of which denigrate and attack Ambrose.

**August 17, 2023 Publication**

247. On August 17, 2023, Parlato published an article entitled **"Is Chris Ambrose a Lying, Thieving, Selfish Narcissist?"** https://frankreport.com/2023/08/17/guest-view-is-chris-ambrose-a-lying-thieving-selfish-narcissist/

248. The article is attributed to Jessica Clark; again, on information and belief, this is another pseudonym Parlato uses. In any event, Parlato promotes and endorses the statements, which defame and/or are misleading and put Ambrose in a false light:

249. *"Chris Ambrose is nothing but a lying, thieving, selfish narcissist through and through. It's plain for everyone to see. He has a bizarre predilection for near child porn and doesn't care about using and exploiting youth for pleasure."*

250. This article provoked 25 comments, nearly all of which denigrate and attack Ambrose.

### August 17, 2023 Publication (Part 2)

251. On August 17, 2023, Parlato published a second article entitled **"Ashley Deckert Director of Rhode Island Department of Children, Youth & Families Responds to Concerns About Ambrose Children"** https://frankreport.com/2023/08/17/ashley-deckert-director-of-rhode-island-department-of-children-youth-families-responds-to-concerns-about-ambrose-children/  This article was written by felon Richard Luthmann, Parlato's frequent collaborator. To support his attacks against Ambrose, Parlato promotes, endorses, and adopts Luthmann's content, which includes material published under the subheading "Danger to Children in RI from Psychopath, Pedophile CT Father." Parlato published:

252. *"[T]he Ambrose children are at risk from their psychopath predator father…Ambrose may bring the children back to his den of iniquity in Madison, Connecticut, where underage drinking, drugs use, and sex (statutory rape) regularly occurs…*

253. Parlato provides a list in the article, which purports to be accurate. However, as Parlato is aware, his claims are false: *"[Materials showing] Christopher Ambrose's dangerousness: December 15, 2020 – CT Court Report showing Ambrose as "HIGH RISK" for dangerousness. Email dated June 6, 2023 between Attorney Michael G. Curley of Murtha Cullina, LLP, and Nancy Stewart, Kelly Burke, and Michelle Peterson of the Connecticut Department of Children and Families (DCF). In this email, there is a reference to 'a new allegation of penetration.' Report dated May 29, 2023, from Private Investigator Manuel Gomez to WDNY US Attorney Trini Ross's Office and the FBI Office-Buffalo*

*detailing molestation by Christopher Ambrose. PI Gomez describes the video evidence he transmitted to the authorities and has in his possession. <u>Report dated May 3, 2023,</u> from Bandy Lee, MD, MDiv, warning of Christopher Ambrose's dangerousness where his children are involved.Signed statement dated May 29, 2023, of The daughter Ambrose detailing Christopher Ambrose's physically and emotionally abusive activity and improper touching. The statement corroborates the presence of men over the age of 18 (some in their 20s) with children aged 14 and 15 for "overnight" stays where there is underage drug, alcohol use, and sex. Social Media pictures corroborating underage drinking, drug use, and sex, published in the July 20, 2023 article: "<u>How is Wealthy Elite Christopher Ambrose of Madison, CT Involved in Underage Drinking, Drugs, and Sex?</u>"*

254. Parlato includes hyperlinks to the documents referenced above, which have been described herein above and should be incorporated here as if fully set forth. Parlato uses the linked material to amplify and "corroborate" his false narrative against Ambrose. The referenced documents are not public, suggesting that Riordan provided them to her associate Luthmann and/or her boyfriend Parlato.

255. Parlato also hyperlinks to a July 20, 2023 article published on Luthmann's substack.com page, endorsing the content to further the misleading perception that Ambrose is a deviant abuser of children who conspires with the supposedly "corrupt" Connecticut Family Courts. Since Parlato published and promotes this content, he "owns" it. Defamatory and/or misleading excerpts from the hyperlinked article include:

256. *"The Connecticut Family Courts basically condone the "sale" of children to the parent who can pay the most and engage the most well-connected barristers. This is what happened to Riordan's three children. [5] "CT Department of Children and Families has a report of 'sexual penetration' involving Ambrose and one of his minor male children…There were allegations Christoper Ambrose engaged in sexual abuse and pedophilia. These allegations are not bald or unfounded. They have their basis in a Yale report…Ambrose admits the Multi-Disciplinary*

---

[5] Throughout this <u>substack.com</u> article Luthmann hyperlinks to multiple Parlato articles, demonstrating their conspiratorial collaboration against Ambrose.

*Task Force at Yale New Haven Hospital made a report that made disturbing disclosures of a sexual nature involving allegations of pedophilia against Ambrose. Ambrose does not deny the report…Will Christopher Ambrose and His Band of Child Rapists Ever Be Questioned by Connecticut Law Enforcement?…Christopher Ambrose is allowing children's innocence, virtue, and morals to be stolen in his home. Ambrose is not only creating a dangerous situation and violating the law but also condoning child rape. This should never be tolerated."*

257. Parlato published the above statements knowing that DCF, the police and Yale had investigated the allegations and determined them to be false. Moreover, Parlato knew at least two Courts (Moukawsher, J. And O'Neill, J.) had published decisions exonerating Ambrose of each of these claims.

258. Parlato also strategically posts hyperlinks with prominent photos and headlines to five articles he previously wrote and published on frankreport.com. By promoting these articles, Parlato is endorsing their content to further spread his defamatory/false light messages against Ambrose. The two hyperlinked articles dated July 20, 2023 and August 8, 2023 are discussed above and should be incorporated here as if fully set forth. The other three hyperlinked articles, dated March 28, 2022, October 10 and 12, 2021, are detailed immediately below:

259. Parlato hyperlinks to an article he published on March 28, 2022 entitled "Fraud and Injustice #3: The Ambrose Children Make Contact as Allegations of Abuse, Pedophilia Are Suppressed By CT Family Court" https://frankreport.com/2022/03/28/fraud-and-injustice-3-the-ambrose-children-make-contact-as-allegations-of-abuse-pedophilia-are-suppressed-by-ct-family-court/ In the article, Parlato defamed and put Ambrose in a false light:

260. In speaking about the Ambrose-Riordan divorce case, Parlato wrote, *"For instance, the attorney for the father tells the GAL, 'the father has the money.' The GAL knows what that means, and she, in turn, tells the custody evaluator – the father has the money... They all assess the case. If there is money, they size up how to stage it and how to take their fat share of the family's wealth...The father has the money. He chose: parental alienation from the mother. He gets custody. Of course, these bad actors don't always have a willing, knowing player like Ambrose, who is himself a lawyer. This cat knows the game as well as they do. He cut his teeth in the deceptive tricks of truth the players in law play...[T]their mother was taken from their lives – for money paid by their father, who stole it from their mother...In what could only be called conspiratorial, Ambrose's attorney, Nancy Aldrich, the GAL, Jocelyn Hurwitz, and the custody evaluator, Jessica Biren Caverly, led by Judge Jane Grossman, rushed to intervene – to prevent the DCF investigation from going forward, and to stop the forensic examination that the medical experts said was essential, and, of course, snatch the children away from the Department of Children and Families' protective hold."*

261. Parlato published the children's most confidential hospital records recounting the abuse allegations that Parlato knew DCF and the court had determined to have been coached by Riordan. These records put Ambrose in a most damning false light.

262. Parlato also hyperlinked to an article he originally published on October 10, 2021 entitled "The Ambrose Papers #5: Longtime ABC Reporter Wayne Dolcefino Investigating; Says Children Reached Out to Him Alleging Abuse by Father" https://frankreport.com/2021/10/10/the-ambrose-papers-5-longtime-abc-reporter-wayne-dolcefino-investigating-says-children-reached-out-to-him-alleging-abuse-by-father/ In that article, Parlato writes: *"This is Part # 5 of the Ambrose Papers, the extraordinary story of how a conniving father and a dubious gaurdian [sic] ad litem teamed up to ruin the lives of three adopted children... T]the father keeps his children in virtual isolation. Not only may they not see their mother, but none of their relatives or family friends they've known since infancy... For most of her kids' lives, [Riordan] was essentially a single mom. Her husband Chris Ambrose spent much of his time off in Hollywood...All of [the guardian ad litem's] legal bills, all of them are being paid by the father in this case...A psychiatrist treating the family called the report, "misguided, dangerous and could be considered malpractice... "They haven't seen anybody in 16 months...They have no wi-fi. They have no phones. They have no computers. People try and see them and send them stuff and they're cut off. They got ripped out of their lives."*

263. Parlato also hyperlinked to an October 12, 2021 he originally published entitled "The Ambrose Papers #6: Despite Alleged Isolation, Sexual, Psychological Abuse of Children,

and Child Porn; Ambrose Wins Custody" https://frankreport.com/2021/10/12/the-ambrose-papers-6-despite-alleged-isolation-sexual-psychological-abuse-of-children-and-child-porn-ambrose-wins-custody/ In the article, Parlato defamed and put Ambrose in a false light:

264. *"The father was away most of their lives working in Los Angeles and New York… while the children lived in Connecticut with their mother…Since getting custody 18 months ago, their father has refused the children access not only to their mother but the entire family and all their lifelong friends…[T]he couple adopted three children. [Riordan] raised them, with the help of family and friends, while Ambrose was off in Los Angeles or NYC, working…And it turns out, Ambrose was leading a double life…Ambrose was secretly living out his fantasies…"*

265. Parlato goes on with a completely fabricated narrative, *"[Ambrose] secretly taking control of the joint bank accounts of his and [Riordan's] and, by paying the guardian ad litem some $175,000, winning custody of the three children with the exclusion of their mother. [The custody order] was to be a 'temporary order' lasting a weekend, then a week, and now the isolation has lasted 18 months…With the loss of their mother, they were also denied contact with 'Papa,' their grandfather, Joani, their grandmother, Aunt Dee, cousins, Austin, Pam, Colin, Julianne, Nicholas, Aunt Michelle…The children are not permitted to see any of their friends and family anymore…And their summers in Rhode Island with Papa now denied to them for two years…[T]he deceptive, abusive, gruesome Chris Ambrose, took away the children's security, took away their place in the world, their familiarity of people, and places where they used to go; the symbolic things, the traditions, the things and memories that sustain young lives and old lives too…*

266. His falsehoods continue, *"The Department of Children and Family Services each time put 96 hour holds on the children so they could be examined and police could investigate and not returned to the father…[Riordan] discovered Ambrose was visiting sites with gay and child porn…Sites that contain porn images of fathers raping their underage sons. [www.mygaycash.com/Bringmeaboy].The site promoted itself: 'In the deepest recesses of our hearts, some of us yearn to be Daddies to good little boys even if they are only our stepsons. Join us at Bring Me A Boy as we explore tight, smooth bodies then stretch tight holes or smear cum on their faces. Let us corrupt, the pretty little things which we call son.' All kinds of sites with adults having sex with Latino boys. [The Ambrose children are Latino and adopted.] And porn sites featuring 'twinks,' young adults who look like adolescent or preadolescent boys.Forensic evidence suggests that not only did Ambrose visit the sites, he might be producing porn for some of the websites… When [Riordan] got the forensic report she brought it to her attorney, and the guardian ad litem…  A shocked GAL, shocked not*

*because of the porn on Ambrose's computer, but because she might lose her billings if Ambrose lost custody, rushed to stop [Riordan] for taking this further…[The guardian ad litem] has billed $178,000 and the father, because he controls the money, not the mother, who was the stay-at-home caretaker, has sided with the father, every inch of the way."*

267. The August 17, 2023 article generated 56 comments, virtually all attacking Ambrose.

**September 12, 2023 Publication**

268. On September 12, 2023, Parlato published an article entitled **"Ambrose Teens Flee Once Again: The Relentless Pursuit of a Father"** https://frankreport.com/2023/09/12/ ambrose-teens-flee-once-again-the-relentless-pursuit-of-a-father/. Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

269. *"For three years, Ambrose held his kids in captivity, not letting them see their mother, her family, or family friends – the ones they grew up with and loved…Ambrose, with a little forum shopping to get the right judge, Judge Thomas J. O'Neill."*

270. The August 17, 2023 article generated 44 comments, virtually all attacking Ambrose.

**September 13, 2023 Publication**

271. On September 13, 2023, Parlato published an article entitled **"Money Talks in Family Court: How Christopher Ambrose Bought His Kids and Their Futures – And Turned Maternal Love into a Liability"** https://frankreport.com/2023/09/13/money- talks-in-family-court-how-christopher-ambrose-bought-his-kids-and-their-futures-and- turned-maternal-love-into-a-liability/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

272. *"[Riordan] was a stay-at-home mother, and Ambrose, when he started the divorce proceedings in 2019, snatched every dime out of their accounts. He even took her inheritance for good measure – leaving her penniless and unable to play the game in CT Family Court, which is justice is what justice can buy…Ambrose outspent the mother 10-1. In CT Family Court, money buys custody and bullshit talks."*

273. Parlato went on a baseless rage against Ambrose and the alleged conspiracy of the family courts for which he provides no evidence: *"Ask the wake of judges – Grossman, Adelman, Moukaswher, or newly-minted O'Neill, called up from hell to roll in the detritus caused by a selfish father's insane demand to force three teenagers to live with him… Judge O'Neill [yelled at] all who threaten the parental alienation racket by refusing to force teenagers to live with the man who purchased them. The racket O'Neill protects is called parental alienation – which is to conspire to hand kids to abusers, then watch how the motions add up, and hearings pile high, billable by the hour. Though profitable for the cast of family court professionals, it causes havoc in the lives of mothers and children, which drives up the cost to the father. Ambrose paid a fortune to buy his kids…[H]e retained the children-snatching family law attorney Alexander Cuda, the leader of the conspiracy of attorneys and judges in the family law section of CT…*

274. Parlato goes on to praise Bandy Lee, paid by Riordan, whose attacks on Ambrose he frequently publishes and endorses, and Manuel Gomez, the violent, disgraced former cop fired for cause by the NYPD, also paid by Riordan: *"Nor would [Judge O'Neill] hear from the psychiatrist Dr. Bandy Lee, who believes Ambrose is a dangerous psychopath, or Private Investigator Manual Gomez, who has evidence he says of Ambrose's abuse."*

275. Parlato betrays his malice for Ambrose with relentless schoolyard *ad hominem* insults: "*It is hard to fathom why any man, other than a psychopath, would wish to force three teens, young adults, to live in his house against their wishes….At the center of the case, with his hunched shoulders and ugly visage, Ambrose seems the incarnation of greed. His beady eyes scan the court, uncaring and unfeeling, interested only in destroying the mother of his children and running their lives. He has an air of cold calculation, his psychopathy so virulent he seems ready, if need be, to use the law of Family Court profit, like Scott Mangano and Fotis Dulos, to snatch life away."*

276. The article generated 91 comments, virtually all attacking Ambrose.

### September 25, 2023 Publication

277. On September 25, 2023, Parlato published an article entitled **"Family Court Gave the Kids to a Psychopath? Chris Ambrose Scores 32 on Psychopathy Checklist"** https://frankreport.com/2023/09/25/family-court-gave-the-kids-to-a-psychopath-chris-ambrose-scores-32-on-psychopathy-checklist/

278. Parlato published this article, extensively quoting and endorsing statements from Bandy Lee that put Ambrose in a damning false light. Before publishing, Parlato knew that Lee had never met Ambrose, authorities had investigated and dismissed her allegations against him. Moreover, he knew or should have known that Yale University had fired Lee in a highly publicized case for (among other things) concerns about her lack of medical knowledge and ethics, including publicly diagnosing individuals she had never met, like Ambrose. Nevertheless, Parlato promoted Lee as a renowned expert, falsely claiming that she served as the Director of Research for Harvard's Center for the Study of Violence; Harvard reports they have no such Center. But Parlato knew such exalted credentials would lend enormous credibility to Lee's attacks against Ambrose, furthering Parlato's goal of destroying his reputation and quality of life. Among the defamatory and/or misleading statements that put Ambrose in a false light:

279. Parlato details each diagnostic score Lee assigned to Ambrose on a psychiatric test, even though she had never met him: *"According to Dr. Lee, Ambrose's score was 32, placing him firmly within the psychopathy range… Dr. Lee…highlighted that a PCL-R score of 30 or more is alarming and may even contraindicate parenting. Ambrose's score of 32 suggests a psychopathic diagnosis or, at the least, alarming psychopathic traits…Dr. Lee pointed out once [sic] of Ambrose's traits: 'Separating growing children from their mother and primary caregiver' [which Lee claimed Ambrose did] is one of the worst forms of abuse, which can have lifelong ramifications as well as decades of loss of life for each child—and can be a sign of this dangerous personality disorder…"*

280. Parlato went on to publish Lee's chart, further detailing Ambrose's alleged psychopathy, *"Dr. Lee warned, 'This potential for Mr. Ambrose's dangerousness, especially where*

*children are involved, should not be overlooked.'"*

|  |  | 0 (definitely not present) | 1 (somewhat present) | 2 (definitely present) |
|---|---|---|---|---|
| 1 | Glibness/superficial charm |  |  | X |
| 2 | Egocentricity/grandiose sense of self-worth |  |  | X |
| 3 | Proneness to boredom/low frustration tolerance |  |  | X |
| 4 | Pathological lying and deception |  |  | X |
| 5 | Conning/lack of sincerity |  |  | X |
| 6 | Lack of remorse or guilt |  |  | X |
| 7 | Lack of affect and emotional depth |  |  | X |
| 8 | Callous/lack of empathy |  |  | X |
| 9 | Parasitic lifestyle |  |  | X |
| 10 | Short-tempered/poor behavioral controls |  |  | X |
| 11 | History of promiscuous sexual relations |  | X |  |
| 12 | History of early behavior problems | X |  |  |
| 13 | Lack of realistic, long-term plans |  |  | X |
| 14 | Impulsivity |  |  | X |
| 15 | Irresponsible behavior |  |  | X |
| 16 | Frequent marital relationships | X |  |  |
| 17 | History of juvenile delinquency | X |  |  |
| 18 | Revocation of conditional release | X |  |  |
| 19 | Failure to accept responsibility for own actions |  |  | X |
| 20 | Many types of offense |  |  | X |
| *Total number of points* | | 32 (prorated from 31) / 40 | | |

281. Parlato also states that Lee suggests that psychopathic individuals, supposedly like Ambrose, *"mislead, cheat, or otherwise violate the rights of other people… They, through a superficially charming presentation, are often capable of eliciting exceptional levels of sympathy from others as an effective means of escaping accountability for their violence— for example, they may recruit others as 'patrons' or 'pawns' to help them turn the narrative around to incriminating their victims instead…"*

282. Parlato **hypelinks** to Lee's May 24, 2023 "confidential" Report of Abuse to DCF, her May 3, 2023 Letter to Riordan and her full explanation of the test psychiatric test she supposedly performed on Ambrose without even meeting him. Parlato had published all of Lee's statements before (see the August 3, 2023 discussion) emphasizing his endorsement of the

content. Therefore, all Lee's statements in the hyperlinked documents must be incorporated here as if fully set forth herein.

283. The article generated 46 comments, virtually all attacking Ambrose.

**September 25, 2023 Publication (Part 2)**

284. On September 25, 2023, Parlato published a second article entitled **"The Escape Continues: Teens Run, Seek 4th Sanctuary from Ambrose's Grip"** https://frankreport.com/2023/09/25/the-escape-continues-teens-run-seek-4th-sanctuary-from-ambroses-grip/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

285. Parlato began with his baseless conspiracy theories: *"Over the course of a three-year divorce and custody dispute, Ambrose transferred his case between three different judges. This strategy, sometimes referred to as 'forum shopping,' ensured that Ambrose was never held accountable for or had to return funds he allegedly took from his wife...Ambrose, leveraging connections... secured a legal victory, as Judge Jane Grossman, then under consideration for reappointment, ruled Riordan was alienating the children from Ambrose... Grossman ordered the children removed from their home with their mother, with whom they lived for 13 years while Ambrose worked in Hollywood and NYC... The children were not permitted to testify and were represented in court by a guardian ad litem... an attorney, closely aligned with Ambrose's attorney Aldrich and whom Ambrose, because he had seized the marital funds, paid for, at $400 per hour, and approved her scope of work...Ambrose involved the Madison police in intimidating tactics against the children..."*

286. Parlato then sought support for his destruction of Ambrose by returning to Lee's specious attacks, paid for by Riordan, *"In a detailed report intended for the court, Dr. Lee labeled Ambrose with 'characteristics of psychopathic personality,' emphasizing his predisposition to deceive and manipulate. Her analysis portrayed Ambrose as someone who could attract immense sympathy, leveraging it as a tool to evade responsibility for his wrongdoings...*

287. Parlato repeated his false claims about Ambrose's treatment of the children, which had been investigated and dismissed as meritless when Parlato published: *"[Lee] said the separation of children from their primary caregiver, as Ambrose had achieved through family court, 'is one of the worst forms of abuse, which can have lifelong ramifications, as well as decades of loss of life for each child'…[Riordan's father] was more of a father during their upbringing than mostly-absent Ambrose… [A] stark contrast to the isolation imposed by Ambrose over the previous three years, barring any contact with their mother's side of the family…They sought refuge with a family friend who had known them their entire lives, but was estranged due to Ambrose's restrictive directives, which prohibited them from contacting her or any friends they knew before CT Family Court took them away from their mother, family, and friends to live with their father — to protect them from parental alienation…"*

288. Parlato then embraced another false narrative, asserting that Ambrose orchestrated a SWAT-stye raid against Riordan by manipulating law enforcement, including the FBI; *"[U]pon discovering the teens' absence in the morning, Ambrose reported a suspected abduction, painting Riordan as a potentially dangerous psychopath. In a dangerous game of high-stakes escalation, upon discovering the teens' absence in the morning, Ambrose reported a suspected abduction, painting Riordan as a potentially dangerous psychopath. This alarm led to the assembly of a 20-person inter-jurisdictional task force, encompassing local and New York state police, as well as FBI agents. Acting on Ambrose's tip, they converged upon a residence where Riordan visited a friend. The SWAT team stormed the house with guns drawn, anticipating a possible confrontation and expecting to find the teens with their mother. Their primary objective was the arrest of Riordan for alleged kidnapping, and the retrieval of the teens to reunite them with Ambrose."*

289. Parlato even misrepresented what happened in the courtroom, insinuating Ambrose had the judge in his pocket, *"In a startling move based solely on Ambrose's claims, Judge O'Neill declared Riordan had illicitly been in touch with her teens, an act deemed criminal in CT."* Parlato's narrative is easily disproved by court transcripts, to which he had access.

290. Parlato extensively quotes Bandy Lee, hired by Riordan, and repeats her most graphic, disturbing falsehoods to titillate his readers, *"I have heard recordings of Mr. Ambrose threatening the daughter with vaginal penetration as punishment for minor misbehavior. All three children have reliably reported sexual abuse, and no one has believed them. Frankly, because the father is so threatening, he has intimidated all witnesses (he has already been threatening to me, which I had to report to local police). The 12 (now 13)-year-old recently reported anal penetration."* It's difficult to conjure a more damning false statement against a father. At the time Parlato published, he knew that DCF and the police had investigated Lee's allegations and determined them to be utterly baseless.

291. Parlato again provided a hyperlinks to a "confidential" August 9, 2023 Report of Abuse to DCF Lee filed, containing the same allegations as her earlier DCF report (detailed above under August 3, 2023); the statements made in the report should be incorporated here as if fully set forth herein.

292. Parlato also includes, *"In a letter dated May 29, 2023, NYC Private Investigator Manuel Gomez made alarming accusations against Mr. Ambrose, stating to the FBI and US Attorney that Ambrose had molested his children."* At the time he published, Parlato knew that every allegation Gomez had made was investigated and determined by DCF, the police, and the courts to be false.

293. The article generated 43 comments, virtually all attacking Ambrose. 53 comments.

### October 3, 2023 Publication

294. On October 3, 2023, Parlato published an article entitled **"The Power Play: How Chris Ambrose's Affluence Shields Him from Scrutiny in CT Family Court"** https://frankreport.com/2023/10/03/the-power-play-how-chris-ambroses-affluence-shields-him-from-scrutiny-in-ct-family-court/ When he published this article, Parlato knew authorities, including law enforcement, DCF, and the courts, had determined the conduct alleged against Ambrose was false. Yet, deliberately put Ambrose in a false light to brutally invade his privacy and destroy his reputation:

295. Parlato asks, *"Is Christopher Ambrose a predator? Has he sexually abused his three adopted children and potentially others when he was the executive director and then abruptly left The Door, a New York City not-for-profit for at-risk Latino and other troubled youths? Does his admission in the custody evaluation report that he knew that the website Latino Boiz featured models that appeared to be underage boys but were models over 18 suggest a reason to investigate?"* Again, when he published and deliberately put Ambrose in a brutal false light, *Parlato* was aware that all allegations had been investigated and deemed baseless.

296. Parlato also knew that other"facts" he reported had been dismissed as false, *"Computer forensics expert, Donna Eno, found numerous images that reflected concern. The material included gay military, Latino, and websites featuring 'young, hot Latinos.' The adopted children are Latino, and two of the children allege Ambrose sexually abused them."*

297. Parlato continued to misrepresent the position of public authorities, including the courts, *"Family Court ignored their outcries though Yale Hospital and New Haven Children's Hospital deemed them credible. Judge Jane Grossman ordered that any DCF investigation into Ambroses' [sic] suspected pedophilia come to a halt and overturned a 96 hour hold on the children's return to Ambrose. Judge Grossman ordered the immediate return of the children to Ambrose within eight hours – even getting out of bed after midnight to ensure DCF did not investigate the children's allegations."*

298. Parlato published other flat-out fabrications to vilify Ambrose, *"Ambrose punished his kids for their disclosures by taking their cell phones and internet away for about a year while retaining psychiatrists to ply them with drugs and psychologists with therapy focused on negating their experiences."*

299. Parlato returned to his conspiracy theories about the Connecticut system, asking baseless questions to deliberately put Ambrose in a false light, *"Did DCF Commissioner Vannesa Dorantes get a similar order, passed on to her assistant Peterson, to ensure DCF found nothing to hurt the affluent power broker, Christopher Ambrose, and his retinue of high-powered connected attorneys who seem to have malignant influence on the judges on his case?"*

300. The article generated 133 comments, virtually all attacking Ambrose.

### October 6, 2023 Publication

301. On October 6, 2023, Parlato published an article entitled **"Update on Ambrose Teens – Living with Mom's Cousin in NY as Ambrose Aims for Mother's Arrest in CT"** https:// frankreport.com/2023/10/06/update-on-ambrose-teens-living-with-moms-cousin-in-ny-as-ambrose-aims-for-mothers-arrest-in-ct/ In the article, Parlato made the following defamatory and/or misleading statements, knowing them to be false, and put Ambrose in a false light for the public:

302. Parlato twisted the truth in misleading statements: *"[Ambrose's] career had previously taken him to California and New York City, leaving the mother, Karen Riordan, as their children's primary caretaker for the first 13 years of their lives...Ambrose fought hard for custody and had all the money..."*

303. Parlato falsely insisted that Ambrose had the money so he controlled the judicial process, *"[The] GAL... earned almost $200,000, paid by Ambrose...However, court-appointed Guardian Ad Litem (GAL), funded by Ambrose, called an emergency hearing...This claim was supported by custody evaluator Jessica Biren-Caverly, also paid by Ambrose... Depending on the testimony of the GAL, to whom the father reportedly paid almost $200,000, [Judge] Adelman found the children's preference to be with their mother 'uninformed'..."*

304. Parlato spews other falsehoods and even claims to read Ambrose's mind, stating *"Ambrose went to Rhode Island and threatened to get a court order for the arrest of his children...Ambrose sought to have the kids go home with him or have the court place them in the Pleasantville Cottage School – a juvenile home for troubled youth."*

305. Parlato repeated his lie that Ambrose had orchestrated a SWAT-style raid, *"The following day, Ambrose escalated the situation further when the FBI and state police, acting on tips from Ambrose, performed a SWAT raid on a home Riordan was visiting. The FBI disappointed him when they informed him that the kids were not there, and the mother was not arrested..."*

306. Parlato accompanied this passage with the photo below showing a squad of armored officers advancing in a SWAT-style cluster toward a residence, their long neck rifles trained on the occupants. Anyone seeing this picture would assume it was the house Riordan was supposedly in. However, it is an uncredited "stock photo" Parlato used from the Internet, deliberately deceiving his readers. Moreover, as Parlato knew when he published, the police had located Riordan using traffic cameras, not a tip from Ambrose, and Riordan stated in her testimony no weapons were drawn.



"Ambrose weaved a yarn of a dangerous mother worthy of one of his Law-and-Order scripts. The FBI disappointed him when they informed him that the kids were not there, and the mother was not arrested."

307. Parlato also repeated one of his most frequent falsehoods, *"Ambrose ... took all the marital money and more than $150,000 of her inheritance."*

308. The article generated 137 comments, virtually all attacking Ambrose.

### October 7, 2023 Publication

309. On October 6, 2023, Parlato published an article entitled **"Ambrose Seeks Drastic Measures in Custody Coercion Battle, His Son, Sawyer, 13, Fights Back"** https:// frankreport.com/2023/10/07/ambrose-seeks-drastic-measures-in-custody-coercion-battle-

his-son-sawyer-13-fights-back/ Parlato made the following defamatory and/or misleading

statements, knowing them to be false, putting Ambrose in a false light before the public.

310. Parlato frequently repeats allegations without acknowledging that investigations and courts determined the allegations were false; in so doing, he deliberately puts Ambrose in a false light. For instance, Parlato published *"Ambrose has been accused of stalking his children physically and in court"* when he knew these accusations were proved false. Likewise, Parlato misleadingly states *"Ambrose had previously shut off the children's cell phones, leading family and friends to provide them with alternative devices…"* and another mislead, *"Ambrose chases [his daughter] in a car."*

311. Some of Parlato's statements are complete conjecture stated as fact, *"A note discovered on Ambrose's desk prior to his divorce filing revealed his concerns about a three-year extramarital affair he had with someone and its potential impact on custody and court-ordered payments…"*

312. Parlato repeatedly insists that Ambrose is "abusive" and "buys" custody, *"Critics say [Judge O'Neill's] first major decision was…to protect an abusive father, Ambrose…Using [the custody evaluation], which he paid for, Ambrose succeeded in persuading judges that Riordan, the mother, was guilty of parental alienation…It was Caverly's report, paid by the father, that Judge Jane Grossman [judge #2] used to flip custody to Ambrose."*

313. The article generated 72 comments, virtually all attacking Ambrose.

### October 8, 2023 Publication

314. On October 8, 2023, Parlato published an article written by Bandy X. Lee entitled

**"Famed Psychiatrist Dr. Bandy X Lee: The Egregious Case of Christopher**

**Ambrose: How CT Family Court Failed Karen Riordan and Her Children"** https://

frankreport.com/2023/10/08/famed-pyschiatrist-dr-bandy-x-lee-the-egregious-case-of-

christopher-ambrose-how-ct-family-court-failed-karen-riordan-and-her-children/.

315. In his preamble, Parlato extols Lee and endorses her brutally negative characterizations of Ambrose, which align with Parlato's baseless statements in scores of articles, *"Dr. Bandy X. Lee, a distinguished American psychiatrist renowned for her expertise in forensic psychiatry and violence studies, delves into the life of Christopher Ambrose, a man she suggests exhibits psychopathic tendencies. Her report aims to uncover how Ambrose allegedly manipulates the Connecticut Family Court system to devastate the*

*lives of his teenage children and their mother. Dr. Lee's analysis also explores the unsettling enjoyment such individuals derive from these destructive actions."*

316. When Parlato published the above, *he knew or should have known* that Lee had been fired for her lack of medical knowledge and medical ethics, that she had never met Ambrose, let alone examined him, and that authorities had investigated and determined her claims about Ambrose were meritless. [6] In short, Parlato knowingly used Lee's professional credentials and assertions to put Ambrose in a false light, violating his privacy and causing significant harm. Parlato promoted and promoted Lee's claims, all of which he knew to have been proved false. He quotes Lee:

317. *"Never in my 25 years of practice did I imagine there would be an 'alternative court,' that deals in criminal child trafficking, where an alternative 'law' reigns, and not even the rules of human decency apply. Indeed, through family court, Christopher Ambrose, who would have been held accountable in any other setting, was able to devastate the life of a client I evaluated, Karen Riordan, and of her children and emerged as 'the innocent one.'...The absentee father [Ambrose] seized the opportunity to marry her [Riordan]...a predatory move to steal her inheritance and hide his homosexuality, among other things...Even though he abruptly stopped being intimate with her as soon as they married, Riordan tolerated his 'quirks' — even though he immediately decided to leave for work in Hollywood and was hardly ever around...In a twisted game of manipulation, Ambrose disrupts the tranquility and joy of his teenage children. Does he take perverse pleasure in the turmoil he instigates? His abusive and exploitative personality emerged, and the children began screaming for help. Riordan initially tried to reconcile everyone, but his actions were outside the bounds of anything she had previously known or even imagined..."*

318. Under the heading, "A Psychopathic 'Father," Parlato published Lee's comments as facts, *"Being so caught off guard as the afflicted person wreaks havoc in your life is a common experience of those unfortunate enough to deal with a psychopathic personality. Christopher Ambrose exhibited extremely characteristic patterns, and given that high levels of the disorder are strongly correlated with dangerousness, I interrupted my evaluation of Riordan to perform the Hare Psychopathy Psychopath Checklist (PCL-R) on him...The highly-regarded and widely-used PCL-R requires doctorate-level education in psychology or psychiatry, forensic training and clinical experience with dangerous personalities, and additional instruction specific to administering the scale... [P]sychopathic individuals' pathological lying, conning, and superficial charm can 'beguile' even the most seasoned clinicians into losing the accuracy of diagnosis during a personal interview...Already, from what I had, [Ambrose] reached a full diagnosis of psychopathy — a score of 32/40 (at least 30/40 is required for 'caseness') — which should raise many alarms and possibly be a contraindication to parenting..."*

319. Parlato presented Lee's statements as fact, referencing incidents fabricated by Riordan, which had been debunked during the divorce trial: *"Psychopathy is a disorder of empathy*

---

[6] There were many mainstream media articles published about Lee's termination for cause from Yale.

*and conscience, where an individual is incapable of loving emotions but is driven to harm living beings, including one's own children. [Ambrose] already showed himself to be racist, taunting these children, the older two who are Guatemalan and the youngest half-Mexican, for their heritage. He also showed himself as a sadist, deliberately causing the family dog's death and killing the children's pet crabs…In a chilling act, Ambrose orchestrated the demise of the children's beloved dog, Cody. This cruel strategy not only deepened the children's disdain for him, but also served his ulterior motive of demonstrating parental alienation."*

320. Parlato published more of Lee's outrageous narrative, which he knew from following the divorce was all false, *"Christopher Ambrose first attempted to cover up his emotional, psychological, physical, and sexual abuse of the children by counter-accusing the mother of abuse. But, when that did not work, he turned to the 'parental alienation" theory'…No doubt, as a former lawyer, he recognized that this was the key to his ability to continue his abuse with impunity and even to turn it into a money-making enterprise by holding the children hostage — the children Karen Riordan adopted without his help — and demanding child support…In 2020, Family Court transferred Riordan's three children, ages 9 to 13, to their father with a 'no contact' order against the mother, and what was supposed to be a week's separation until trial extended into a month, a year, and eventually three years — the typical abuse of process by which Family Courts engage in the predatory alienation of children."* As Parlato is aware, the delays in the divorce trial were partly due to Covid, but more significantly to Riordan, as The Decision states on p. 1.

321. Lee continues to blame Ambrose, citing incidents that never happened or are taken wildly out of context, rendering them false, *"The oldest and youngest immediately started cutting themselves, and the middle child became suicidal and missed almost half a year of school…The oldest went from being an international gymnast and athlete to becoming morbidly obese. They ceased all activities and were confined in their rooms, if not constantly harassed, without privacy, even in the bathroom…The father took the doorknobs off the doors to ensure the children could not bar him from their bedrooms… When the children tried to report their sexual abuse to medical providers, Ambrose took away their phones and Internet access and constantly threatened them…In my investigation, I heard recordings of Ambrose threatening the daughter with vaginal penetration as punishment for minor misbehavior…The 12-year-old's sexual assault was documented in a recording of his screams."*

322. Parlato embeds a video in the article with a caption, *"Video Above: In this video captured by Mia, shows her reaction to the chilling screams of a child echoing in the background. Mia identifies the voice as her younger brother, Sawyer, then merely 11 years old, reacting to an undisclosed situation involving their father inside his room…"*

323. Parlato also embedded audio, writing: *"Audio Below: Listen closely to the ominous undertones in this audio clip. Here, we hear Ambrose threatening Mia, suggesting a harsh punishment for an unacceptable action. His parenting style leans towards aggression, possibly even crossing legal boundaries. The phrase 'dig it in deep' leaves us*

*questioning its underlying meaning."* As Parlato knew when he published these digitized recordings, DCF and the police determined both were not what Lee claimed.

324. Parlato published more falsehoods still; again, he knew DCF, the police *and* the court-appointed counsel Riordan had secured for the children found the following allegations baseless: *"Adult men were invited to sleep in the 16-year-old daughter's room, bringing drugs and engaging in intercourse with other underage girls…All three children articulately and reliably reported this abuse to multiple adults, consistently including hospital personnel, school officials, and the police, but all eventually deferred to Family Court…These children thus had to endure a 'living hell'… Still, Ambrose hunted [the daughter] down over the Connecticut confidential address program Riordan enrolled in and stalked her with a car, almost getting her into a serious accident."*

325. Parlato published photos of Ambrose, the children, and their dog, further violating the family's privacy and subjecting all - including the minor children - to scrutiny, ridicule, emotional distress.

326. So, Parlato published this devastating impression of Ambrose, based entirely on "facts" he knew to be false. He then amplified the damage by hyperlinking to Lee's various social media platforms, including bandylee.com, and medium.com, which contain additional articles brutalizing Ambrose. Parlato also provided links to her profiles in Wikipedia, LinkedIn, Amazon, and other sites that discuss her "qualifications" (as explained, many are exaggerated or simply false) to use the authority such credentials engenders, harming Ambrose further still.

327. A reasonable person would understand Parlato's published article to assert that an allegedly exalted expert with impressive (albeit often counterfeit or exaggerated) qualifications diagnosed Ambrose as a dangerous psychopath and insists that he engaged in morally disturbing conduct, including repeatedly sexually abusing his children.

328. This article elicited 82 reader comments, most denigrating Ambrose.

**October 10, 2023 Publication (Part 1)**

329. On October 10, 2023, Parlato published an article entitled "**Ambrose Case Sparks Alarm in Rockland County – Authorities Launch Investigation**" https://frankreport.com/2023/10/10/ambrose-case-sparks-alarm-in-rockland-county-authorities-launch-investigation/ . In the article, Parlato supports statements his frequent collaborator, convicted felon Richard Luthmann, made to authorities.

330. At the time he published, Parlato knew that authorities in CT, RI, and NY had investigated Luthmann's allegations and found them baseless. Nevertheless, Parlato promoted and endorsed Luthmann's statements, defaming and/or putting Ambrose in a false light.

331. The article Parlato published and promoted refers to Ambrose as a *"psychopath predator father"* and claims "THE SITUATION REQUIRES IMMEDIATE CPS INVESTIGATION" [emphasis in the original]. Parlato used the sub-headline **"CHRISTOPHER AMBROSE MOLESTS HIS CHILDREN.'** [Emphasis in the original]. He published, *"In a recording by the teens, Mia makes distressing revelations of her father's alleged sexual abuse… reinforcing allegations of her father's abuse.[The son], 13, reported to Mt. Pleasant Police that his father sexually molested him."* When Parlato published, he knew that police and child protective services had determined the referenced allegations to be false and that the daughter had a documents history of making such allegations with coaching from her mother, who is Parlato's lover.

332. Parlato also repeats his frequent false claims that *"a report from the Multi-Disciplinary Task Force at Yale New Haven Hospital containing details of potential sexual abuse…Dr. Bandy X. Lee, a reputed psychiatrist, revealed recordings she'd obtained that allegedly contained threats from Ambrose to Mia, using sexually explicit language to control and intimidate her for seeking help."* When he published, Parlato knew Ambrose was exonerated of these allegations, as The Moukawsher Decision established.

333. Parlato also published, *"Ambrose…suggest[ed] the siblings be placed in 'brutal juvenile detention centers' rather than the haven of their maternal relative… Judge O'Neill [granted protective orders] without hearing testimony from the teens or any other expert or fact witnesses concerning the alleged abuse…"* Parlato goes on to state that *"Ambrose in Connecticut, with his wealth and connections, has successfully silenced [his children]."*

334. This article elicited 88 reader comments, most denigrating Ambrose.

**October 10, 2023 Publication (Part 2)**

335. On October 10, 2023, Parlato published a second article entitled "Social Media Celebrity Robbie Harvey Demands Investigation into Ambrose's Alleged Abuse" https://frankreport.com/2023/10/10/social-media-celebrity-robbie-harvey-demands-investigation-into-ambroses-alleged-abuse/

336. Robbie Harvey is a TikTok "influencer" who posts videos"exposing" individuals he identifies as "dangerous," inciting his 3M followers to take action against the targets. [7]

337. On information and belief, Parlato contacted Harvey and shared his false narrative about Ambrose. Harvey did exactly as Parlato hoped: Beginning on September 28, 2023, Harvey posted a half dozen videos repeating Parlato's false accusations, using the "evidence" Parlato had provided, and encouraged his followers to "go after" Ambrose. Harvey posted a half dozen videos, all parroting Parlato's narrative, along with audios/videos Parlato provided.

338. In this article, Parlato hyperlinked to and quoted two of Harvey's TikToks and embedded a third that was 7 minutes 54 seconds long. Parlato was thrilled with Harvey's work, stating in his article, *"Harvey's latest video goes beyond revealing [Ambrose's] alleged misconduct. He uses his significant online influence – boasting over 3 million followers – to call for action, urging his followers to contact the Connecticut Attorney General, William Tong, and demand an investigation into the claims of sexual and psychological abuse made against Chris Ambrose by his children."* At the time, Parlato published, he was aware that these allegations had been investigated and found baseless. Parlato's efforts to get Ambrose arrested and prosecuted for conduct he knew never happened betrays his extreme malice and willingness to deceive.

_____

[7] In one case, Harvey targeted a partner at the national law firm Greenberg Traurig, posted videos falsely accusing the man of abusing his wife and children, and urged his followers to inundate the law firm and the lawyer's clients with calls demanding they fire this "child predator." Harvey's followers complied and the attorney lost his $1M/year job and left him and his three children, over whom he had sole custody, emotionally wrecked. The attorney sued Harvey, who quickly agreed to a monetary significant settlement (believed to be approximately $1,000,000) and published a full apology, acknowledging that his narrative had been false.

339. Parlato also published the transcript and video footage of the children accusing their

father of abuse that Riordan paid disgraced investigator Manny Gomez to produce.

340. In addition, Parlato published quotes from disgraced Bandy Lee, also paid by Riordan,

denigrating the evaluator's report that recommended Ambrose get custody, further

insinuating that Ambrose was an unfit parent.

341. In his article, Parlato hyperlinked Harvey's video, which parroted much of this information; the result left readers with the impression that Parlato had nothing to do with Harvey's story, when, in fact, he had provided the story and the "evidence." Among the quotes Parlato published; *"[The daughter stated], 'Yeah, touched me on my \*\*\*\* before and my \*\*\*\*\* before…[The younger son] 'Like he was touching me on my…' [Gomez]: 'Can you demonstrate to me what he was doing to you?' [Son] 'He was like…'[Gomez] 'Alright, and how often was he doing it?'[Son] 'A lot.'"* When he published this these exchanges, which had been produced three years before, Parlato knew authorities, including the courts, had determined the statements had been coerced from the children.

342. Parlato also endorsed Gomez's statements assassinating Ambrose's character, *"In all these cases and thousands of people I have met and encountered, I never have met one as manipulating as Christopher Ambrose. He is truly a Leonardo da Vinci of liars. He manipulates everything. I don't think there's anything that comes out of this man's mouth that's ever the truth. Other than the word 'hello'."*

343. Parlato also quotes Lee and Harvey insinuating that Ambrose had "bought off" the custody evaluator:*"Well, allegedly, [the custody evaluator] was paid over $10,000 by Chris Ambrose. And if you count her fees to testify and her prep time, the amount is much higher."* By having Harvey publish the same narrative that he had published, Parlato created credibility for the falsehoods.

344. In short, Parlato sought out Harvey to amplify and give authority to his defamatory

narrative about Ambrose. He chose Harvey because he has a history of inciting his 3M

followers to "destroy" his targets. Parlato's intentions could not be more apparent: He

tried to use Harvey to ruin Ambrose, just as Harvey had ruined the Greenberg Traurig

attorney. Parlato's malice is transparent.

345. Upon learning of Harvey's videos, Ambrose sent him a cease and desist letter virtually

identical to the one he had sent to Parlato. He also provided Harvey with the court

documents detailing all the allegations, which Parlato had reported on. Harvey immediately realized that the narrative and "evidence" Parlato had provided to him were inaccurate and defamatory. Harvey removed every video and reader comment about Ambrose from his platforms. He never published another word about Ambrose, nor has he worked with Parlato again.

346. This article elicited 88 reader comments, most denigrating Ambrose.

### October 21, 2023 Publication

347. On October 21, 2023, Parlato published another article in frankreport.com written by Riordan's disgraced psychiatrist Lee under the headline **"Forensic Psychiatrist Bandy Lee Faces, Threats, Slander for Advocating for Ambrose Teens."** https://frankreport.com/2023/10/21/forensic-psychiatrist-bandy-lee-faces-threats-slander-for-advocating-for-ambrose-teens/ **Parlato promotes and endorses Lee's claims, even as he knew authorities had investigated and debunked everything she alleged in the article.

348. In the article, Parlato quotes Lee, *"I have written about Karen Riordan, because I know the case in detail as an expert witness and yet have been prevented from testifying on it (my experience of Family Courts is that they keep tightly to their pool of poorly qualified 'experts' who have the potential to be bought)."*

349. Lee states as fact the three children *"suffer[ed] three years of unspeakable abuse…I interviewed the daughter within 24 hours of her running away from her violent abuser-father."*

350. Under the subheading "Abusers Turn Tables on Victims," Parlato quotes Lee, *"If not contained, abusers become more entitled and violent… The abuser, in this case, Christopher Ambrose, not only discovered the location of his daughter within an hour of the mother notifying the police, but also looked up my contacts to write a threatening letter to me that I should never interview his daughter without his consent. Fortunately, based on the teen's disclosures, I had become a mandated reporter by the time he wrote to me."*

351. Parlato quoted Lee calling Ambrose an "abuser," even as he knew that Ambrose was exonerated of every allegation of misconduct, *"I even followed up with the 16-year-old*

*when she interviewed for my book and documented how dramatically she improved in the four months of leaving her abuser…"*

352. Parlato continued publishing and endorsing Lee's abject falsehoods to support for his own false light statements against Ambrose, "S*ince I immediately reported Ambrose's threats to the police, he could not write to me again. Still, he has been slandering me, fabricating false stories…Significantly, I have studied how dangerous personalities operate, and his obsession with researching all the different states in which I held licenses, his veiled threats, and his aggressive weaponisation [sic] of courts to reverse the narrative are signs of psychopathy…All three children, who eventually fled from their violent abuser, Ambrose…Their mother…singlehandedly raised them all their lives… Ambrose hunted them down and either sent the police or tried to manipulate their guardian into releasing them…Ambrose visited [the children] with police and executed a four-hour standoff, threatening the children."*

353. Under a photo of the plaintiff, Parlato wrote, *"Chris Ambrose won't let his children live with their mother or allow them to be happy anywhere."*

354. Parlato also hyperlinked to an article, "An 'Alternative Court' of Unspeakable Criminality, Violence, and Abuse," posted on Lee's medium.com site on October 7, 2023.

355. A reasonable person would understand the information in the article was provided by an *"expert witness who knows the case in detail,"* and that Parlato endorsed the content.

356. This article elicited 23 reader comments, most attacking Ambrose in graphic, vile terms.

## October 23, 2023 Publication

357. On October 23, 2023, Parlato published an article written by felon/extortionist/former convict Richard Luthmann entitled **"Family Court Mastery Secures Ambrose's Return of His Teenagers Amidst Abuse Claims"** https://frankreport.com/2023/10/23/ambroses-legal-mastery-secures-return-of-his-teenagers-amidst-abuse-claims/ Parlato promoted Luthmann, including him on the frankreport.com masthead and posting photos of him in the the article; he also endorsed Luthmann's falsehoods and insinuations that put Ambrose in a false light:

358. *"The [Ambrose children], who had previously been on the run from their adoptive father due to accusations of serious abuse, are reportedly back under his roof in Madison, Connecticut, in a home brimming with newly installed locks, cameras, and alarm systems…Ambrose laid in wait outside Laurenzi's home…Ambrose explicitly directed the Sheriff and local police department action…But this time, Ambrose was able to coax the children into his car…"*

359. Parlato's article continued to put Ambrose in a false light. The article states that the two older children, born in Guatemala, could avoid Ambrose because *"international compacts prohibit legally sanctioned sexual molestation and abuse…[the children] tried to flee their abusive father but after chasing them through three states, he captured them and coerced their return…Ambrose had [gone to] coerce and threaten the children into returning to his Madison, Connecticut home…"*

360. In addition to relying on Luthmann, who served years in prison for fraud, Parlato's article sites Bandy Lee, whose claims had been debunked by public authorities and the court. Though Parlato was aware that Ambrose had been exonerated of all abuse charges, he published that Lee reported Ambrose for sexual abuse to police, who *"took Dr. Lee's personal complaint against Ambrose based on a threatening letter he sent her earlier… Because of Ambrose's ex-parte maneuverings, no judge will hear the other side of the story any time soon, including Ambrose's history of threats…Ambrose is a dangerous psychopath, according to Dr. Lee's clinical medical opinion. Using the Hare Psychopathy Checklist, Dr. Lee evaluated Ambrose. Her report was unequivocal, 'A 'full' diagnosis of psychopathy—a score above 30—raises many alarms and could be a contraindication to parenting. I have also affixed my score of the twenty items of the PCL-R, along with the final score (which can be prorated in the case of non-incarcerated persons). Mr. Ambrose's score adds up to 32. This is  strongly suggestive that a diagnosis of psychopathy is present and justified—or, at the very least, that disturbing levels of psychopathic features are present…'Dr. Lee fears what Ambrose is capable of and knows he is "extremely dangerous…I have met individuals more dangerous than Christopher Ambrose in my clinical work. Every single one of them is currently housed in a maximum-security institution."*

361. Under a photo of the Ambrose children, Parlato wrote, *"[They] tried to flee their abusive father but after chasing them through three states, he captured them and coerced their return."*

362. This article elicited 62 reader comments, most attacking Ambrose in graphic, vile terms.

**October 26, 2023 Publication**

363. On October 26, 2023, Parlato published an article entitled **"When a Custody Battle Turns Tragic; 'When is Enough Enough?'"** https://frankreport.com/2023/10/26/when-a-custody-battle-turns-tragic-when-is-enough-enough/ The article is attributed to Jeanine Morrison; on information and belief, this is a pen name Parlato uses. The article refers to Ambrose as a "child abuser" even though Parlato was aware Ambrose has been exonerated of all such allegations:

364. Parlato published, *"[T]he authorities are forcing [the children] to live with their abusive father, Chris Ambrose."* Parlato goes on to reference *"Chris' abuse."*

365. In addition Parlato published misleading "facts," all casting Ambrose in a false light, *"As a former attorney and screenwriter, he knows how to work the system, manipulate the narrative in his favor, and maybe send veiled threats to those who might oppose him…. [The children] live in terror, isolated and alone with their abuser. An abuser they have shunned, humiliated, and revolted against publicly, undoubtedly angering Chris and his fragile ego to no end — so much so that he resorts to defending himself anonymously on this website in the comment section…Chris has weaponized the legal system and local authorities to get his way."*

366. The article compares Ambrose to a father who murdered a judge, stating *"[Ambrose] would fluctuate between severe surveillance — with hidden recorders in their rooms and taking the door knobs off the doors so they couldn't lock — to extreme neglect — letting the kids miss school, drink and do drugs, invite people over at all hours, and drive his car without a license."*

367. Under photos of Ambrose, Parlato makes more statements he knew authorities and the courts had determined to be false, *"The father took the doorknobs off the doors to ensure the children could not keep him out of the bedroom"* and *"Chris Ambrose won't let his children live with their mother or allow them to be happy anywhere."*

368. This article elicited 63 reader comments, most attacking Ambrose.

**November 1, 2023 Publication**

369. On November 1, 2023, Parlato wrote an article entitled **"Three Teens Make Desperate Plea for Protection from Ambrose: Now He Wants to Take Away Their Phones"** https://frankreport.com/2023/11/01/three-teens-make-desperate-plea-for-protection-from-

ambrose-now-he-wants-to-take-away-their-phones/ Parlato made the following

defamatory and/or misleading statements, putting Ambrose in a false light:

370. Parlato continued repeating his falsehoods and baseless conspiracy theories and alleging

"facts" putting Ambrose in a false light. At the time he published, Parlato knew these

claims had been disproved, as stated in The Decision:

371. Parlato wrote, *"On August 8, after Ambrose went to two judges…he found Judge Thomas J. O'Neill…Ambrose made a motion… seeking a pliable judge willing to order the teens' cell phone service be canceled within 24 hours. Now, [the children] are locked and locked [sic], with 24 hour surveillance, with no phone or internet… "*

372. *"After Ambrose converted the joint accounts into his control, Riordan, unable to compete with the spending frenzy of family court, was like a sheep to be sheared. So were the children….Ambrose, aided by court-appointed professionals he paid, and some judicious judge hopping, managed to flip custody…Along the way, he subsumed more than $1 million of the mother's assets, avoiding financial disclosures, alimony and child support… "*

373. *"After he got custody, he kept the children in virtual isolation for three years, often taking away their phones and internet, and denying them the right to see their mother, or any of the family and friends they grew up with. "*

374. Parlato continued his misrepresentations; writing of Riordan, his girlfriend, he wrote, *"Ambrose had taken all her money."*

375. Parlato even misstated judicial decisions, easily disproved by court transcripts, *"Before issuing his disastrous-to-the-children-but-pleasing-to-their–father ruling Judge O'Neill was adamant: He would not listen to the teenagers. Their voices were irrelevant… [T]o say it succinctly in O'Neill's vernacular – money talks and children should be neither seen nor heard. "*

376. This article elicited 155 reader comments, virtually all attacking Ambrose.

### November 13, 2023 Publication

377. On November 13, 2023, Parlato wrote an article entitled **"CT Family Court: Ambrose's Adoption Deception Unraveled"** https://frankreport.com/2023/11/13/connecticut-custody-battle-suspended-lawyers-aggressive-tactics-against-mother-revealed/ Parlato

continued his repetitive misrepresentation of facts, defaming and/or making misleading

statements that put Ambrose in a false light. <u>The more a lie is repeated, the more likely it is to be believed</u>:

378. *"[Ambrose] took control of the marital assets and flipped custody in family court. This effectively barred Riordan from contacting her children. Ambrose cited parental alienation while trying to alienate the children from their mother… [Judge] Adleman… never required Ambrose to file financial affidavits to show what he did with the marital assets… making his decision based entirely on Ambrose's allegations…"*

379. Parlato went on with more falsehoods, all disproved as publicly available court records demonstrate, *"Ambrose… now seeks to have the judge force Riordan to seek the removal of information about the teenagers from the publication before locking her up… Ambrose's house, now equipped with surveillance systems…The loving father will do anything to prevent the three teens from seeing their adoptive mother."*

380. This article elicited 126 reader comments, virtually all attacking Ambrose.

### November 14, 2023 Publication

381. On November 14, 2023, Parlato wrote an article entitled **"A Fairy Tale Adoption Turns Sour as Ambrose Seeks to Isolate Kids"** https://frankreport.com/2023/11/14/a-fairy-tale-adoption-turns-sour-as-ambrose-seeks-to-isolate-kids/ Parlato made the following defamatory and/or misleading statements, putting Ambrose in a false light:

382. *"[Ambrose] figures that the teenagers won't be able to see [Riordan] if she is behind bars…They are living captive at his house under surveillance. The loving father will do anything to prevent the three teens from seeing their adoptive mother…[Riordan] raised the kids from infancy — for the first thirteen years of the two eldest…and the first nine years of the [youngest's] life…Ambrose wants the children to have the courts, exclude the adoptive mother, her family and the biological mother. Perhaps other abusers can understand it. If the teens see others, they might disclose something that could adversely impact Ambrose. Better to keep the teens isolated…It is said 'money can't buy love,' which is true. His children do not love him. They are afraid of him. But in Connecticut Family Court, money can at least buy custody.Just ask Chris Ambrose."*

383. Under a photo of Ambrose, Parlato wrote, *"Chris Ambrose captured his children and he does not want them to make any outtcries [sic], based on his theory that children should not be seen or heard."* Parlato also published the photo below, replacing Ambrose's nose with a penis with the caption *"If every one of Chris Ambrose's little white ones were to*

*increase the size of his nose, he would enjoy a ponderous, a truly prodigious nose.*" As explained, Parlato's malice for Ambrose is transparent.



384. This article elicited 222 reader comments, virtually all attacking Ambrose.

### November 24, 2023 Publication

385. On November 24, 2023 Parlato published an article written by his frequent collaborator, convicted felon/extortionist/fraud Richard Luthmann, entitled **"'Game of Thrones Lawyer' Richard Luthmann Sues NYC Council Member, Judge, Plagiarist, Lawyers and Others for Unpaid Debts, Corruption"** https://frankreport.com/2023/11/24/game-of-thrones-lawyer-richard-luthmann-sues-nyc-council-member-judge-plagiarist-lawyers-and-others-for-unpaid-debts-corruption/

386. In the article, Parlato gratuitously includes a hyperlink to an earlier article he published on March 17, 2023 entitled "Christopher Ambrose Fails at Everything But One Special Talent" https://frankreport.com/2023/03/17/christopher-ambrose-fails-at-everything-but-

one-special-talent/. That article, also written by Luthmann, puts Ambrose in a defamatory and/or false light and includes multiple hyperlinks to other articles that defame Ambrose:

387. *"Before the divorce, Ambrose was an absentee father for much of his children's lives…At the same time, his ex-wife, Karen Riordan, was the sole caretaker for their children…The abuse these children have experienced over the last few years fills pages of Frank Report. In a complaint with the CT State Attorney General, there were scores of audio and videos the children made of their father punishing them or abusing them…[Ambrose] is such a persuasive liar…"* When Parlato published and endorsed these statements, he knew they had been proved false in court.

388. Parlato published still more statements he knew from publicly available court transcripts had been dismissed as untrue or were wildly misleading and deliberately created a completely false impression, *"At one point, Ambrose took the doorknobs off the doors of the children so they could not keep him out of their rooms. He did that on Christmas Day. A good father and good husband, he is not…He began by alienating the children, taking all the marital assets, and fighting to deprive the children of their mother, their primary attachment figure. A good father and good husband, he is not…Ambrose recently went to Connecticut Family Court to get a judge to stop the children's mother from seeing the children. He argued that she should never see her children because she did not stop Frank Parlato from publishing the truth about his misdeeds."*

389. Parlato continued to publish misleads that put Ambrose in a false light, "Now Christopher Ambrose, blackballed from the Connecticut Bar for non-payment… As a lawyer, Ambrose was previously licensed in New York State. However, the New York Unified Court System website says he was suspended from law practice on November 13, 2006, by the Appellate Division for a Violation of the Judiciary Law…"

390. Parlato relentlessly repeated more of his falsehoods, *"[Ambrose] kept all the marital assets, and abscond[ed] with [Riordan's] inheritance…Ambrose may have been banking on the same CT State Court actors who did the bidding of his attorney, paid by him with money taken from his wife, coming to his aid….He argued that she should never see her children because she did not stop Frank Parlato from publishing the truth about his misdeeds…As a husband, as apparent from the facts in his divorce proceeding, he was absentee while pursuing his writing career…He deceived Karen Riordan into thinking he was a nice enough guy to marry and start a family with. He then deceived her into practically sole child care while he was out in Hollywood trying to 'make it big'…Once back in Connecticut, Ambrose saw the opportunity to bilk his wife out of her assets, inheritance, and children by deceiving the Connecticut Family Court. His words and actions lead to the inescapable conclusion that the man is highly delusional."*

391. The March 17 article elicited 148 reader comments, virtually all attacking Ambrose.

**December 15, 2023 Publication**

392. On December 15, 2023, Parlato published an article entitled "**Nusbaum's Actions Under Microscope in Ambrose-Riordan Case**" https://frankreport.com/2023/12/15/nusbaums-actions-under-microscope-in-ambrose-riordan-case/ Parlato published this article attributed to Janine Morrison (as explained, this is believed to be one of Parlato's pen names) promoting and endorsing the following defamatory and/or misleading statements, putting Ambrose in a false light:

393. *"[Ambrose] wants [Riordan] in prison, because his teenage children prefer to live with her, not him. Ambrose… was <u>labeled potentially psychopathic</u> by noted psychiatrist Dr. Bandy Lee, has used Connecticut's legal system to attempt to destroy his ex-wife and punish his children ages 17, 17 and 13. Since 2020, Ambrose has consistently…accus[ed] Riordan of brainwashing the children and reducing them to zombies…Ambrose…has barred the children from seeing any family members or friends…requested [Riordan's] arrest without a trial for custodial interference, with the hope that if she is in prison for a lengthy term, the teenagers will realize they can't see their mother…"*

394. Parlato goes on to repeat other baseless allegations, which were determined baseless by publicly available court decisions, *"Judge O'Neill chose not to allow the children to testify, relying solely on their father's version…To get the children away from their mother, Ambrose apparently lied to federal agents, saying the mother kidnapped the children and was a dangerous threat. A 20 person SWAT team descended on Riordan… The SWAT team left without arresting Riordan, beating, shooting or killing her, or even ransacking the house, much to Ambrose's chagrin and disappointment…"*

395. Parlato also repeated more falsehoods, *"Now that the teens have returned to their father's home, Ambrose has taken extraordinary measures to keep the teenagers from leaving his loving care. He installed bars on windows, alarm systems, secret surveillance devices to record the teens' every move, and illegally locked the children inside the house without sufficient means of egress in violation of fire and safety codes."* When he published, Parlato knew these statements had been contradicted by police and fire department reports, all publicly available.

396. Under a photo of Ambrose, Parlato wrote, *"Litigious, disgraced Hollywood writer and suspended lawyer Christopher Ambrose wants the children isolated and their mother arrested."*

397. Parlato hyperlinked to an article written by Bandy Lee that he published on October 8, 2023. Lee's defamatory/misleading statements, discussed herein under the heading "October 8, 2023," should be incorporated here as if fully set forth herein.

398. The article elicited 185 reader comments, many attacking Ambrose.

**February 5, 2024 Publication**

399. On February 5, 2024, Parlato published an article written by his frequent collaborator, the felon/extortionist/fraud/former convict Richard Luthmann, entitled **"BREAKING: Video Indicates Jennifer's Law is a CT Family Courts 'Cash For Kids' Coverup"** https://frankreport.com/2024/02/05/breaking-video-indicates-jennifers-law-is-a-ct-family-courts-cash-for-kids-coverup/  The article defames and/or puts Ambrose in a viciously false light:

400. The article pulls quotes from an earlier article Parlato wrote and published, stating *"Parlato published the following about the Ambrose v. Riordan case almost a year and a half ago: This is CT, and this is a family court…[that]… invented a way for well-to-do abusers and pedophiles to prevail – 'parental alienation' – and it is used as a weapon to take money from the rich and give the children in return…[O]nce it is determined by any quack or con artist GAL or custody evaluator – is to take the children from the parent they love and order no contact with her – and hand them over to the abuser with money.'*

401. The article continued, quoting Parlato, *"For those who say some mothers alienate their children from the father, which is true, I say children can be alienated from a father because he is a cruel ass, a cunning man… It can be the abuser himself. But alienated [sic] the children… because the father had the money and because he had CT family court – he could buy the children like you might buy a dozen eggs at the market. That market is CT Family Court, and it is, arguably, as vicious and sinister a place as the world has known."*

402. Parlato even repeated his most outrageous, unconscionable lies about Ambrose, *"In the Ambrose v. Riordan case, damning evidence of abuse and sexual penetration was repeatedly presented to public officials, judges, attorneys, the police, and the Connecticut Department of Children and Families (DCF). It was all ignored."*

403. The article elicited 273 reader comments, many attacking Ambrose.

**March 21, 2024 Publication**

404. On March 21, 2024, Parlato published an article entitled **"Family Court Scandal: Children as Profit? One Father Fights Back With Website"** https://frankreport.com/2024/03/21/family-court-scandal-children-as-profit-one-father-fights-back-with-website/. The article focuses on another case, but Parlato gratuitously included hyperlinks to several articles he had previously written and published, two of which focus on Ambrose, defaming and/or putting him in a false light.

405. The first of these hyperlinked articles, originally published on February 16, 2022, is entitled "Corrupt CT Family Court: Money-Driven Results Lead to Trafficked Children Deprived of Contact With Mother, Ambrose Case Set Again for Trial Before Judge Adelman" https://frankreport.com/2022/02/16/corrupt-ct-family-court-ambrose-case-again-set-for-trial-before-judge-adelman-after-roller-coaster-legal-ride

406. In the article, Parlato deliberately puts Ambrose in a false light, suggesting he is part of a criminal conspiracy to gain custody of his children, writing : *"We intend to prove CT Family Court is a hotbed of child trafficking. In the [Ambrose-Riordan] case, there is a conspiracy by [lists judges, attorneys, therapists, evaluators, and others in the case] – all of whom are wetting their beaks in the never-ending game of Connecticut Family Court – and selling children to the highest bidder, which means granting custody to the parent with money– usually the father. In short, the child trafficking occurs with the movement of children for money – based on lawyers and therapists making money. The usual plan is to set up a high conflict divorce case – where attorneys and therapists make money – and, with the judges' complicity, hand exclusive custody [usually] to the father, leaving the mother and her children in a land of no contact. What do the judges get? The support of the attorneys and therapists in their quest for reappointment and possibly other, under the table, benefits. It is friends helping friends, associates doing what is necessary for all [except the children and mothers] to be happy. Frank Report hopes to prove criminal intent and all the other elements of child trafficking and RICO, which is running rampant in Connecticut family court."*

407. Parlato repeats his baseless conspiracy theories, deliberately putting Ambrose in a false light, *"A good place to start is the remarkable, high-conflict divorce and custody case of former TV writer Chris Ambrose… The case is back before the court of corrupt Judge Gerald Adelman…The father has the money. Please keep in mind that this gaggle of thieves – the therapists and the lawyers – handed custody to the father. Had they not done so, none of these ragged rascals would have made any money on this case… If the mother got custody, the father would not have paid a dime to the attorneys and therapists. Since he, the unfit parent, has custody and the mother is fighting – he has to continue to pay – and pay – and pay. Still, it is a bargain for him since he is using his wife's share of the marital funds – and it will be cheaper than child support and alimony and splitting the marital assets. The justification for depriving children of their mother and placing them with their father…is a custody evaluation report… which in Connecticut means, following the Golden Rule, that whoever has more gold rules and the higher the conflict the more the gold and hand custody to the father with the money [unless the mother has money, then hand custody to her]…For no reason other than the influence of money – Ambrose has money because he took all the marital funds – more than $2 million – out of Riordan's reach and paid for the custody evaluation and, to date, most of the GAL's fees – the two women who recommended that he alone have custody of the children… [Riordan] was deceived by a husband who used the corrupt Connecticut Family Court system, that sinister, awful den of injustice where money buys custody."*

408. Parlato displayed his malice for Ambrose by again posting the photo in which he replaces Ambrose's nose with a penis. Under another photo of Ambrose, Parlato wrote, *"Chris Ambrose does not want his children to ever see their mother."* As the public court records show, Ambrose has repeatedly testified to the opposite.

409. This article generated 93 comments, nearly all attacking Ambrose.

410. The second hyperlinked article was originally published by Parlato on <u>February 18, 2022,</u> and entitled "Corrupt CT Family Court Judge Adelman Favors Affluent Father, Smashes Mother, Kids Be Damned" https://frankreport.com/2022/02/18/corrupt-ct-family-court-judge-adelman-favors-affluent-father-smashes-mother-kids-be-damned/. The article defames and or places Ambrose in a false light, violating his privacy and ruining his reputation:

411. Parlato repeats his *ad hominem* insults and conspiracy theories, based entirely on conjecture, putting Ambrose in the center of "child trafficking," *"Connecticut Family Court Judge Gerard I. Adelman, one of the most corrupt judges to sit on the bench anywhere, and a surefire, future federal convict for RICO and child trafficking, did what*

*he does best, at the most recent court hearing regarding the case of Ambrose v. Riordan: He handed all decisions to the wealthy father, pleasing his coconspirators, lawyer Nancy Aldrich, and Guardian Ad Litem (GAL) Jocelyn Hurwitz. As I cover this case, I realize it is a textbook case of corruption by sinister actors… [C]orrupt and biased Judge Adelman played a wild and corrupt game of conspiracy with that most sinister judge, Thomas Moukwasher…[T]here was a conspiracy among [lists judges, attorneys, therapists, etc.], a filthy conspiracy to hand custody of three children to the wealthy father… Here is where these sinister hogs may rot in hell for eternity for doing: They do not care at all about the children, three of them ages 15, 15 and 11 – who are languishing under the malevolent influence of their father, the plagiarizing, unemployable coward Chris Ambrose – and deprived of all contact with their mother – just so these hogs can get fatter."*

412. Parlato further assassinates Ambrose's character, *restating more lies, "[W]hile Ambrose, the thief, was allowed to steal all the marital assets from their mother as she was kept from her children – for no honest reason under the sun… Judge Adelman knows all this but profit trumps children every time in his court. He did the bias hearing with his coconspirator to give him cover to steal the rest of the mother's share of the marital assets and traffic the kids to the affluent father – this is the CT Family Court game."*

413. The article elicited 31 reader comments, many attacking Ambrose.

### March 30, 2024 Publication

414. On March 30, 2024, Parlato published an article entitled **"Family Law Fraud; Courtroom Collusion; Lawyer's Underhanded Tactics – A Sickening Stew"** https://frankreport.com/2024/03/30/family-law-fraud-courtroom-collusion-lawyers-underhanded-tactics-a-sickening-stew/ In the article, Parlato defamed and/or put Ambrose in a false light, writing:

415. *"Chris Ambrose had stolen all the marital money. He froze his wife of 17 years out of everything – about $2 million…He had been an absent father, and at his insistence, the mother, Karen Riordan, had given up her job as a teacher and raised the three kids full-time… But [Ambrose] knew the family court game and was ready to buy custody…"*

416. Under a banner in bold stating, "Ambrose was a Textbook Case of Parental Alienation as a Revenue Generator," Parlato continued his misrepresentations about Ambrose's and Riordan's positions, both of which are public record, to cast Ambrose in a false light, *"Where this became a peach of a deal – what lawyers call 'high conflict' – is that while Ambrose had unlawfully taken the money this mother would fight for her children…That*

*means if the lawyers set it up right, they could make Ambrose pay a lot to fight off his wife… But to be blunt, the mother would only fight if she did not have any custody; she was willing to split custody. She even encouraged the children to be with their dad regularly. So, the plan was to take all custody away from her. Her first attorney, Rich Callahan, arranged with Ambrose's attorney, Nancy Aldrich, on how they were going to set up Riordan, the mother, to lose custody. The father wanted this as well. This was the way he could keep all the assets and not pay alimony or child support…"*

417. Parlato continued to spin his damning albeit baseless conspiracy theory, *"The first thing to do was get a GAL… Now, the plan was laid out to [the GAL] with a simple one line in an email by the mother's attorney (in a conspiratorial act of betrayal): 'The father has control of the money and will be paying.' Once the GAL knew this, the playbook called not for the silver bullet but for parental alienation. The GAL's first job was to get a custody evaluator… the ruthless monster of CT Family Court [names the evaluator with puerile ad hominem]. She recommended taking the kids away from the mother and giving them solely to the abusive father, who in fact paid her some $17,000 for her services. Her custody report is a masterpiece of deceit and distortion, and will no doubt be studied one day for how these criminal writings once passed as the rule of law…The lawyers all knew that once then mother lost custody, there would be years of fighting (billings)… Ambrose had stolen all the money…"*

418. Under another sub-headline, "Collaborating Grifters," Parlato continued to make unsupported claims against Ambrose, intentionally creating a damning picture of him, *"[T]he attorneys conspired to move the case to a judge who played their game… Ambrose was willing to pay six or even seven figures to buy custody…So [Judge Grossman] destroyed three children's lives by removing them from the mother – using the lie of parental alienation. [Ambrose] was largely a stranger [to his children] and a scary and abusive one at that….. [I]t is done for money. Nothing more…Ambrose…spent his wife's share of the marital assets and kept his own…So the clever attorney/plagiarist bought custody of the kids for about a million dollars but by using his wife's million. [Riordan's attorney] …did nothing but collaborate with Ambrose's attorney…In the Ambrose case, he did abuse his children, but the attorneys decided to use parental alienation (falsely) because it was more lucrative…"*

419. The article elicited 437 reader comments, many attacking Ambrose.

### August 14, 2025 Publication

420. Parlato has publicly acknowledged that he is aware of this legal action. Nevertheless, since it was filed, he has published at least three additional articles targeting Ambrose, not only on websites he controls but also on platforms managed by others, including his close associate, federal felon Richard Luthmann. These publications reflect the same

reckless disregard for the truth that characterized his earlier "reporting." They include outright falsehoods, the disclosure of highly offensive private facts, and statements so wildly misleading that they cast Ambrose in a false light. Parlato's decision to continue publishing under these circumstances evidences not only his intent to harm the plaintiff's reputation but also his contempt for both the truth and the judicial process, and further demonstrate actual malice.

421. On August 14, 2025, Parlato wrote and published on *FrankReport.com* an article titled ***"Psychopath? Or Just Broke? Family Court Manipulator Chris Ambrose Exposes More Than he Meant"*** (https://frankreport.com/2025/08/14/psychopath-or-just-broke-family-court-manipulator-christopher-ambrose-lawsuit-exposes-more-than-he-meant/). In this piece, Parlato quoted extensively from Bandy Lee's allegations against Ambrose, praising her as a preeminent authority. Yet Parlato was fully aware—having read both the Complaint filed against him and the Complaint Ambrose filed against Lee—that Yale had terminated her from an unpaid position after the Executive Committee of the Department of Psychiatry concluded she lacked medical knowledge, professional judgment and ethics. Despite this fatal blow to her credibility, Parlato nevertheless amplified Lee's discredited statements, writing:

422. "*According to her report, Ambrose, whose conduct she evaluated through interviews with his children, his ex-wife, others who know him, court filings, and observing him in court, scored 32 out of 40 on the PCL-R. A score of 30 or above signals full-blown psychopathy.*"

423. Parlato also asserted: "*Lee identified the children whom she interviewed as victims of sexual and/or emotional abuse by Ambrose.*"

424. These statements, republished and endorsed by Parlato despite his knowledge of Lee's professional disgrace, are false and defamatory per se. They accuse Ambrose of severe

mental illness, dishonesty, dangerousness, and severe child abuse—allegations that strike at the heart of his reputation, livelihood, and standing in the community. Moreover, Parlato is aware the children were. Determined by every authority, including multiple courts, _not_ to be the victims of any abuse whatsoever by Ambrose. Parlato's knowing reliance on discredited sources to level such accusations is clear evidence of his actual malice.

425. Parlato went on to publish more statements that are false or present Ambrose in a false light or publicize private facts:

426. *"Ambrose returned to his home in Connecticut and soon after filed for divorce from his wife, Karen Riordan, a former teacher, who gave up her career to be a stay-at-home mother raising the couple's three adopted children."*

427. *"His agents reportedly dropped him, and he never worked again on any TV production after 2018."*

428. *"Ambrose… had been absent from his children's lives for extended periods."*

429. *"Ambrose succeeded in having the family court remove Riordan from their lives… The only life they had known was with their mother, their primary caregiver."*

430. *"During the protracted divorce, Ambrose transferred all marital assets – estimated in court filings at more than $2 million – into accounts under his control, lodging the money, as court documents revealed, with Fidelity Investments in a series of accounts."*

431. *"In court, before Judge Eddie Rodriguez, Ambrose admitted taking possession of Riordan's six-figure maternal inheritance, leaving her financially destitute and homeless."*

432. *"Throughout the proceedings, Ambrose avoided any financial disclosure requirements—refusing to turn over records that could reveal income, holdings, or expenses."*

433. Parlato even linked directly to Ambrose's sealed financial affidavit—an act that demonstrates actual malice and an intent to weaponize private facts against him. The article drew at least 72 reader comments, most hostile toward Ambrose, underscoring the reputational harm intentionally inflicted.

434. In sum, the August 14, 2025 article is a continuation of Parlato's malicious campaign to defame Ambrose, casting him falsely as a psychopath, abuser, and dishonest litigant, while exploiting sealed court documents and private family matters for sensational effect.

435. This pattern of conduct continued in subsequent publications, as set forth below.

### August 17, 2025 Publication

436. On August 17, 2025, Parlato published another article on FrankReport.com titled *"Claiming Poverty From a $2.2 M Beach House"* (https://frankreport.com/2025/08/17/claiming-poverty-from-a-2-2m-beach-house-the-ambrose-affidavit-story/).

437. In the article, Parlato fabricated a false and defamatory narrative of Ambrose's financial circumstances, falsely portraying him as a "fraud." Purporting to have had access to private investment statements, confidential social services records, and a supposedly written lease, Parlato published as established truth private facts that were inaccurate, misleading, or wholly invented. He further claimed knowledge of an alleged inheritance based solely on the filing of a single probate document, disregarding the fact that most trust instruments are never publicly filed specifically to ensure financial privacy. These inaccurate assertions—whether fabricated, materially distorted, or stripped of context—were published in a manner calculated to humiliate. By publishing distorted claims, despite having supposedly reviewed records that contradicted them, Parlato acted with reckless disregard for the truth and deliberately cast Ambrose in a false light, further evidencing actual malice.

438. Parlato wrote, quoting from the document Ambrose had sought to have sealed, *"I am not employed. My gross pay or wages are: $0.00. My take-home pay or wages are: $0.00....I have been unemployed for three years and unable to find work. I support the kids and myself*

*by invading my modest 401(k), already depleted by enormous divorce expenses. My kids and I are on Medicaid (Husky Health). I just learned I am eligible for SNAP."* [8]

439. *"He declared that he had $294.98 in cash or bank accounts…He reported owning no stocks, bonds, art, jewelry, or anything else of financial value."*

440. *"In his March 16 affidavit, Ambrose wrote, 'I just learned I am eligible for SNAP.' Yet state electronic benefit records show he had been receiving SNAP benefits since December 2024."*

441. *"Ambrose reported paying $132 for four phone lines. But billing records show he canceled his children's lines in 2023, with relatives now paying for their three phones."*

442. *"Family court records, however, show he assumed control of joint assets and moved funds into various Fidelity Investments accounts."*

443. *"Records reviewed by Frank Report reveal he is managing more than one account and employs advanced strategies like stock/bond allocation, tax-loss harvesting, and legacy planning — consistent with a seven-figure retirement and not a single account."*

444. *"Ambrose also did not disclose an expected inheritance of about $800,000 from his parents' $2.5 million estate, now in probate."*

445. *"Court filings show he is suing his brothers, Neil and Colin Amborse [sic], over access to a Fidelity account and proceeds from the family home. Federal courts generally consider a pending inheritance a financial resource that Ambrose must report."*

446. *"Court filings reveal multiple inconsistencies: understated rent, SNAP benefits undisclosed, dependents misrepresented, a car undervalued, retirement assets blurred, and an inheritance omitted."*

447. *"Attorney Neil Ambrose is being sued by his brother Chris Ambrose Chris wants control of his parents [sic] estate according to court records."*

448. Each of these assertions is either wholly false, materially misleading, or an intentional disclosure of private information published without context solely to humiliate. Parlato selectively distorted or misrepresented the records to mislead and create a false narrative of concealment, fraud even familial animosity. His conduct further evidences his continued reckless disregard for the truth and establishes his actual malice.

---

[8] It is worth noting that financial disclosures in Connecticut family courts are automatically sealed.

449. Parlato also published multiple photographs of Ambrose's residence, including a detailed map pinpointing its exact location. This practice of gathering and disclosing private identifying information about an individual—such as a home address or private family or financial details—when done with the intent or foreseeable effect of harassment, intimidation, or exposing the person to unwanted attention or danger, is commonly known as "doxxing." Parlato is aware that his writings have already incited readers to make threats of physical harm, including mutilation and worse, against Ambrose, and publishing the location and photos of his residence in this manner was calculated to magnify that danger. This disclosure caused Ambrose severe emotional distress, placed his safety at risk, and invaded the sanctity and privacy of his home.

450. Connecticut law underscores the seriousness of this conduct. In 2021, the state expanded its cyberstalking and cyber-harassment statutes to expressly prohibit doxxing, recognizing it as unlawful to publish another person's private information for the purpose of harassment or intimidation. These statutes provide civil remedies for victims in addition to potential criminal liability. Harassment through indirect communications such as online postings constitutes a Class C misdemeanor, and when carried out in a way intended to incite fear of serious injury or death, the offense escalates to a Class D felony, punishable by up to five years' imprisonment and/or a $5,000 fine. Moreover, Connecticut courts have recognized that speech crossing the line into a "true threat" is not constitutionally protected. Parlato's doxxing of Ambrose's residence, in the context of his hostile and defamatory reporting, falls squarely within this category.

451. The article drew at least 35 reader comments, most hostile toward Ambrose, illustrating the reputational harm intentionally inflicted.

### August 23, 2025 Publication

452. On August 23, 2025, Parlato published yet another defamatory article on *FrankReport.com* titled ***Ambrose's Script: Family Court, Federal Court, and Fake Poverty*** https://frankreport.com/2025/08/23/ambroses-script-family-court-federal-court-and-fake-poverty/ The piece was authored by Margaret Sullivan, a close associate of Riordan who is a frequent presence at court proceedings. Like Riordan, Sullivan lost custody of her own children and shares her and Parlato's conspiracy theories about unsubstantiated Connecticut family court corruption.

453. Among the knowingly false and misleading statements published by Parlato are the following:

454. *"Christopher Ambrose is not just dishonest — he is dangerous."*

455. *"He transferred marital assets into secret Fidelity accounts."*

456. *"He withheld financial records from his own divorce proceedings. He took control of his ex-wife's inheritance. He made his children's mother — their only stable parent — homeless."*

457. *"He pays $3750 per month, but told the court he pays $2400."*

458. Parlato also republished the discredited "diagnosis" of Ambrose by Bandy Lee, a psychiatrist who never examined or spoke to him. As Parlato well knows, Lee was terminated from her

position after colleagues raised concerns about her lack of professional knowledge, judgment and ethics. Yet Parlato falsely portrayed her as credible, publishing the following statements:

459. *"Christopher Ambrose is suing Dr Bandy Lee a psychiatrist who says he exhibits symptons [sic] of a clincal pyschopath."*

460. *"[Lee] dared to use her professional expertise to assess his behaviors and protect others. Her conclusion? A 32 out of 40 on the Hare Psychopathy Checklist."* Parlato even reposted the diagnostic tool the discredited Lee allegedly used:

|    |                                              | 0 (definitely not present) | 1 (somewhat present) | 2 (definitely present) |
|----|----------------------------------------------|----------------------------|----------------------|------------------------|
| 1  | Glibness/superficial charm                   |                            |                      | X                      |
| 2  | Egocentricity/grandiose sense of self-worth  |                            |                      | X                      |
| 3  | Proneness to boredom/low frustration tolerance |                          |                      | X                      |
| 4  | Pathological lying and deception             |                            |                      | X                      |
| 5  | Conning/lack of sincerity                    |                            |                      | X                      |
| 6  | Lack of remorse or guilt                     |                            |                      | X                      |
| 7  | Lack of affect and emotional depth           |                            |                      | X                      |
| 8  | Callous/lack of empathy                      |                            |                      | X                      |
| 9  | Parasitic lifestyle                          |                            |                      | X                      |
| 10 | Short-tempered/poor behavioral controls      |                            |                      | X                      |
| 11 | History of promiscuous sexual relations      |                            | X                    |                        |
| 12 | History of early behavior problems           | X                          |                      |                        |
| 13 | Lack of realistic, long-term plans           |                            |                      | X                      |
| 14 | Impulsivity                                  |                            |                      | X                      |
| 15 | Irresponsible behavior                       |                            |                      | X                      |
| 16 | Frequent marital relationships               | X                          |                      |                        |
| 17 | History of juvenile delinquency              | X                          |                      |                        |
| 18 | Revocation of conditional release            | X                          |                      |                        |
| 19 | Failure to accept responsibility for own actions |                        |                      | X                      |
| 20 | Many types of offense                        |                            |                      | X                      |
| *Total number of points* | | 32 (prorated from 31) / 40 | | |

461. These statements are false, defamatory per se, and intended to portray Ambrose as both financially dishonest and mentally unstable. Parlato's repetition and amplification of such accusations, including reliance on Lee's unprofessional and fabricated "diagnosis," were made with actual malice.

462. This article generated 38 comments, most unfavorable to Ambrose.

## COUNT I – INVASION OF PRIVACY (FALSE LIGHT)

463. Ambrose repeats and realleges the foregoing paragraphs as if fully set forth herein.

464. Under Connecticut law, false light invasion of privacy requires proof that: a. the defendant publicized information placing the plaintiff in a false light highly offensive to a reasonable person; and

b. the defendant knew of or acted with reckless disregard as to the falsity of the publicized matter.

465. Defendant Frank Parlato published and/or hyperlinked false, misleading, and disparaging statements concerning Plaintiff Christopher Ambrose in articles authored by him and in third-party articles he endorsed or republished on his websites.

466. Parlato also published private interviews and documents, including confidential records and correspondence, which falsely portrayed Ambrose and placed him in a misleading and offensive light.

467. Parlato knew or recklessly disregarded the falsity of these statements and the false light in which Ambrose was cast.

468. Parlato's publications constituted substantial misrepresentations of Ambrose's character and conduct such that a reasonable person would find the false light highly offensive.

469. Ambrose is a private individual and is not a public official or public figure.

470. Parlato's publications online were accessed by individuals in Connecticut, throughout the United States, and worldwide.

471. The Statements were part of a malicious campaign by Parlato beginning in or about October 2021 and continuing through July 2023 and through the present.

472. As a result, Ambrose has been subjected to public hatred, ridicule, harassment, disgrace, and threats of violence, causing severe emotional, reputational, and personal harm.

## COUNT II – PUBLIC DISCLOSURE OF PRIVATE FACTS

473. Ambrose repeats and realleges the foregoing paragraphs as if fully set forth herein.

474. Under Connecticut law, public disclosure of private facts requires proof that:
a. the defendant publicized a matter concerning the private life of another;
b. the matter would be highly offensive to a reasonable person; and
c. the matter is not of legitimate public concern.

475. Unlike defamation, truth is not a defense; even true facts may be actionable if they are highly offensive and not of legitimate concern to the public.

476. Parlato published articles, hyperlinks, and documents revealing private details about Ambrose's personal life, family relationships, finances, medical and insurance benefits, and divorce proceedings and other private matters.

477. These disclosures included, among other things, highly confidential DCF records, custody evaluations, psychiatric reports, and private financial information.

478. The facts disclosed were not matters of legitimate public concern and were disseminated solely to embarrass, harass, and injure Ambrose, who is not a public official or public figure.

479. Even if portions of the disclosed material were accurate, the publication of such private and intimate details was highly offensive to a reasonable person.

480. Parlato's conduct was intentional, willful, and malicious, undertaken with knowledge that it would cause humiliation, distress, and injury, or with reckless disregard of that certainty.

481. As a direct and proximate result of Parlato's conduct, Ambrose has suffered severe emotional distress, reputational injury, and other actual damages.

## COUNT III – DEFAMATION *PER SE*

482. Ambrose repeats and realleges the foregoing paragraphs as if fully set forth herein.

483. Under Connecticut law, a statement is defamatory *per se* if it imputes conduct so inherently harmful that damages are presumed, including:

   a. crimes of moral turpitude (e.g., child abuse);
   b. crimes punishable by imprisonment (e.g., theft or fraud); or
   c. misconduct or lack of integrity in one's profession.

484. Parlato published and/or republished statements falsely accusing Ambrose of, among other things:

- Sexually molested his children (including accusations of "child rape");

- Emotionally, psychologically, and verbally abused his children and ex-wife;

- Stalked and hunted his children and ex-wife;

- Permitted substance use by minors and statutory rape in his home;

- Embezzled his ex-wife's inheritance and stole marital assets;

- Lost his law license and was repeatedly fired for plagiarism and fraud;

- Conspired with judges and state agencies to unlawfully retain custody of his children; and

- Lied under oath in court and to child protective services, law enforcement, including federal agents.

485. These statements were false, highly defamatory, and published with actual malice—knowledge of falsity or reckless disregard for the truth.

486. Parlato's statements constitute defamation *per se*, entitling Plaintiff to presumed damages in addition to actual damages suffered.

## COUNT IV – DEFAMATION (GENERAL)

487. Ambrose repeats and realleges the foregoing paragraphs as if fully set forth herein.

488. Under Connecticut law, defamation occurs when a defendant publishes a false statement to a third party that identifies the plaintiff and harms the plaintiff's reputation. The defendant may be liable if the statement was made willfully, recklessly, or negligently.

489. Defendant Frank Parlato published, endorsed and/or hyperlinked to the false and misleading statements about Plaintiff Christopher Ambrose, with knowledge of their falsity, reckless disregard for the truth, or negligence.

490. Parlato's conduct was intentional, willful, and malicious, undertaken with knowledge that it would cause humiliation, distress, and injury, or with reckless disregard of that certainty.

491. These statements identified Ambrose and subjected him to public hatred, ridicule, contempt, distrust, harassment, disgrace, and potential violence, seriously damaging his personal and professional reputation.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

492. Ambrose incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

493. Under Connecticut law, a claim for intentional infliction of emotional distress requires proof that:

a. The defendant intended to cause emotional distress, or knew or should have known that emotional distress was the likely result of their conduct;

b. The conduct was extreme and outrageous;

c. The conduct caused the plaintiff emotional distress; and

d. The emotional distress was severe.

494. Parlato's conduct, including publishing and disseminating highly inflammatory and false statements about Ambrose to a global audience, was extreme and outrageous, exceeding all bounds tolerated in a civilized society.

495. Parlato's conduct was intentional, willful, malicious, and/or carried out with reckless disregard for the likelihood that it would cause severe emotional harm to Ambrose.

496. As a direct and proximate result of Parlato's actions, Ambrose has suffered and continues to suffer humiliation, mental anguish, shame, distress, and other serious emotional injuries.

497. Ambrose is entitled to compensatory, special, and punitive damages in amounts to be determined at trial.

## COUNT VI – HARASSMENT AND REQUEST FOR INJUNCTIVE RELIEF

498. All previous allegations are incorporated as if fully set forth herein.

499. Defendant Parlato has engaged in a prolonged and malicious course of conduct intended to harass, intimidate, and emotionally and otherwise injure Ambrose by publishing and republishing false, malicious, and defamatory content—including words, images, even a map—on digital platforms accessible to Ambrose and the public.

500. This conduct, as alleged, is consistent with the elements of criminal harassment under Connecticut General Statutes § 53a-183(a), which criminalizes communication of words or images via electronic platforms with the intent to harass, terrorize, or alarm another person, and for no legitimate purpose.

501. Under § 53a-183(b), such communications are deemed to have occurred both where they originated and where they were received—Connecticut being the place of harm and Ambrose's residence.

502. Although Ambrose does not bring a criminal action, this pattern of conduct demonstrates ongoing irreparable harm and justifies the issuance of a permanent injunction to stop Parlato's campaign of harassment.

503. Ambrose has a substantial likelihood of success on the merits of his claims, including invasion of privacy by false light, defamation and intentional infliction of emotional distress. The harm Ambrose faces from continued harassment outweighs any burden on Parlato, and the public interest supports protecting private individuals—especially children and families—from targeted online abuse.

504. No adequate remedy at law exists, and injunctive relief is necessary to prevent further irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Christopher Ambrose respectfully requests that this Court enter judgment in his favor and grant the following relief:

1. **Injunctive Relief**

   o  A preliminary and permanent injunction restraining Defendant Frank Parlato, Jr. from:
   a. Engaging in any acts of harassment against Plaintiff; and
   b. Making or republishing any statements—directly or indirectly, including through third parties—about Plaintiff on any website, platform, forum, or podcast he owns, controls, or contributes to.

○ Such other injunctive relief as the Court deems necessary for Plaintiff's protection, including directives to law enforcement.

2. **Removal of Defamatory Content**

○ An order requiring the immediate removal of all statements, comments, writings, photographs, videos, and audio recordings referencing Plaintiff, whether created by Defendant or third parties, from any medium under Defendant's control.

3. **Retraction**

○ An order requiring Defendant to publish a full and prominent retraction of the defamatory and false light statements, including but not limited to false accusations that Plaintiff:

▪ Sexually molested his children (including accusations of "child rape");

▪ Emotionally, psychologically, and verbally abused his children and ex-wife;

▪ Stalked and hunted his children and ex-wife;

▪ Permitted substance use by minors and statutory rape in his home;

▪ Embezzled his ex-wife's inheritance and stole marital assets;

▪ Lost his law license and was repeatedly fired for plagiarism and fraud;

▪ Conspired with judges and state agencies to unlawfully retain custody of his children;

▪ Lied under oath in court and to child protective services, law enforcement, and federal agents.

○ Such retractions must be issued on all platforms where the original statements appeared, be of comparable prominence, and reach the same audience. Defendant may not qualify, minimize, or attribute the retractions to litigation or denials by Plaintiff. Retractions must fully and unequivocally acknowledge the falsehoods and their harmful impact.

4. **Apology**

○ An order requiring Defendant to issue a written and public apology to Plaintiff, acknowledging the harm caused to him and his children by Parlato's falsehoods. The apology must be published on all platforms under Defendant's control and must be as visible and prominent as the original defamatory content.

5. **Monetary Relief**

- o An award of compensatory and punitive damages in an amount not less than $5,000,000.

- o An award of all litigation costs, including filing fees, service of process costs, and any other out-of-pocket expenses incurred in prosecuting this action.

- o An award of pre-judgment and post-judgment interest as permitted by law.

6. **Other Relief**

- o Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Christopher Ambrose respectfully requests trial by jury as to all issues and claims so triable.

Dated: 29 August 2025

Respectfully submitted,

Christopher A. Ambrose, *Pro Se*
153 Middle Beach Rd.
Madison, CT 06443
203.505.1889
ca0515@aol.com